## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **Catholic Charities of Ingham, Eaton & Clinton Counties**,<br><br>                 Plaintiff,<br><br>v.<br><br>**Elizabeth Hertel**, individually and in her official capacity as Director of the Michigan Department of Health and Human Services; **Angela Smith-Butterwick**, individually and in her official capacity as Director of the Department's Substance Use, Gambling & Epidemiology Division; **Dana Nessel**, individually and in her official capacity as Attorney General of Michigan; and **Mid-State Health Network**,<br><br>                 Defendants. | Case No.<br><br><br>**Verified Complaint** |

## INTRODUCTION

1.      This case arises from Michigan's decision to single out and punish a Catholic ministry—not for any failure of service, not for any complaint, and not for any programmatic deficiency—but solely because the ministry operates in accordance with the teachings of the Catholic Church. Defendants' actions reflect a pattern of religious targeting: arbitrary government power wielded to pressure a faith-based organization to abandon its beliefs in exchange for serving the public.

2.      For over a decade, Catholic Charities of Ingham, Eaton & Clinton Counties ("Catholic Charities") has faithfully served vulnerable women in the Lansing region through its counseling ministry.

3.      Yet when government officials learned of the religious commitments that animate Catholic Charities' work—beliefs about the sanctity of life, human dignity, and the moral impermissibility of abortion and contraception—they launched an investigation, crafted new policies targeting those beliefs, and ultimately stripped Catholic Charities of its designation as a Women's Specialty Services and Enhanced Women's Services provider.

4.      Defendants' actions were motivated by hostility toward Catholic Charities' faith and carried out in violation of the First and Fourteenth Amendments to the United States Constitution, as well as federal statutory protections for faith-based providers.

5.      The Constitution and federal law do not allow the government to condition public benefits on the surrender of religious conviction, nor do they tolerate the selective targeting of religious organizations for disfavored treatment.

6.      Catholic Charities is therefore entitled to declaratory and injunctive relief to stop the ongoing and prospective violations of its constitutional and statutory rights.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because the lawsuit raises questions under the Constitution and the laws of the United States.

8.     This Court can grant the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 and 65.

9.     This Court can award the requested damages under 28 U.S.C. § 1343.

10.    This Court can award costs and attorney's fees under 42 U.S.C. § 1988.

11.    Venue lies in this district pursuant to 28 U.S.C. § 1391(b) because all parties reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

12.    Plaintiff is a Michigan nonprofit corporation with religious and charitable purposes. It is the successor entity to both St. Vincent Catholic Charities and Cristo Rey Community Center, which merged to form Catholic Charities of Ingham, Eaton & Clinton Counties ("Catholic Charities").

13.    Catholic Charities' St. Vincent Campus is located at 2800 W. Willow St., Lansing, Michigan. Cristo Rey Counseling Services ("Cristo Rey") is a ministry of Catholic Charities and operates from 1717 N. High St., Lansing, Michigan.

14.    Catholic Charities has substance-abuse-counseling and treatment-services contracts funded through the Substance Use Prevention, Treatment, and Recovery Services Block Grant Program (the "Substance Use Block Grant").

15.    Defendant Elizabeth Hertel is the Director of the Michigan Department of Health and Human Services (the "Department"). As Director, Defendant Hertel is charged with directing and supervising the Department's operations and administering the functions of the Department. *See* E.R.O. No. 2015-1, Mich. Comp. Laws § 400.227. Defendant Hertel directed, supervised, or

3

authorized the Department's investigation into Catholic Charities' religious beliefs and practices and the Department's ultimate decision to discontinue Cristo Rey's designation as a Women's Specialty Services and Enhanced Women's Services provider. Defendant Hertel is sued in her official and personal capacities.

16. The Department is a principal department in the executive branch of the State of Michigan. The Department is responsible for administering the federal Substance Use Block Grant in Michigan, including overseeing the distribution of federal funds through Prepaid Inpatient Health Plans and Community Mental Health Service Programs. The Department also regulates substance use disorder service providers and controls the Women's Specialty Services and Enhanced Women's Services designation at issue here.

17. Defendant Angela Smith-Butterwick is the Director of the Department's Substance Use, Gambling & Epidemiology Division, which is responsible for administering the Substance Use Block Grant funds for the Department. On May 22, 2026, Defendant Smith-Butterwick issued the letter discontinuing Cristo Rey's longstanding designation as a Women's Specialty Services and Enhanced Women's Services provider (the "Discontinuation Letter"). Defendant Smith-Butterwick is sued in her official and personal capacities.

18. Defendant Dana Nessel is the Attorney General of Michigan. The Attorney General is Michigan's chief legal and law-enforcement officer, serves as legal counsel to state agencies and officers, supervises legal work performed by assistant attorneys general in the name of the Attorney General, and has unilateral statutory authority to intervene in lawsuits to enforce state law. Mich. Comp. Laws § 14.101. Upon information and belief, Defendant Nessel and her office provided, approved, ratified, or continues to enforce the legal guidance on which the Department relied in discontinuing Cristo Rey's designation as a Women's Specialty Services and Enhanced Women's Services provider. Defendant Nessel has a

4

documented history of using her office to alter state policy affecting Catholic and faith-based service providers. In prior litigation, this Court held that Defendant Nessel personally and the Department officially targeted St. Vincent Catholic Charities, the predecessor to Catholic Charities, for its Catholic beliefs and practices. *See Buck v. Gordon*, 429 F. Supp. 3d 447, 462, 467 (W.D. Mich. 2019). Defendant Nessel has also made numerous public statements demonstrating hostility toward individuals and organizations that hold sincere religious beliefs about abortion and contraception—the beliefs at issue in this case—characterizing them as "anti-abortion extremists" and "anti-abortion crusaders." Prospective relief against Defendant Nessel is needed because her office's ongoing legal guidance and enforcement position continue to constrain the Department and cause Cristo Rey's exclusion. Defendant Nessel is sued in her official and personal capacities.

19. Defendant Mid-State Health Network is a Prepaid Inpatient Health Plan that contracts with the Department and serves as the Department's agent to manage and distribute Medicaid funds and federal Substance Use Block Grant funds throughout the mid-Michigan region. Mid-State Health Network contracts with local substance-abuse service providers, including Catholic Charities, to deliver substance-abuse-prevention and treatment services. As alleged herein, Mid-State Health Network targeted Catholic Charities for its religious beliefs and practices, adopted policies directed at Catholic Charities' faith-based policies, and has refused to refer women to Catholic Charities since the Department discontinued Cristo Rey's designation.

20. Mid-State Health Network is a public governmental and regional entity formed pursuant to Michigan law. *See* Mich. Comp. Laws § 330.1204b(3) ("A regional entity established under this section is a public governmental entity separate from the county, authority, or organization that establishes it."). It performs governmental functions and duties, including serving as the Medicaid

specialty service prepaid health plan for the designated area. Mich. Comp. Laws § 330.1204b(2)(b). An employee of Mid-State Health Network is also considered a public employee. Mich. Comp. Laws § 330.1204b(7)(a)(i).

## FACTUAL BACKGROUND

**I. Catholic Charities is a Catholic ministry that faithfully serves the mid-Michigan community.**

21. Catholic Charities' mission statement is driven by the organization's Catholic beliefs: "Rooted in Jesus's love and guided by the teachings of the Catholic Church, we are dedicated to serving those in need through the Spiritual and Corporal Works of Mercy. We promote respect for the dignity and sanctity of human life and strive to strengthen families, nurturing the compassion and justice central to our faith."

22. Catholic Charities exercises its faith and carries out this religious mission through a wide range of ministries and programs that serve the mid-Michigan community.

23. It provides programs and ministries in healthcare, dental services, counseling, financial coaching, food and clothing assistance, prescription assistance, adoption and foster care, refugee resettlement, immigration, and legal assistance.

24. Catholic Charities' ministries are needed and effective. For example, Catholic Charities' Refugee Services program celebrated 50 years of service in 2025, receiving recognition from the State for its efforts in resettling over 18,000 refugees.

25. Annually, Catholic Charities serves approximately 79,000 individuals through its various ministries and programs.

### *Cristo Rey Counseling Center*

26. Cristo Rey Counseling Center is a ministry of Catholic Charities that offers counseling services to those in need. It holds the same religious beliefs, teachings, and mission as Catholic Charities.

6

27.    Cristo Rey is state-licensed and accredited, providing a broad array of counseling services for individuals and families. Its programs include substance use assessment and treatment, mental health therapy, parenting programs, walk-in assessments, anger management programs, teen programs, and women's services.

28.    Relevant here, Cristo Rey has served as a designated Women's Specialty Services and Enhanced Women's Services provider for over 10 years, maintaining compliance with all program requirements without any significant issues.

29.    In 2024 and 2025 alone, Cristo Rey provided 394 Women's Specialty Services therapy sessions to 16 clients.

30.    During that same time, Cristo Rey had a 94 percent retention rate of clients continuing Women's Specialty Services.

31.    Cristo Rey is the only provider in the Lansing region that offers Women's Specialty Services and Enhanced Women's Services. The nearest provider is approximately 30 miles away.

32.    For the women Cristo Rey serves, lack of reliable transportation and the challenges of poverty and trauma mean that the 30-mile distance is not a minor inconvenience. It is a barrier that may prevent them from accessing treatment altogether. These women depend on local case management to maintain consistent engagement with services; requiring them to travel to a distant provider risks interrupting the relationships and jeopardizing care.

33.    Cristo Rey provides these services pursuant to a Substance Use Disorder Treatment Contractual Agreement with Mid-State Health Network, an agreement funded primarily through Medicaid and the Substance Use Block Grant.

### *Catholic Beliefs on the Sanctity of Life*

34.    As a Catholic organization, Catholic Charities holds religious beliefs consistent with the teachings and doctrines of the Catholic Church.

7

35.    These beliefs include the sanctity of human life from conception to natural death, the nature of marriage as the union of one man and one woman, and the moral impermissibility of abortion, contraception, and abortifacient drugs.

36.    Catholic teachings recognize that each person is created in the image of God and has inherent dignity.

37.    So Catholic Charities teaches that every individual should be treated with respect, compassion, and sensitivity, regardless of their background, race, religion, identity, or status.

38.    Catholic Charities is committed to protecting and promoting the dignity of all those whom they serve, advocating for them with humility and care.

39.    The Catholic principle of subsidiarity particularly respects the family, which is the foundational unit of society and essential to personal development and societal health.

40.    Catholic Charities maintains that abortion and contraception can negatively impact family integrity by redefining human identity and relationships in ways that conflict with the natural order.

41.    Central to Catholic Charities' faith is the Catholic Church's teaching that human life is sacred from the moment of conception. The Catholic Church teaches that "human life is sacred and that the dignity of the human person is the foundation of a moral vision for society."[1]

42.    The Catholic Church's opposition to abortion is rooted in the belief that every human person, from the moment of conception, possesses inherent dignity as one created in the image of God.

---

[1] United States Conference of Catholic Bishops, *Seven Themes of Catholic Social Teaching, Life and Dignity of the Human Person*, available at https://www.usccb.org/beliefs-and-teachings/what-we-believe/catholic-social-teaching/seven-themes-of-catholic-social-teaching

43.    Because the Church teaches that life begins at conception, the direct and intentional destruction of an unborn child is considered a grave moral evil.

44.    The Catholic Church's opposition to contraception is similarly rooted in its understanding of human dignity and the nature of marital love.

45.    The Church teaches that contraception disrupts the openness to life, which the Church believes is intrinsic to marital love.

46.    Because the Church holds that human sexuality is ordered toward both the unity of spouses and the procreation of children, artificial interference with the life-giving purpose of the marital act is considered morally impermissible. For this reason, the Church instead promotes natural family planning and abstinence as morally acceptable approaches to family planning.

47.    These teachings are not peripheral or optional aspects of the Catholic faith. They are central moral teachings that Catholic institutions are bound to uphold in all aspects of their work and ministry.

48.    Catholic Charities integrates these teachings into all aspects of its operations, including Cristo Rey's counseling and treatment services, and its staff are expected to follow the teachings of the Catholic faith in their daily work.

49.    Providing its services in a manner consistent with Catholic teaching is a central part of Catholic Charities' religious exercise, character, and affiliation.

50.    Consistent with these sincerely held religious beliefs, Catholic Charities and Cristo Rey maintain policies regarding contraception, family planning, and abortion which are rooted in their Catholic faith.

51.    Rather than refer clients to abortion services or artificial contraceptives, Catholic Charities and Cristo Rey offer natural family planning counseling and abstinence support.

*Core Values & Commitment to Mission*

52.    Catholic Charities is affiliated with the Catholic Diocese of Lansing and subject to the authority of the Bishop of Lansing, who maintains certain reserved powers over Catholic Charities.

53.    As part of its Catholic affiliation, all employees are expected to support the beliefs and teachings of the Catholic Church that directly relate to performing their respective roles in carrying out Catholic Charities' ministry and mission.

54.    All Catholic Charities employees therefore must review and sign a document entitled "Core Values and Commitment to Mission" (the "Commitment to Mission"), a true and correct copy of which is attached as **Exhibit 1**.

55.    The Commitment to Mission is rooted in the principles of Catholic Moral and Social Teaching and reflects the Diocese's commitment to promoting human dignity, the common good, and justice.

56.    The Commitment to Mission makes clear that "[s]taff are expected to be guided in every way by the teachings of the Catholic faith in their daily work: these include church teachings on abortion, sterilization, abstinence, and the sanctity of the family." Ex. 1 at 4.

57.    Critically, the Commitment to Mission states that "Catholic Charities staff may not refer clients who are seeking services that are in opposition to Catholic teaching to a resource that will assist in the client procuring those services." *Id.*

58.    This prohibition is a direct expression of Catholic Charities' sincerely held religious beliefs and its obligation to operate in fidelity to the moral, ethical, and religious directives of the Catholic Church.

59.    The Commitment to Mission addresses specific situations that may arise in an employee's daily work at Catholic Charities, including when "[a] pregnant client asks where she may be able to secure an abortion" and when "[a]

10

young mother who is fearful of becoming pregnant again asks where to find low-cost birth control options." *Id*. "In all situations, Catholic Charities staff must adhere to the moral compass set forth by the Catholic Church" and "must not be an accessory to actions that are not in accord with these values." *Id*.

60. During the time that Cristo Rey served as a designated Women's Specialty Services and Enhanced Women's Services provider, it provided counseling services consistent with its religious beliefs without any complaint or adverse finding regarding the quality or scope of their services.

## II. The Department receives millions through the federal Substance Use Block Grant Program.

61. The federal Substance Use Block Grant is a noncompetitive, formula grant that provides funds to all 50 states to help prevent and treat substance abuse.

62. To receive a grant, a state must: (a) designate a unit of its executive branch to administer the grant-related work; (b) apply annually; (c) have the flexibility to distribute the funds to local government entities, such as municipal, county, or intermediaries, including administrative service organizations; and (d) have sub-recipients, such as community- and faith-based organizations, that can deliver substance use prevention activities and substance use disorder treatment and recovery support services.

63. The State of Michigan, through the Department, has participated in the Substance Use Block Grant Program since its inception.

64. It has received hundreds of millions of dollars during that time.

65. In 2026, the Department received over $28 million in Substance Use Block Grant funds.

11

### III.    The Women's Specialty Services and Enhanced Women's Services programs fulfill a Substance Use Block Grant requirement.

66.    Under federal law, states receiving Substance Use Block Grant funds must spend a minimum amount on services for pregnant women and women with dependent children, including women who are attempting to regain custody. *See* 42 U.S.C. § 300x-22(b); 45 C.F.R. § 96.124(e).

67.    Federal regulations explain that such services must include:

- Primary medical care for women, including referral for prenatal care and, while the women are receiving such services, child care;

- Primary pediatric care, including immunization, for their children;

- Gender specific substance abuse treatment and other therapeutic interventions for women which may address issues of relationships, sexual and physical abuse and parenting, and child care while the women are receiving these services;

- Therapeutic interventions for children in custody of women in treatment which may, among other things, address their developmental needs, their issues of sexual and physical abuse, and neglect; and

- Sufficient case management and transportation to ensure that women and their children have access to these services.

45 C.F.R. § 96.124(e).

68.    To fulfill this grant set-aside requirement, Michigan created two programs designed to serve women with substance use disorders: Women's Specialty Services and Enhanced Women's Services.

69.    Women's Specialty Services is the foundational program, while Enhanced Women's Services provides an enhanced layer of services.

12

*Women's Specialty Services*

70.    To qualify as a Women's Specialty Services provider—and to be eligible for the related government funding—a provider must be designated as gender-responsive by the Department.

71.    This designation depends, in part, on whether the provider offers the five types of services identified in the federal regulation referenced above. *See* 45 C.F.R. § 96.124(e).

72.    The designation is also governed by the Department's Substance Abuse Treatment Policy #12, entitled "Women's Treatment Services." A true and correct copy of that policy is attached as **Exhibit 2**.

73.    According to Treatment Policy #12, designated providers are expected to deliver gender-specific, trauma-informed treatment services rooted in relational theory—a model that recognizes women's psychological development and recovery occur in the context of interpersonal relationships. *See* Ex. 2 at 1–2.

74.    Treatment Policy #12 describes the components of "women-specific treatment" only in general terms, noting that providers must:

- Provide accessible services and reduce barriers to treatment, such as child care, transportation, and mental health concerns;

- Continuously assess clients' psychosocial needs and strengths within the family context;

- Understand women's psychological development and modify therapeutic techniques according to client needs;

- Develop a process to identify and address abuse, violence, and trauma issues in a trauma-informed setting;

- Identify and address the needs of family members through informal supports;

- Identify and treat concurrent mental health disorders, in an integrated fashion, with substance use disorder treatment and other health care;

- Inquire about the physical health needs of the client and her children and make appropriate referrals;

- Help clients identify and manage legal issues, including custody matters;

- Conduct an assessment that is sensitive to sexual abuse issues;

- Help clients develop survival skills in the following areas: education and literacy; job readiness and job search; parenting skills; family planning; housing; language and cultural concerns; and basic living skills/selfcare; and

- Develop a recovery/continuing care plan for clients and remain available as a resource for at least one year following discharge.

*See id.* at 9–11.

75. Catholic Charities, through Cristo Rey, provides treatment that meets the requirements of the Women's Specialty Services program.

76. Treatment Policy #12 does not include any specific requirements related to abortion or contraception.

77. Nor does Treatment Policy #12 require providers to directly provide or facilitate access to abortions or contraceptives that would conflict with their deeply held religious convictions.

78. The relevant Mid-State Health Network policy also says nothing about abortion or contraception. MSHN, Policies & Procedural Manual, SUD Services-Women's Specialty Services, a true a correct copy attached as **Exhibit 3**.

79. Catholic Charities' contract with Mid-State Health Network doesn't reference abortion or contraception either.

*Enhanced Women's Services*

80.    Any designated Women's Specialty Services provider is "eligible to offer Enhanced Women's Services." Mich. Dep't of Health & Human Servs., Treatment Technical Advisory #08, at 4, a true and correct copy attached as **Exhibit 4**.

81.    Enhanced Women's Services builds on Women's Specialty Services through "an intensive case management program" that is "designed to incorporate long-term case management and advocacy programming." Ex. 4 at 1.

82.    The program is available to women who are pregnant or up to twelve months post-partum with dependent children, including women who are involved with child welfare services and attempting to regain custody. *Id.* at 2.

83.    Enhanced Women's Services "shares the same theoretical basis, relational theory, as [W]omen's [S]pecialty [S]ervices." *Id.* at 1.

84.    The Enhanced Women's Services designation is governed by the Department's Treatment Technical Advisory #08, entitled "Enhanced Women's Services." *See* Ex. 4.

85.    Technical Advisory #08 outlines the program's "core components" and says the advisory is meant to serve "as a supplement to [Treatment Policy #12]." *Id.* at 2.

86.    Although Technical Advisory #08 lists five components "[r]equired for Enhanced Women's Services Programming," it describes those components in general terms and includes them under a section titled "RECOMMENDATIONS." *Id.* at 4.

87.    First, the technical advisory reiterates that providers "choosing to develop an Enhanced Women's Services program will be required to follow the guidelines of [Treatment Policy #12]." *Id.*

88.    Second, it explains that "[t]he Enhanced Women's Services model" uses a "three-pronged approach" meant to decrease "future alcohol or drug-exposed births." This entails: (a) "eliminat[ing] or reduc[ing] the use of alcohol or drugs"; (b) "promot[ing] the effective use of contraceptive methods," which can include the "appropriate use of family planning methods"; and (c) "teach[ing] the women how to effectively use community-based service providers." *Id.*

89.    Third, "[p]eer advocates" are expected to be "peers, to the extent that they are also mothers and may have experienced similar circumstances as their potential clients." *Id.*

90.    Fourth, peer advocates must be "community-based and provide reasonable transportation for their enrolled clients to relevant appointments and services." *Id.*

91.    Fifth, and finally, peer advocates should be "persistent[ ]" in "stay[ing] in touch with their clients," actively looking for them "when they have unexpectedly moved" and "utiliz[ing] emergency contacts provided by the client to re-engage her in services." *Id.* at 4–5.

92.    Technical Advisory #08 then lists specific requirements related these core components, such as maintaining "consistent contact [with clients] for at least 18 to 24 months," coordinating the client's "service plan with extended family," "provid[ing] transportation assistance through peer advocates," and "develop[ing] a referral agreement with community agency to provide family planning options and instruction." *Id.* at 5–6.

93.    Catholic Charities, through Cristo Rey, provides treatment that meets all the requirements of the Enhanced Women's Services program.

94.    Treatment Policy #12 and Technical Advisory #08 say nothing about providing or facilitating abortions; nor do they require a provider to offer any

16

specific type of contraceptive method or to offer or refer for contraceptive methods that conflict with the provider's sincerely held religious beliefs.

95.    To the contrary, federal law governing the Substance Use Block Grant Program—and, by extension, Women's Specialty Services and Enhanced Women's Services—defines "family planning services" to "include a broad range of acceptable and effective methods and services to limit or enhance fertility." 45 C.F.R. § Pt. 96, App. A. It further defines "contraceptive methods" as including "natural family planning and abstinence." *Id.*

96.    Catholic Charities offers natural family planning counseling and support services to women participating in Women's Specialty Services and Enhanced Women's Services, consistent with its Catholic mission and the teachings of the Catholic Church.

97.    Natural family planning, as offered by Catholic Charities through Cristo Rey, constitutes a recognized "contraceptive method" under applicable federal law.

98.    Catholic Charities also offers abstinence counseling and support services to women participating in Women's Specialty Services and Enhanced Women's Services, consistent with its Catholic mission and the teachings of the Catholic Church.

99.    Abstinence, as counseled by Catholic Charities through Cristo Rey, constitutes a recognized "contraceptive method" under applicable federal law.

100.    By providing natural family planning and abstinence counseling and support, Catholic Charities fulfills the Enhanced Women's Services program recommendation to "promot[e] the effective use of contraceptive methods" through "appropriate use of family planning methods." Ex. 4 at 4.

17

**IV.    The Department contracts with Mid-State Health Network to perform governmental functions, including administration of Women's Specialty Services and Enhanced Women's Services.**

101.    The State of Michigan does not administer its Medicaid behavioral health programs or the Substance Use Block Grant directly.

102.    Instead, the State delegates these governmental functions to regional intermediaries, or agents, known as Prepaid Inpatient Health Plans.

103.    Prepaid Inpatient Health Plans are public specialty behavioral health managed care entities that contract with the Department to administer Medicaid and Substance Use Block Grant services within designated geographic regions throughout the state.

104.    Defendant Mid-State Health Network is one of ten Prepaid Inpatient Health Plans, and it serves as the designated plan for 21 counties in mid-Michigan.

105.    Mid-State Health Network is a public governmental and regional entity formed pursuant to Michigan law. *See* Mich. Comp. Laws § 330.1204b(3) ("A regional entity established under this section is a public governmental entity separate from the county, authority, or organization that establishes it.")

106.    Mid-State Health Network administers hundreds of millions of dollars in federal and state funds, including Medicaid funds and Substance Use Block Grant funds, on behalf of the State.

107.    Under its contract with the Department, Mid-State Health Network is required to comply with all applicable federal and state laws, Department policies, procedures, and technical advisories, and is subject to extensive state oversight.

108.    Mid-State Health Network exercises governmental powers and functions, including determining eligibility for publicly funded services, authorizing the distribution of government funds, and credentialing and de-credentialing providers, among other things.

18

109. Relevant here, the Department has delegated to Mid-State Health Network the authority to select, contract with, and terminate substance-use-disorder treatment providers—including providers participating in the Women's Specialty Services and Enhanced Women's Services programs.

110. Mid-State Health Network is therefore subject to the same constitutional constraints as the State itself.

111. Mid-State Health Network acts under color of state law by administering public funds, determining provider eligibility, and enforcing compliance with state-mandated policies.

112. Through this contractual framework, Mid-State Health Network contracts directly with local substance-use-disorder treatment providers—including Catholic Charities/Cristo Rey—to deliver Medicaid and Block Grant funded services at the community level.

113. Catholic Charities, through Cristo Rey, has contracted with Mid-State Health Network to provide substance-use-disorder treatment services, including Women's Specialty Services and Enhanced Women's Services, for more than a decade.

114. The contract requires: 30 days' written notice of any alleged breach and an opportunity to cure before termination; mandates that "[e]very attempt shall be made to jointly resolve contract and service issues/disputes" through a formal provider appeal process; establishes a progressive enforcement framework before any provider can be excluded; and expressly provides that payments "shall not be stopped, interrupted, reduced, or otherwise delayed as a consequence of the pendency of any dispute."

115. In their zeal to punish Catholic Charities for its religious beliefs, Defendants bypassed every one of these contractual protections.

19

## V.    Federal Charitable Choice requirements protect the religious autonomy of faith-based providers.

116.    When, as here, states elect to use "nongovernmental organizations" to deliver substance abuse services funded by the Substance Use Block Grant, federal law imposes specific obligations on how they must treat faith-based providers. These obligations are commonly known as "Charitable Choice" requirements.

117.    Charitable Choice serves a vital purpose: ensuring that religious organizations are not excluded from federally funded social service programs—or otherwise penalized—on account of their religious character, beliefs, or exercise.

118.    Charitable Choice provisions governing the Substance Use Block Grant Program guarantee faith-based providers like Catholic Charities "independence from Federal, State, and local governments," including "control over the definition, development, practice, and expression of [their] religious beliefs." 42 U.S.C. § 300x-65(c)(1).

119.    This statutory guarantee ensures that religious providers may participate in the Substance Use Block Grant Program without being forced to abandon or compromise their religious character, beliefs, practices, or policies.

120.    Michigan is bound by these statutory requirements. Indeed, as a condition to receiving Substance Use Block Grant funds, the Department certified compliance with these Charitable Choice requirements.

121.    Mid-State Health Network is likewise bound. Through its contract with the Department, Mid-State Health Network has been "given the authority . . . to select [providers]" under the Substance Use Block Grant Program. 42 U.S.C. § 300x-65(k). As a result, it "shall have the same duties under" the Charitable Choice provisions "as the government." *Id.*

122.    Yet Defendants have not complied with these statutory requirements as related to Catholic Charities.

20

## VI.    Defendants target Catholic Charities for its Catholic faith.

### A.    Defendants launch a probe into Catholic Charities' Core Values and Commitment to Mission.

123.    Despite federal Charitable Choice requirements and Catholic Charities' long history of successful participation in Women's Specialty Services and Enhanced Women's Services, Defendants have singled out Catholic Charities—and punished it—for its Catholic beliefs and practices.

124.    In March 2026, Mid-State Health Network demanded a meeting with Catholic Charities to discuss the ministry's religious beliefs and practices, as expressed in its "Core Values and Commitment to Mission" document. *See* MSHN-Catholic Charities Meeting Agenda, Mar. 13, 2026, a true and correct copy attached as **Exhibit 5**.

125.    Although the agenda indicated that the meeting would be between only Catholic Charities and Mid-State Health Network, Department officials attended. *See* Catholic Charities-MSHN Meeting Notes, Mar. 13, 2026, a true and correct copy attached as **Exhibit 6**.

126.    Upon information and belief, Mid-State Health Network obtained a copy of Catholic Charities' "Core Values and Commitment to Mission" document from a disgruntled former employee and shared it with Department officials.

127.    At the meeting, both the Department and Mid-State Health Network raised concerns about the core values and religious expectations for employees set out in the document.

128.    Indeed, Mid-State Health Network's own notes show that the meeting involved "significant conversation around Catholic Charities' required pledge signed by staff," which included "restrictions related to client discussions and/or referrals" for matters such as "[u]nplanned pregnancies & abortion," "[c]ontraception,"

21

"[g]ender identity / gender ideology," and "[a]doption placements with same-sex couples." Ex. 6 at 1.

129.    During the meeting, Mid-State Health Network officials demeaned Catholic Charities' religious beliefs and practices as conflicting with program requirements "for objective, non-judgmental client support." *Id.*

130.    But the Commitment to Mission explains that Catholic Charities "welcome[s] and serve[s] all persons." Ex. 1 at 4.

131.    And Catholic Charities representatives clarified during the meeting that while staff "cannot directly recommend or assist with referrals for abortion or certain reproductive services" that conflict with Catholic teaching, they "may refer" clients "to general options." Ex. 6 at 1.

132.    But that wasn't enough for Defendants.

133.    Even though the Department recognized that Catholic Charities was a "critical community partner," it said it would "review contract language before confirming whether participation can continue." *Id.* at 2.

### B.    Mid-State Health Network crafts a new policy targeted at Catholic Charities' religious beliefs and practices.

134.    Following the March meeting, Mid-State Health Network pressed Catholic Charities over its Charitable Choice Notice—a document that explains the ministry's Catholic identity and informs potential and existing clients of their right to seek treatment from a non-faith-based provider.

135.    And just five days after the March meeting, Mid-State Health Network adopted a brand-new policy specifically targeting Catholic Charities' religious beliefs and practices.

136.    That policy, entitled "Disclosure of Faith-Based Treatment Orientation," says it was adopted to ensure compliance with federal Charitable Choice requirements. MSHN, Policies & Procedural Manual, Disclosure of Faith-

Based Treatment Orientation, at 1 (Mar. 24, 2026), a true and correct copy attached as **Exhibit 7**.

137.    The new policy maintains that federal Charitable Choice provisions "require[ ] faith-based providers who receive public federal funds to disclose whether or not and how religious doctrine, beliefs, or value systems may inform treatment practices within the agency." Ex. 7 at 1.

138.    The new policy then mandates disclosure of "[a]ny known service limitations related to reproductive health, family planning, sexual orientation, gender identity, gay marriage, or any other topics that may be restricted or otherwise influenced by the agency's religious orientation." *Id.*

139.    But federal Charitable Choice provisions require no such disclosures.

140.    Nor could the government require faith-based providers to make such disclosures when it does not require similar disclosures of secular providers; the government cannot treat religious reasons for service limitations worse than secular reasons.

141.    Instead, under federal law, individuals must simply be notified of their right to seek services from another provider if they object "to the religious *character* of the organization." 42 U.S.C. § 300x-65(e) (emphasis added); *see also* 42 C.F.R. § Pt. 54a, App. (setting forth model Charitable Choice notice).

142.    So, in contrast to Mid-State Health Network's new policy, federal law does not require Catholic Charities to detail all "limitations or exclusions in services that may result from [its] religious orientation." Ex. 7 at 1.

143.    Nevertheless, Catholic Charities tried to cooperate and provided Mid-State Health Network with an updated Charitable Choice Notice that added the following language: "Cristo Rey Counseling Services, as a Catholic organization, does not provide services such as assistance in seeking contraceptive, abortion or gender altering services because to do so would conflict with the agency's sincerely

23

held religious beliefs." Catholic Charities Charitable Choice Notice, a true and correct copy as **Exhibit 8**.

144. The Charitable Choice Notice further provides that "[a]ll individuals have the right to seek treatment in non-faith-based organizations and will be supported in a warm transfer, referral, or alternative services depending on the individual's needs and requests." Ex. 8 at 1.

145. The Charitable Choice Notice also establishes a clear referral mechanism: "If individuals select to a transfer/referral/alternative service, Catholic Charities will notify the alternative provider via Mid-State Health Network's (MSHN) Utilization Management Department utilizing MSHN's electronic health record system, REMI, to facilitate this transfer." *Id.*

146. Catholic Charities provides clients and potential clients with this Charitable Choice Notice upon initial intake.

147. Thus, Catholic Charities' existing practices—including its Charitable Choice Notice, referral mechanism, and cooperation with Mid-State Health Network's utilization management system—fully satisfied any legitimate concern about client access to services and informed decision-making.

148. But, again, this was insufficient for Defendants.

**C.    The Department abruptly discontinues Cristo Rey's designation as a Women's Specialty Services and Enhanced Women's Services provider.**

149. Despite Catholic Charities' cooperation and more than a decade of successful partnership, the Department took unexpected and precipitous action.

150. On May 22, 2026, Defendant Smith-Butterwick issued the Discontinuation Letter without any warning, discontinuing Cristo Rey's longstanding designation as a Women's Specialty Services and Enhanced Women's Services

24

provider, effective immediately. A true and correct copy of the Discontinuation Letter is attached as **Exhibit 9**.

151.    The Discontinuation Letter said that due to Catholic Charities' "internal policies and procedures," the Department believed Cristo Rey "cannot provide the required services found in Treatment Policy #12, Women's Treatment Services, nor Technical Advisory #08, Enhanced Women's Services." Ex. 9 at 1.

152.    The Department did not provide any meaningful explanation for its conclusion.

153.    The Discontinuation Letter simply quotes the five types of services identified in 45 C.F.R. § 96.124, none of which reference abortion or contraceptive services. *Id.*; *see also supra* Para. 67 (describing those requirements).

154.    It then references Technical Advisory #08's recommendation that Enhanced Women's Services providers "promote the effective use of contraceptive methods." Ex. 9 at 1.

155.    The letter fails to mention that the technical advisory says this requirement can be fulfilled through instruction in the "appropriate use of family planning methods." Ex. 4 at 4.

156.    The letter concludes by saying that Cristo Rey "may be reconsidered for designation" only if Catholic Charities makes "policy and procedural changes that fulfill these requirements." Ex. 9 at 2.

157.    In other words, the Department conditioned Cristo Rey's reinstatement on abandoning its religious beliefs, policies, and practices.

158.    Notably, the Discontinuation Letter did not identify any specific service deficiency or programmatic violation.

159.    The Discontinuation Letter did not cite any incident in which a woman had been denied medically necessary services.

160.   The Discontinuation Letter did not allege that Cristo Rey had failed to make appropriate referrals through Mid-State Health Network's utilization management system.

161.   And the Discontinuation Letter did not point to any complaint, audit finding, or quality concern.

162.   The sole basis for the discontinuation was Cristo Rey's "internal policies and procedures"—its religious beliefs and practices.

163.   The same day the Discontinuation Letter was issued, Mid-State Health Network's Chief Clinical Officer demanded that Catholic Charities immediately "cease any new admissions into the EWS/WSS program" and ordered it to develop a plan to transition existing clients.

**D.    The Department refuses to provide an explanation or legal justification for the discontinuation.**

164.   On May 27, 2026, Catholic Charities responded with a letter requesting that the Department "immediately stay the effective date of the discontinuation pending resolution of the matters raised in this letter," noting that the action came "as a great surprise" to the ministry.

165.   The letter was addressed to Defendant Smith-Butterwick and copied Mid-State Health Network's Chief Clinical Officer. A true and correct copy of the letter is attached as **Exhibit 10**.

166.   Catholic Charities' letter emphasized that "[i]mmediate discontinuation would cause serious harm to the vulnerable women and children currently enrolled in Cristo Rey's programs," and that "[n]o formal notice of potential violation was issued, no cure period was provided, and no administrative process was made available to Catholic Charities prior to the discontinuation." Ex. 10 at 1.

167.   Catholic Charities therefore asked the Department to identify "which specific Catholic Charities policies and procedures prevent the agency from

26

providing the required services" under Treatment Policy #12 and Technical Advisory #08. *Id.*

168. The letter also requested that the Department explain "which of the five [Women's Specialty Services] service requirements is alleged to be deficient and the factual basis for that allegation." *Id.* at 2.

169. Catholic Charities' letter further noted that the Discontinuation Letter "completely bypasses the contractual framework between Cristo Rey and [Mid-State Health Network], which includes an extensive section governing contractual disputes and remedies." *Id.* at 1.

170. Catholic Charities asked for a written response within five business days (i.e., June 3, 2026). *Id.* at 3.

171. The Department has completely ignored Catholic Charities' letter and has not responded.

172. The Department did not grant a stay.

173. The Department did not identify any specific violation of Treatment Policy #12 or Technical Advisory #08.

174. The Department did not explain which of the five service requirements Cristo Rey had allegedly failed to meet.

175. And the Department has offered no opportunity for Catholic Charities/Cristo Rey to address or cure any alleged deficiency.

**E.    Mid-State Health Network stops referring women to Catholic Charities and forces Catholic Charities to stop accepting new admissions.**

176. For its part, Mid-State Health Network has continued to press Catholic Charities.

177. Just one day after receiving Catholic Charities' letter, Mid-State Health Network's Chief Clinical Officer sent an email demanding that Catholic

Charities immediately stop admissions into the Women's Specialty Services and Enhanced Women's Services program and develop a plan to transition existing clients.

178.    Catholic Charities has not accepted any new admissions into those programs since the Department discontinued Cristo Rey's designation.

179.    Mid-State Health Network has also stopped referring women to Catholic Charities for its Women's Specialty Services and Enhanced Women's Services programs.

180.    Pursuant to Mid-State Health Network's instructions, Catholic Charities has notified all existing Women's Specialty Services and Enhanced Women's Services clients of the discontinuation and informed them of their option to transition to another area provider.

181.    However, because Catholic Charities is committed to ensuring that no client experiences any disruption in care because of the designation change, it has offered to continue providing those clients with the same services they had been receiving before the discontinuation, with Catholic Charities agreeing to cover the costs of those services consistent with its faith-based policy of serving everyone regardless of their finances.

## VII.    Defendants' actions continue their history of targeting Catholic Charities for its Catholic beliefs and practices.

182.    In 2019, Catholic Charities' predecessor entity, St. Vincent Catholic Charities, was forced to file a federal lawsuit against the Department and Attorney General Nessel when they tried to shut down St. Vincent's foster-care and adoption ministry due to its religious beliefs about marriage and sexuality. *See Buck v. Gordon*, 429 F. Supp. 3d 447 (W.D. Mich. 2019).

183.    This Court granted St. Vincent a preliminary injunction, finding that the record supported an "inference of religious targeting." *Id.* at 464.

28

184.    Specifically, the Court found that "the historical background, specific series of events, and statements of Defendant Nessel all point toward religious targeting." *Id.* at 462. The Court further explained that the record reflected "a hostility toward a religious viewpoint," warranting strict scrutiny. *Id.* at 467.

185.    The Court observed that, among other things, Defendant Nessel had referred to proponents of a law protecting faith-based child placing agencies as "hate-mongers" described that law as "indefensible" and based solely on "discriminatory animus." *Id.* at 467, 469.

186.    In addition to her hostility toward Catholic organizations in the adoption context, Defendant Nessel has made numerous public statements demonstrating animus toward those who hold sincere religious beliefs about abortion and contraception—the very beliefs at issue in this case.

187.    Defendant Nessel has repeatedly characterized individuals and organizations that hold religious beliefs about the sanctity of life and the immorality of abortion and contraception as "anti-abortion extremists"[2] and "anti-abortion crusaders."[3]

188.    For example, in one social media post, Defendant Nessel stated: "When anti-abortion extremists told us this was just a 'states' rights' issue, we knew they were lying. They will stop at nothing to control women's bodies, and I will stop at nothing to fight back to protect our right to make our own decisions about our health care."[4]

---

[2] Dana Nessel (@DanaNesselAG), FACEBOOK (May 8, 2022), https://bit.ly/4oFESiq.
[3] Dana Nessel (@DanaNesselAG), FACEBOOK (Jan. 30, 2024), https://bit.ly/4f1kqo3.
[4] Dana Nessel (@dananessel), X.COM (Feb. 27, 2023, 3:23 PM), https://perma.cc/9GGY-9UBW.

189. Defendant Nessel has also promised to "do everything in [her] power to protect Michiganders from anti-abortion extremists who want to dictate extremely personal healthcare decisions."[5]

190. These statements demonstrate that Defendant Nessel harbors the same hostility toward Catholic and other religious organizations that hold sincere religious beliefs about abortion and contraception as she does toward Catholic organizations that hold sincere beliefs about marriage.

191. Defendant Nessel is Michigan's chief legal and law-enforcement officer. She serves as legal counsel to the Department and its officials, and she supervises legal work performed by assistant attorneys general in the name of the Attorney General.

192. Upon information and belief, Defendant Nessel's office provided, approved, ratified, or continues to enforce the legal guidance on which the Department relied in discontinuing Cristo Rey's designation as a Women's Specialty Services and Enhanced Women's Services provider.

193. The *Buck* litigation concerned the Department's actions against St. Vincent Catholic Charities in the foster care and adoption context.

194. Now, the same Department has taken the same type of action against the same organization in the substance-abuse-treatment context. And it has done so for the same reason: because of Catholic Charities' Catholic beliefs.

195. In fact, Defendant Hertel executed the settlement agreement in *Buck* on behalf of the Department. She therefore was on notice that the Department could not take adverse action against Catholic organizations because of their religious beliefs.

---

[5] Dana Nessel (@dananessel), X.COM (May 8, 2022, 6:54 AM), https://perma.cc/8FNP-XYTG.

196.    Despite being a party to the *Buck* settlement and being on notice that religious targeting violates the Constitution, the Department has now repeated the same pattern of conduct against Catholic Charities that led to the federal court's findings of religious hostility in *Buck*.

## VIII.  Catholic Charities is suffering irreparable harm.

197.    Catholic Charities is suffering irreparable harm because of Defendants' actions and will continue to suffer such harm in the absence of declaratory and injunctive relief.

198.    The loss of First Amendment freedoms, even for a minimal period of time, unquestionably constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

199.    By excluding Catholic Charities from the Women's Specialty Services and Enhanced Women's Services programs based on its religious beliefs, Defendants are depriving Catholic Charities of its constitutional rights with each passing day.

200.    The Supreme Court has repeatedly held that the government "violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson v. Makin*, 596 U.S. 767, 778 (2022).

201.    "By conditioning the availability of benefits in that manner," Defendants "penalize[ ] the free exercise of religion." *Id.* at 780. This ongoing penalty constitutes irreparable harm that cannot be remedied later.

202.    Defendants' discontinuation of Cristo Rey's designation also interferes with Catholic Charities' religious mission and calling because the ministry exists to serve women and families in need through the Spiritual and Corporal Works of Mercy—including women struggling with substance use disorders.

203.    Since the Department issued the Discontinuation Letter, Mid-State Health Network has stopped referring women to Catholic Charities. As a direct result, Catholic Charities cannot accept new admissions and has been prevented from pursuing its ministry to women who suffer from substance-use disorders.

204.    Catholic Charities has continued to provide services to existing clients who were part of the Women's Specialty Services and Enhanced Women's Services programs at its own expense to ensure that no client experiences any disruption in care because of the discontinuation. This out-of-pocket expenditure demonstrates the ongoing financial harm Catholic Charities is suffering because of Defendants' actions.

205.    The loss of funding has also inhibited Catholic Charities' ability to pursue other ministry opportunities, further compounding the harm to its religious mission.

206.    For example, the loss of government funding will prevent Catholic Charities/Cristo Rey from filling an open staff position, thereby diminishing its capacity to serve women and families in need.

207.    Defendants have put Catholic Charities to an impossible and unconstitutional choice: Catholic Charities can either (a) continue exercising its religious beliefs but forgo participating in the Women's Specialty Services and Enhanced Women's Services programs and receiving government funding, thereby denying it the ability to minister to women struggling with substance use disorders; or (b) abandon its religious beliefs and practices in order to participate in the programs.

208.    Catholic Charities should not have to choose between its religious exercise and its ability to help women in need.

209.    Every day that Defendants exclude Catholic Charities from receiving otherwise available government funds and participating in the Women's Specialty

Services and Enhanced Women's Services programs because of its religious beliefs is another day Catholic Charities' constitutional rights are being violated.

210.    Catholic Charities has no adequate remedy at law for the ongoing and prospective violations of its constitutional rights and thus will continue to suffer irreparable harm without an injunction.

211.    The harm to Catholic Charities' religious mission—its ability to minister to women struggling with substance use—cannot be quantified or compensated through monetary relief.

212.    Each day the discontinuation remains in effect, women in the Lansing region who would otherwise receive care through Cristo Rey are left without access to the faith-based, relationship-centered treatment that Catholic Charities' ministry uniquely provides. Once those women are diverted to other providers or lost to the system entirely, the opportunity to minister to them is gone.

213.    Catholic Charities will continue to face irreparable harm going forward unless Defendants' unconstitutional actions are enjoined.

## CAUSES OF ACTION

### <u>COUNT I</u>
**Violation of the Free Exercise Clause**
**U.S. Const. Amend. I; 42 U.S.C. § 1983**

214.    Catholic Charities incorporates by reference paragraphs 1–213.

215.    "[A] law targeting religious beliefs as such is never permissible." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 n.4 (2017) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)). Laws burdening religious practice must be neutral and generally applicable, and those that are not must satisfy strict scrutiny. *See Fulton v. City of Philadelphia*, 593 U.S. 522 (2021).

216.    However, governmental hostility toward religious beliefs—whether "masked" or overt—is unconstitutional *per se*. *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617 (2018).

217.    Defendants' actions in discontinuing Cristo Rey's designation and excluding Catholic Charities/Cristo Rey from the Women's Specialty Services and Enhanced Women's Services programs are neither neutral nor generally applicable and based on religious hostility.

218.    The Discontinuation Letter cited Catholic Charities' "internal policies and procedures"—which are rooted in its Catholic faith—as the sole basis for exclusion. Ex. 9 at 1.

219.    Defendants failed to specify which program requirement Catholic Charities/Cristo Rey actually violated, cite any client complaint, or point to any audit finding or quality concern.

220.    The exclusive focus on Catholic Charities' faith-based policies, combined with the absence of any neutral, programmatic justification, reveals the Discontinuation Letter for what it is: an action targeting Catholic Charities because of its religious beliefs and exercise.

221.    Catholic Charities requested that the Department identify, with specificity, which service requirements Cristo Rey allegedly violated and the factual basis for that allegation. Defendants provided no response. The Department's total silence—its refusal to cite any rule Catholic Charities actually violated—is the hallmark of pretextual government action. An unexplained exclusion of a religious provider that has successfully participated in the program for more than a decade strongly supports an inference of religious targeting.

222.    Moreover, Technical Advisory #08 expressly states that the Enhanced Women's Services program is available to "programs choosing to develop" such

services, confirming that it is a voluntary enhancement, not a mandatory component of the Women's Specialty Services program. Ex. 4 at 4.

223. Upon information and belief, Defendants have not applied the same standard to any other similarly situated provider.

224. A law or policy that treats comparable secular entities more favorably than a religious organization is not neutral or generally applicable. *See Tandon v. Newsom*, 593 U.S. 61, 62 (2021).

225. The Department's targeting of Catholic Charities' faith-based policies—while leaving other providers undisturbed—"devalues religious reasons ... by judging them to be of lesser import than nonreligious reasons." *Lukumi*, 508 U.S. at 537–38. "Thus, religious practice is being singled out for discriminatory treatment." *Id.* at 538.

226. Moreover, a policy that permits discretionary "individualized exemptions" is "the antithesis of a neutral and generally applicable policy" and therefore "must run the gauntlet of strict scrutiny." *Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012); *see also Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021).

227. The Department engages in individualized assessments of provider compliance and exercises discretion in deciding which providers receive and retain Women's Specialty Services and Enhanced Women's Services designations, evidenced by the discretion exercised in the Discontinuation Letter. The Department determines program compliance on a case-by-case basis. It grants or withholds designations based not on objective standards but rather on individualized assessments and judgments. This constitutes a system of individual exemptions that triggers strict scrutiny. *Fulton*, 593 U.S. at 534.

228. The government also violates the Free Exercise Clause when it excludes a religious organization from an otherwise available public benefit on account of its religious character or religious exercise. *Carson*, 596 U.S. at 778; *see*

*also Trinity Lutheran*, 582 U.S. 449; *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020).

229.    Here, Defendants excluded Catholic Charities from a public benefit for which it is otherwise qualified solely because of its religious character and exercise. Catholic Charities satisfies all programmatic requirements to participate in the Women's Specialty Services and Enhanced Women's Services programs. The sole basis for Defendants' discontinuation decision was Catholic Charities' "internal policies and procedures"—that is, its faith-based policies rooted in Catholic teaching. The government cannot disqualify "otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character," *Trinity Lutheran*, 582 U.S. at 462, or "on the basis of [its] religious exercise," *Carson*, 596 U.S. at 789.

230.    Defendants do not have a compelling reason for their actions. The Department has identified no government interest—let alone a compelling one—that justifies excluding Catholic Charities from the Women's Specialty Services and Enhanced Women's Services programs.

231.    Nor have Defendants selected the least restrictive means to further any purported government interest.

232.    To the contrary, Defendants' actions directly undermine any interest the government might have in providing quality substance abuse treatment services to vulnerable women, as Catholic Charities' decade-long track record demonstrates its effectiveness in serving women struggling with addiction.

233.    Absent injunctive and declaratory relief against Defendants, Catholic Charities is and will continue to be irreparably harmed.

36

## COUNT II
### Violation of Due Process
### U.S. Const. Amend. XIV; 42 U.S.C. § 1983

234.    Catholic Charities incorporates by reference paragraphs 1–213.

235.    The Due Process Clause of the Fourteenth Amendment prohibits the government from depriving any person of life, liberty, or property without due process of law.

236.    At a minimum, due process requires notice of the basis for governmental action and a meaningful opportunity to be heard before the deprivation occurs.

237.    Catholic Charities has a protected property interest in its contracts and continued participation in the Women's Specialty Services and Enhanced Women's Services programs, as well as a protected liberty interest in its right to practice its religious ministry free from arbitrary governmental interference.

238.    Defendants deprived Catholic Charities of these protected interests without adequate notice or any meaningful opportunity to address Defendants' concerns.

239.    No formal notice of potential violation was issued, no cure period was provided, and no administrative process was made available to Catholic Charities prior to the discontinuation.

240.    The Discontinuation Letter asserted the discontinuance as taking immediate effect with no opportunity to discuss or cure the alleged non-compliance.

241.    The Discontinuation Letter also completely bypassed the contractual framework between Catholic Charities/Cristo Rey and Mid-State Health Network, which includes an extensive section governing contractual disputes and remedies.

242.    The contract was never referenced in the Discontinuation Letter, nor was any authority cited for the Department's action.

37

243.    Furthermore, the standards underlying Defendants' discontinuation decision are unconstitutionally vague. The void-for-vagueness doctrine, rooted in the Due Process Clause, requires that laws and regulations provide "fair notice" of what conduct is prohibited or required so that persons of ordinary intelligence can conform their conduct accordingly. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

244.    Here, the Discontinuation Letter cited only Catholic Charities' "internal policies and procedures" as the basis for the discontinuation but failed to identify any specific standard, rule, or requirement that Catholic Charities violated. Neither Treatment Policy #12 nor Technical Advisory #08 contains any explicit requirement regarding abortion or contraception referrals, and the Department has never articulated an objective, enforceable standard that would put Catholic Charities on notice of the precise conduct that would result in discontinuation. Defendants' unexplained reliance on vague, undefined criteria deprived Catholic Charities of the fair warning required by the Constitution.

245.    The Supreme Court has long held that a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926). The vagueness doctrine applies with particular force where, as here, government discretion invites arbitrary and discriminatory enforcement. *FCC*, 567 U.S. 239 at 253. The Department's decision to discontinue Cristo Rey's designation without specifying which conduct violated which requirement—and without any objective criteria to guide future compliance—exemplifies the kind of standardless, ad hoc governmental action the vagueness doctrine is designed to prevent.

246.    Absent injunctive and declaratory relief, Catholic Charities is and will continue to be irreparably harmed.

## COUNT III
### Violation of the Free Speech Clause
### U.S. Const. Amend. I; 42 U.S.C. § 1983

247.  Catholic Charities incorporates by reference paragraphs 1–213.

248.  The Free Speech Clause of the First Amendment prohibits the government from compelling individuals and organizations to speak messages with which they disagree. *See Nat'l Inst. of Family & Life Advoc. v. Becerra*, 585 U.S. 755 (2018); *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023).

249.  The Free Speech Clause protects Catholic Charities' ability to speak in accordance with its religious views and protects its ability not to speak.

250.  Catholic Charities' natural-family-planning counseling and abstinence support, as well as its religious practice of not referring clients to abortion services or artificial contraceptives, constitute protected speech.

251.  By requiring Catholic Charities to rewrite its Notice to disclose what specific services it cannot provide as conflicting with the organization's religious beliefs, such compelled speech violates the First Amendment.

252.  In addition, to the extent that Defendants are requiring Catholic Charities to make referrals for contraceptive or abortion services as a condition of continued participation in the Women's Specialty Services and Enhanced Women's Services programs, Defendants are compelling and restricting Catholic Charities' speech in violation of its sincerely held religious beliefs.

253.  Such a requirement is a content and viewpoint-based limitation on speech, does not serve any compelling or even valid interest in a narrowly tailored way, and infringes the ministry's right to free speech.

254.  Requiring Catholic Charities to forfeit its right to free speech to participate in Women's Specialty Services and Enhanced Women's Services is an unconstitutional condition and violates the Free Speech Clause.

255.    Absent injunctive and declaratory relief against Defendants, Catholic Charities is and will continue to be irreparably harmed.

## COUNT IV
### Violation of the Charitable Choice Act
### 42 U.S.C. § 300x-65

256.    Catholic Charities incorporates by reference paragraphs 1–213.

257.    42 U.S.C. § 300x-65 prohibits "discrimination against nongovernmental organizations and certain individuals on the basis of religion in the distribution of government funds to provide substance abuse services." 42 U.S.C. § 300x-65(a)(1).

258.    42 U.S.C. § 300x-65 further provides that a religious organization providing services under the Substance Use Block Grant shall retain its independence from the government, including "control over the definition, development, practice, and expression of its religious beliefs." Id. § 300x-65(c)(1).

259.    Under 42 U.S.C. § 300x-65(h), a religious organization "seek[ing] to enforce" its "rights under [the Charitable Choice provisions] may assert a civil action for injunctive relief . . . against the entity, agency or official that allegedly commits such violation."

260.    Defendants violated 42 U.S.C. § 300x-65 by discriminating against Catholic Charities on the basis of religion. The Discontinuation Letter cited Cristo Rey's "internal policies and procedures"—that is, Cristo Rey's sincerely held religious beliefs and practices concerning abortion and contraception—as the basis for discontinuation. Defendants thus excluded Catholic Charities because of its religious character and the religious beliefs reflected in its internal policies.

261.    Defendants have further violated 42 U.S.C. § 300x-65 by interfering with Catholic Charities' independence from the government and its control over the definition, development, practice, and expression of its religious beliefs.

40

262.    As a condition of receiving Substance Use Block Grant funds, Michigan certified compliance with these Charitable Choice requirements. Mid-State Health Network is likewise bound.

263.    Defendants' discontinuation of Cristo Rey's designation because of its religious policies violates that certification and the protections Congress enacted to safeguard faith-based providers.

264.    Absent declaratory and injunctive relief, Catholic Charities is and will continue to be irreparably harmed.

**COUNT V**
**Violation of Religious Autonomy**
**U.S. Const. Amend. I; 42 U.S.C. § 1983**

265.    Catholic Charities incorporates by reference paragraphs 1–213.

266.    The First Amendment grants "a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

267.    Yet Defendants discontinued Cristo Rey's designation and excluded Catholic Charities from the Women's Specialty Services and Enhanced Women's Services programs solely because of the ministry's "internal policies and procedures."

268.    The Discontinuation Letter conditions reinstatement on Catholic Charities making "policy and procedural changes." Ex. 9 at 2. But Catholic Charities' policies and procedures are based on Catholic teachings and doctrine. Defendants' actions therefore attempt to dictate internal religious policy in violation of the First Amendment and are per se unconstitutional.

269.    Absent injunctive and declaratory relief, Catholic Charities is and will continue to be irreparably harmed.

## COUNT VI
### Violation of the Equal Protection Clause
### U.S. Const. Amend. XIV; 42 U.S.C. § 1983

270.    Catholic Charities incorporates by reference paragraphs 1–213.

271.    The Equal Protection Clause of the Fourteenth Amendment prohibits the government from treating similarly situated persons or entities differently without adequate justification. Where, as here, the government's differential treatment is based on religion, the Equal Protection Clause demands strict scrutiny.

272.    Catholic Charities is similarly situated to other substance-use-disorder treatment providers that participate in the Women's Specialty Services and Enhanced Women's Services programs. Like these other providers, Catholic Charities is licensed by the State of Michigan, has contracted with Mid-State Health Network to deliver treatment services, and has maintained compliance with all applicable program requirements for more than a decade.

273.    Secular substance-use-disorder treatment providers that do not share Catholic Charities' religious beliefs regarding contraception and abortion are allowed to continue operating as Women's Specialty Services and Enhanced Women's Services providers, maintain their contractual relationships with Defendants, and receive government funding—despite limiting the provision of certain services for secular reasons.

274.    Defendants have thus treated Catholic Charities differently from other similarly situated providers based solely on Catholic Charities' religious character and the religious beliefs that inform its internal policies. This differential treatment cannot survive any level of scrutiny, let alone the strict scrutiny that applies when the government discriminates based on religion.

275.    Defendants' disparate treatment of Catholic Charities reflects discriminatory intent and purpose. The Discontinuation Letter explicitly targeted Catholic Charities' "internal policies and procedures" as the basis for exclusion, without identifying any neutral, programmatic justification. This exclusive focus on Catholic Charities' faith-based policies, combined with the absence of any specific program violation, client complaint, or audit finding, evidences a discriminatory purpose to punish Catholic Charities for its religious exercise.

276.    The discriminatory intent behind Defendants' actions is further evidenced by the Department's and Defendant Nessel's documented history of religious targeting.

277.    The arbitrary and irrational nature of Defendants' actions further supports an inference of discriminatory purpose. Catholic Charities successfully participated in the Women's Specialty Services and Enhanced Women's Services programs for more than a decade without any complaint, adverse finding, or quality concern.

278.    The sequence of events leading to the discontinuation likewise evidences discriminatory intent. Defendants' investigation was triggered not by any service deficiency or client complaint, but by Mid-State Health Network's demand to discuss Catholic Charities' religious beliefs as expressed in its Core Values and Commitment to Mission document. The Department and Mid-State Health Network focused their inquiry on the religious expectations for Catholic Charities employees, including positions on abortion, contraception, and other matters of Catholic doctrine. Within weeks of initiating this religiously focused inquiry, Mid-State Health Network adopted a new policy specifically targeting Catholic Charities' faith-based practices, and the Department issued the Discontinuation Letter. This sequence demonstrates that Defendants' actions were motivated by Catholic

Charities' religious character and beliefs, not by any legitimate programmatic concern.

279.    Defendants cannot satisfy strict scrutiny.

280.    Defendants have identified no compelling government interest that justifies its discriminatory exclusion of Catholic Charities from the Women's Specialty Services and Enhanced Women's Services programs.

281.    Nor have Defendants employed the least restrictive means. Catholic Charities' existing practices, including its Charitable Choice Notice and referral mechanism through Mid-State Health Network's utilization management system, fully accommodated any interest in client access to alternative services without requiring Catholic Charities to violate its religious beliefs.

282.    Absent injunctive and declaratory relief, Catholic Charities is and will continue to be irreparably harmed.

**COUNT VII**
**Retaliation for Exercise of Constitutional and Civil Rights**
**42 U.S.C. § 1983**

283.    Catholic Charities incorporates by reference paragraphs 1–213.

284.    Catholic Charities' predecessor entity, St. Vincent Catholic Charities, engaged in protected speech and religious exercise and took action to protect its civil rights in *Buck v. Gordon*, 429 F. Supp. 3d 447 (W.D. Mich. 2019).

285.    The Department has a documented history of targeting Catholic organizations for their religious beliefs. In *Buck*, this Court found that the Department's actions against Catholic Charities' predecessor, St. Vincent Catholic Charities, were the product of "religious targeting" and reflected "a hostility toward a religious viewpoint," warranting strict scrutiny and entry of a preliminary injunction. *Id.* 467.

286. Defendants' exclusion of Catholic Charities from the Women's Specialty Services and Enhanced Women's Services programs and issuance of the Discontinuation Letter would be sufficient to deter a person of ordinary firmness from exercising his or her constitutional rights.

287. The same governmental entity—the Department—was involved in both the prior litigation and the present dispute, and its actions reflect a continuing pattern of hostility toward Catholic organizations that assert their constitutional rights, in violation of the First Amendment and 42 U.S.C. § 1983.

288. Absent injunctive and declaratory relief against Defendants, Catholic Charities is and will continue to be irreparably harmed.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully asks this Court to enter judgment against Defendants and provide the following relief:

A. Declare that the First and Fourteenth Amendments to the United States Constitution prohibit Defendants from discontinuing Cristo Rey's designation as a Women's Specialty Services and Enhanced Women's Services provider—and prevents them from otherwise withholding federal funds from Catholic Charities, including Substance Use Block Grant funds—because of Catholic Charities' religious character, beliefs, speech, or practices, including its sincerely held beliefs and practices regarding contraception and abortion;

B. Declare that Defendants violated Catholic Charities' right to due process by discontinuing Cristo Rey's designation without notice, explanation, or opportunity to be heard, and in circumvention of the contractual dispute resolution framework between Cristo Rey and Mid-State Health Network;

C. Declare that 42 U.S.C. § 300x-65 prohibits Defendants from discontinuing Cristo Rey's designation as a Women's Specialty Services and

Enhanced Women's Services provider—and prevents them from otherwise withholding federal funds from Catholic Charities, including Substance Use Block Grant funds—because of Catholic Charities' religious character, beliefs, or practices, including its sincerely held beliefs and practices regarding contraception and abortion.

D.     Issue preliminary and permanent injunctions restoring Cristo Rey's designation as a Women's Specialty Services and Enhanced Women's Service provider, and ordering Defendants to continue performance of their contractual obligations to Catholic Charities;

E.     Issue preliminary and permanent injunctions prohibiting Defendants, their agents, employees, and those acting in concert with them, from discriminating against Catholic Charities based on its religious character, beliefs, speech, and/or practices, including by excluding Catholic Charities from the Women's Specialty Services and Enhanced Women's Services programs, canceling contracts, refusing to renew contracts, or refusing to enter into new contracts with Catholic Charities;

F.     Issue a preliminary and permanent injunction prohibiting Defendants from retaliating against Catholic Charities for exercising its constitutional and statutory rights, including its right to religious exercise, protected speech, and petitioning the government;

G.     Award Catholic Charities compensatory, punitive, and nominal damages against the State Defendants in their individual capacities;

H.     Award Catholic Charities compensatory and nominal damages against Defendant Mid-State Health Network;

I.     Award Catholic Charities the costs of this action and reasonable attorney's fees; and

J.     Award such other and further relief as the Court deems equitable and just.

Respectfully submitted this 26th day of June, 2026.

David A. Cortman
Georgia Bar No. 188810
**Alliance Defending Freedom**
1000 Hurricane Shoals Rd. NE,
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@adflegal.org

Mikayla Douglas
Texas Bar No. 24138378
**Alliance Defending Freedom**
7250 Dallas Parkway, Suite 700
Plano, TX 75024
(469) 894-8705
mculbertson@ADFlegal.org

s/ *John J. Bursch*
John J. Bursch
Michigan Bar No. P57679
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-435
jbursch@adflegal.org

Ryan J. Tucker
Arizona Bar No. 034382
Jeremiah Galus
Arizona Bar No. 030469
Mark Lippelmann
Arizona Bar No. 036553
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jgalus@ADFlegal.org
rtucker@ADFlegal.org
mlippelmann@ADFlegal.org

*Attorneys for Plaintiffs*

47

## DECLARATION UNDER PENALTY OF PERJURY

I, Deacon Bob Bauer, a citizen of the United States and a resident of the State of Michigan, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this _25th_ day of June, 2026, at Lansing, Michigan.

Deacon Bob Bauer
Interim CEO
Catholic Charities of Ingham, Eaton
& Clinton Counties