**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**Catholic Charities of Ingham, Eaton & Clinton Counties**,

Plaintiff,

v.

**Elizabeth Hertel**, individually as former Director of the Michigan Department of Health and Human Services; **Amy Epkey**, in her official capacity as Acting Director of the Michigan Department of Health and Human Services; **Angela Smith-Butterwick**, individually and in her official capacity as Director of the Department's Substance Use, Gambling & Epidemiology Division; **Dana Nessel**, individually and in her official capacity as Attorney General of Michigan; and **Mid-State Health Network**,

Defendants.

Case No. 1:26-cv-01941-HYJ-RSK

Hon. Judge Hala Y. Jarbou

**Plaintiff's Response in Opposition to State Defendants' Motion to Dismiss**

## Table of Contents


Table of Authorities ........ iii

Introduction ........ 1

Legal Standard ........ 2

Factual Background ........ 2

I. Defendants administer federal block grant funds for women's services programs. ........ 2

II. Cristo Rey is a long-running Catholic Charities ministry. ........ 4

III. The Complaint plausibly alleges that Defendants targeted Catholic Charities' religious beliefs in a coordinated investigation. ........ 5

IV. Mid-State adopted—and State Defendants approved—the Faith-Based Disclosure targeting Catholic Charities' religious policies. ........ 6

V. State Defendants revoked Catholic Charities' designation, and Mid-State cut off funding. ........ 7

Argument ........ 8

I. The Complaint plausibly alleges standing because Cristo Rey is Catholic Charities' internal ministry. ........ 8

II. The Verified Complaint plausibly states claims for relief. ........ 10

A. Defendants violate the Free Exercise Clause. ........ 10

1. Defendants targeted Catholic Charities for its religious beliefs. ........ 12

2. Defendants' actions are not neutral and generally applicable. ........ 13

3. Defendants exclude Catholic Charities from an otherwise available public benefit because of its religious exercise. ........ 15

B. Defendants violate the Free Speech Clause. ........ 18

1. Defendants compel Catholic Charities' speech. ........ 18

2. Defendants impose content- and viewpoint-based restrictions on Catholic Charities' speech. ... 19

C. Defendants violate Charitable Choice. ... 20

D. Defendants violate religious autonomy ... 23

E. Defendants violate the Due Process Clause. ... 25

F. Defendants violate the Equal Protection Clause. ... 27

G. Defendants retaliate against Catholic Charities because of their religious exercise. ... 29

III. The State Defendants' partial-dismissal arguments fail. ... 31

A. Catholic Charities properly alleges Hertel directed and authorized the challenged conduct. ... 31

B. Nessel's enforcement authority and documented animus tie her to this case. ... 31

C. Nessel's anti-religious statements are material to the claims and should not be stricken. ... 34

D. Defendants are not entitled to qualified immunity. ... 35

Conclusion ... 37

Certificate of Compliance ... 38

Certificate of Service ... 39

## Table of Authorities

### Cases

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) .......... 18

*Agency for International Development v. Alliance for Open Society International, Inc.*,
570 U.S. 205 (2013) .......... 19

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) .......... 35

*Ass'n of American Physicians & Surgeons v. U.S. Food & Drug Administration*,
13 F.4th 531 (6th Cir. 2021) .......... 2

*Associated Builders v. Perry*,
115 F.3d 386 (6th Cir. 1997) .......... 32

*Bates v. Pakseresht*,
146 F.4th 772 (9th Cir. 2025) .......... 15

*Baynes v. Cleland*,
799 F.3d 600 (6th Cir. 2015) .......... 36

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 2

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 2

*Board of Regents v. Roth*,
408 U.S. 564 (1972) .......... 25

*Brown & Williamson Tobacco Corp. v. United States*,
201 F.2d 819 (6th Cir. 1953) .......... 34

*Buck v. Gordon*,
429 F. Supp. 3d 447 (W.D. Mich. Sept. 26, 2019) .......... 13, 29, 32, 35

*Buddenberg v. Weisdack*,
939 F.3d 732 (6th Cir. 2019) .......... 35

*Carson v. Makin*,
596 U.S. 767 (2022) .......... 11, 15, 16, 17

*Catholic Charities of Jackson, Lenawee, & Hillsdale Counties v. Whitmer*,
162 F.4th 686 (6th Cir. 2025) ........ 20

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) ........ 20

*Christian Healthcare Centers, Inc. v. Nessel*,
117 F.4th 826 (6th Cir. 2024) ........ 33

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ........ 12, 14, 28, 35

*Cleveland Board of Education v. Loudermill*,
470 U.S. 532 (1985) ........ 25, 26

*Copperweld Corp. v. Indepence Tube Corp.*,
467 U.S. 752 (1984) ........ 9

*Courtright v. City of Battle Creek*,
839 F.3d 513 (6th Cir. 2016) ........ 35

*Dahl v. Board of Trustees of Western Michigan University*,
15 F.4th 728 (6th Cir. 2021) ........ 17

*Espinoza v. Montana Department of Revenue*,
591 U.S. 464 (2020) ........ 15, 16

*Evans–Marshall v. Board of Education of Tipp City Exempted Village School District*,
428 F.3d 223 (6th Cir.2005) ........ 36

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ........ 27

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) ........ 11, 13, 14, 15

*Gracehaven, Inc. v. Montgomery County Department of Job & Family Services*,
No. 3:24-CV-325, 2025 WL 1158079 (S.D. Ohio Apr. 21, 2025) ........ 16

*Guertin v. State*,
912 F.3d 907 (6th Cir. 2019) ........ 36

*Hope v. Pelzer*,
536 U.S. 730 (2002) ........ 36

*InterVarsity Christian Fellowship/USA v. Board of Governors of Wayne State University*,
534 F. Supp. 3d 785 (E.D. Mich. 2021) .... 36

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*,
344 U.S. 94 (1952) .... 23, 25

*Kelley v. C.R. Equipment Sales*,
898 F. Supp. 509 (W.D. Mich. 1995) .... 32

*Kennedy v. Bremerton School District*,
597 U.S. 507 (2022) .... 11

*Kloosterman v. Metropolitan Hospital*,
No. 1:22-CV-944, 2023 WL 12081259 (W.D. Mich. Sept. 20, 2023) .... 36

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
584 U.S. 617 (2018) .... 11, 12, 13, 35, 36

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .... 27

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2021) .... 13

*Michigan Farm Bureau v. Department of Environment, Great Lakes, & Energy*,
515 Mich. 481 (2024) .... 33

*Mid Vermont Christian School v. Saunders*,
151 F.4th 86 (2d Cir. 2025) .... 13

*National Institute of Family & Life Advocates v. Becerra*,
585 U.S. 755 (2018) .... 18, 19, 20

*Our Lady of Guadalupe School v. Morrissey-Berru*,
591 U.S. 732 (2020) .... 23

*Parrino v. Price*,
869 F.3d 392 (6th Cir. 2017) .... 26, 28

*Pearson v. Callahan*,
555 U.S. 223 (2009) .... 35

*Pulsifer v. Westshore Christian Academy*,
142 F.4th 859 (6th Cir. 2025) .... 23

*Reform America v. City of Detroit*,
37 F.4th 1138 (6th Cir. 2022) ........ 28

*Right to Life of Michigan v. Nessel*,
No. 1:26-cv-390, 2026 WL 2117175 (W.D. Mich. July 10, 2026) ........ 33

*Rust v. Sullivan*,
500 U.S. 173 (1991) ........ 19

*Sensabaugh v. Halliburton*,
937 F.3d 621 (6th Cir. 2019) ........ 29

*Tandon v. Newsom*,
593 U.S. 61 (2021) ........ 15

*Top Flight Entertainment, Ltd. v. Schuette*,
729 F.3d 623 (6th Cir. 2013) ........ 33

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017) ........ 15, 16

*Ward v. Polite*,
667 F.3d 727 (6th Cir. 2012) ........ 15

*Wesley v. Campbell*,
779 F.3d 421 (6th Cir. 2015) ........ 35, 36

**Statutes**

42 U.S.C. § 290kk-1 ........ 22

42 U.S.C. § 300x-65 ........ 19, 20, 21, 22, 23, 25

Mich. Comp. Laws Ann. § 14.28 ........ 32, 34

Mich. Comp. Laws Ann. § 400.227 ........ 31

Mich. Comp. Laws Ann. § 600.2041 ........ 9

Mich. Comp. Laws Ann. § 600.2051 ........ 9

**Other Authorities**

Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, Div. B, §§ 506–507, 140 Stat. 173 (2026) ........ 11

Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, Div. B, § 507(d)(1), 140 Stat. 173 (2026) ........ 11

**Regulations**

45 C.F.R. § 96.124(e) .......... 10

45 C.F.R. Pt. 96, App. A .......... 3, 10

## Introduction

The Verified Complaint alleges specific, concrete facts giving rise to the plausible inference that Defendants targeted and excluded Catholic Charities for its religious beliefs, not for any program deficiency. State Defendants ask this Court to reject that inference on the pleadings, substituting their own sanitized version of events, their own characterization of motive, and their own view of the evidence. Rule 12(b)(6) does not permit that.

Defendants' motion insists that Catholic Charities violated neutral, generally applicable program requirements. But that theory cannot be reconciled with the allegations of the Complaint, which must be taken as true at this stage. According to the Complaint, Defendants investigated Catholic Charities because of the religious beliefs expressed in its Commitment to Mission—a religious document. The Complaint further alleges that Defendants interrogated Catholic Charities over those beliefs, implemented a Faith-Based Disclosure policy targeting those same beliefs, and then issued a Discontinuation Letter citing Catholic Charities' "internal policies and procedures"—a euphemism for the Catholic beliefs they found objectionable—and conditioned reinstatement on changing those beliefs. Remove the religion from this case, and there is no investigation, no Faith-Based Disclosure policy, no discontinuation, and no adverse action of any kind.

Defendants' theory also collapses under the weight of the governing texts. As the Complaint explains, no federal regulation, no Department policy, and no contract provision requires Catholic Charities to facilitate abortions and artificial contraception. To the contrary, federal law affirmatively prohibits penalizing providers who decline them.

The lack of textual support for Defendants' position is affirmative evidence of the Constitutional violations. When the government punishes a religious provider for violating a requirement that does not exist in the text, and enforces that

invented requirement against no one else, the most natural inference is that the real objection is to the provider's religion. And that inference is confirmed at every turn by Catholic Charities' well-pleaded facts. Defendants' actions do not demonstrate neutral program administration. They demonstrate religious targeting, compelled speech, exclusion from a public benefit, and deprivation without process—all dressed up as a program compliance dispute. State Defendants' motion to dismiss should be denied in its entirety.

## Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts that "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). For Rule 12(b)(6) motions, courts assume that the complaint's allegations and incorporated documents are "true (even if doubtful in fact)." *Id.* at 555. At this motion to dismiss stage, Catholic Charities' burden "is relatively modest." *Bennett v. Spear*, 520 U.S. 154, 171 (1997). They need only pass the "plausibility test." *Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 543 (6th Cir. 2021) (citation modified). Catholic Charities passes that test because they have mustered more than "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" of constitutional violations. *Twombly*, 550 U.S. at 556.

## Factual Background

### I. Defendants administer federal block grant funds for women's services programs.

The Verified Complaint alleges that the federal Substance Use Block Grant distributes funds to every state for the prevention and treatment of substance abuse. VC ¶ 61, Page.ID.11. Michigan has participated since the program's inception, receiving hundreds of millions of dollars. VC ¶¶ 63–64, Page.ID.11. Participating states must devote a minimum share of those funds to services for

pregnant women and women with dependent children. VC ¶ 66, Page.ID.12. The Complaint asserts that Michigan satisfies this obligation through two programs: Women's Specialty Services and Enhanced Women's Services. VC ¶ 68, Page.ID.12.

According to the Complaint, the Department of Health and Human Services (the "Department") oversees the Substance Use Block Grant and controls provider designations for both programs. VC ¶¶ 70, 80, Page.ID.13, 15. The Complaint further alleges that to receive these federal funds, Michigan certified that it would comply with federal Charitable Choice requirements—including the prohibition on discriminating against religious providers. VC ¶ 120, Page.ID.20.

As alleged, two Department policy documents govern provider eligibility. Treatment Policy #12 addresses Women's Specialty Services and describes required components only in general terms; it says nothing about abortion or contraception. VC ¶¶ 73–77, Page.ID.13–14. Technical Advisory #08 addresses Enhanced Women's Services and references "promot[ing] effective use of contraceptive methods" through "appropriate use of family planning methods." VC ¶ 88, Page.ID.16. The Complaint alleges that neither policy requires providers to furnish or facilitate abortions, nor to offer any specific contraceptive method that would conflict with sincerely held religious beliefs. VC ¶ 94, Page.ID.16–17. Notably, federal law defines "contraceptive methods" under the Block Grant to include "natural family planning and abstinence." 45 C.F.R. Pt. 96, App. A; VC ¶ 95, Page.ID.17.

The Complaint explains that Mid-State Health Network is a prepaid inpatient health plan that contracts with the Department to administer and distribute grant funds regionally. VC ¶ 19, Page.ID.5. Mid-State, in turn, contracts with local providers—including Catholic Charities—to deliver substance-abuse treatment services at the community level. VC ¶ 112, Page.ID.19.

## II. Cristo Rey is a long-running Catholic Charities ministry.

The Verified Complaint alleges that Catholic Charities is a Michigan nonprofit corporation formed through the merger of St. Vincent Catholic Charities and Cristo Rey Community Center. VC ¶ 12, Page.ID.3. It operates under the Catholic Diocese of Lansing and is subject to the Bishop's authority. VC ¶ 52, Page.ID.10. Catholic Charities' stated mission is "[r]ooted in Jesus's love and guided by the teachings of the Catholic Church," promoting "respect for the dignity and sanctity of human life." VC ¶ 21, Page.ID.6. The Complaint further alleges that Catholic Charities serves approximately 79,000 individuals each year across ministries in healthcare, counseling, refugee resettlement, adoption, and legal assistance. VC ¶¶ 23, 25, Page.ID.6.

As the Complaint explains, Cristo Rey Counseling Services is an internal ministry of Catholic Charities, sharing the same beliefs, teachings, and mission. VC ¶ 26, Page.ID.6. It is not a separate legal entity. Every meeting and piece of correspondence at issue in this case involved Catholic Charities personnel. *See* VC ¶¶ 12–13, 124–133, 164–170, Page.ID.3, 21–22, 26–27.

The Complaint contends that Cristo Rey has held state designations as both a Women's Specialty Services and Enhanced Women's Services provider for over a decade, performing these federally funded services under contract with Mid-State. VC ¶¶ 28, 33, Page.ID.7. The Complaint further alleges that throughout that period, Cristo Rey complied with all program requirements and received no complaints, adverse findings, or quality concerns. VC ¶ 60, Page.ID.11. In fiscal years 2024 and 2025, Cristo Rey delivered 394 Women's Specialty Services therapy sessions to 16 clients and achieved a 94 percent retention rate. VC ¶¶ 29–30, Page.ID.7. The Complaint alleges it remains the only provider offering these programs in the Lansing region; the nearest alternative is roughly 30 miles away. VC ¶ 31, Page.ID.7.

The Complaint explains that Catholic Charities holds as central to its faith that human life is sacred from conception and that abortion and contraception are morally impermissible. VC ¶¶ 34–35, Page.ID.7–8. These beliefs permeate its operations. Rather than referring clients to abortion or artificial-contraceptive services, Catholic Charities provides natural family planning counseling and abstinence support—both federally recognized "contraceptive methods" under the Block Grant. VC ¶¶ 48, 51, 95–100, Page.ID.9, 17.

According to the Complaint, every Catholic Charities employee must review and sign the organization's "Core Values and Commitment to Mission" document ("Commitment to Mission"). VC ¶ 54, Page.ID.10. That document, rooted in Catholic Moral and Social Teaching, explains that "[s]taff are expected to be guided in every way by the teachings of the Catholic faith in their daily work," including teachings on "abortion, sterilization, abstinence, and the sanctity of the family." VC ¶ 56, Page.ID.10. It instructs that staff may not refer clients to services that conflict with Catholic teaching. VC ¶ 57, Page.ID.10.

## III. The Complaint plausibly alleges that Defendants targeted Catholic Charities' religious beliefs in a coordinated investigation.

The Complaint alleges that in March 2026, Mid-State demanded a meeting with Catholic Charities to discuss the ministry's religious beliefs as set forth in its Commitment to Mission. VC ¶ 124, Page.ID.21. Although the agenda identified only Catholic Charities and Mid-State as participants, Department officials attended as well. VC ¶ 125, Page.ID.21.

According to the well-pleaded allegations, the discussion centered on Catholic Charities' doctrinal positions regarding "[u]nplanned pregnancies & abortion," "[c]ontraception," "[g]ender identity / gender ideology," and "[a]doption placements with same-sex couples." VC ¶ 128, Page.ID.21–22. The Complaint alleges that Mid-State officials disparaged those beliefs as incompatible with requirements for

"objective, non-judgmental client support." VC ¶ 129, Page.ID.22. Catholic Charities clarified that while its staff cannot directly recommend or assist with abortion referrals, they may refer clients to "general options." VC ¶ 131, Page.ID.22. The Complaint further alleges that the Department conceded that Catholic Charities was a "critical community partner" but stated it would "review contract language before confirming whether participation can continue." VC ¶ 133, Page.ID.22.

## IV. Mid-State adopted—and State Defendants approved—the Faith-Based Disclosure policy targeting Catholic Charities' beliefs.

The Complaint next alleges that just five days after interrogating Catholic Charities about its faith, Mid-State adopted a brand-new "Disclosure of Faith-Based Treatment Orientation" policy (the "Faith-Based Disclosure"). VC ¶ 135, Page.ID.22. That policy mandates that faith-based providers disclose "[a]ny known service limitations related to reproductive health, family planning, sexual orientation, gender identity, gay marriage, or any other topics that may be restricted or otherwise influenced by the agency's religious orientation." VC ¶ 138, Page.ID.23. The Complaint further alleges—and the Court must accept as true—that secular providers face no comparable obligation to disclose their own service limitations. VC ¶¶ 139–140, Page.ID.23.

The Complaint alleges that the Faith-Based Disclosure materialized with the Department's knowledge and approval. Catholic Charities alleges that Mid-State is required to comply with Department policies and is "subject to extensive state oversight." VC ¶¶ 19, 107, Page.ID.5, 18. The Department delegated to Mid-State the authority to manage providers in the Women's Specialty Services/Enhanced Women's Services programs. VC ¶ 109, Page.ID.19. Mid-State confirms that it must "seek State approval of its policies prior to implementation." ECF No. 15, PageID.350. The Complaint plausibly alleges that the Department therefore either

approved the Faith-Based Disclosure or knew of and acquiesced in the adoption of a policy directed squarely at Catholic Charities' religious beliefs.

The Complaint alleges that Catholic Charities nevertheless cooperated. It submitted an updated Charitable Choice Notice to Mid-State explaining that Cristo Rey does not provide abortion, contraceptive, or gender-altering services because of its religious beliefs, and establishing a referral mechanism through Mid-State Health Network's utilization management system for clients who wish to seek alternative services. VC ¶¶ 143–145, PageID.23–24.

## V. State Defendants revoked Catholic Charities' designation, and Mid-State cut off referrals and funding.

The Complaint alleges that, notwithstanding Catholic Charities' cooperation and its unblemished decade of participation, the Department acted without warning. According to the Complaint, on May 22, 2026, Defendant Smith-Butterwick issued a letter revoking Cristo Rey's Women's Specialty Services and Enhanced Women's Services designations, effective immediately (the "Discontinuation Letter"). VC ¶ 150, PageID.24–25. The Complaint alleges that the Discontinuation Letter attributed the revocation to Catholic Charities' "internal policies and procedures" and stated that Cristo Rey "cannot provide the required services." VC ¶ 151, PageID.25. Reinstatement was conditioned on Catholic Charities making "policy and procedural changes"—that is, changes to its religious policies. VC ¶ 156, PageID.25.

The letter cited no service deficiency, no client complaint, no referral failure, and no audit finding or quality concern. VC ¶¶ 158–161, PageID.25–26. The Complaint alleges that Catholic Charities received no notice of any alleged violation and no opportunity to cure before the discontinuation took effect. VC ¶¶ 239–240, PageID.37. That same day, Mid-State's Chief Clinical Officer ordered Catholic Charities to stop accepting new admissions immediately. VC ¶ 163, PageID.26.

The Complaint alleges that the contract between Catholic Charities and Mid-State requires 30 days' written notice of any alleged breach, an opportunity to cure, a formal provider appeal process for disputes, and a guarantee that payments will not be interrupted during the pendency of any dispute. VC ¶ 114, PageID.19. It contends that Defendants disregarded every one of these protections. VC ¶ 115, PageID.19.

The Complaint alleges that five days later, Catholic Charities wrote to the Department and copied Mid-State seeking a stay of the discontinuation, asking which specific policies or service requirements Cristo Rey had allegedly violated, and requesting a written response within five business days. VC ¶¶ 164–170, PageID.26–27. According to the well-pleaded allegations, the Department never responded, leading to this lawsuit.

Drawing all reasonable inferences in Catholic Charities' favor—as the Court must—the factual record plausibly establishes that Defendants targeted and excluded Catholic Charities because of its religious beliefs.

## Argument

### I. The Complaint plausibly alleges standing because Cristo Rey is Catholic Charities' internal ministry.

State Defendants' standing theory depends on a characterization of the relationship between Catholic Charities and Cristo Rey that is contrary to that alleged in the Complaint. State Defendants argue that Catholic Charities lacks standing because the Department de-designated "Cristo Rey," not Catholic Charities, and because the relationship between the two is unclear. ECF No. 17, PageID.604. But the Complaint's allegations establish that Catholic Charities and Cristo Rey are a single legal entity. The Complaint explains that Catholic Charities is a successor entity formed through the merger of St. Vincent Catholic Charities and Cristo Rey Community Center. VC ¶ 12, PageID.3. Cristo Rey Counseling

Services is not a separate entity. The Complaint alleges it is an internal ministry of Catholic Charities, holding the same religious beliefs, teachings, and mission. VC ¶¶ 13, 26, PageID.3, 6. An incorporated nonprofit and its unincorporated internal ministries constitute a single juridical person. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 770 (1984) ("[O]perations of a corporate enterprise organized into divisions must be judged as the conduct of a single actor."). The incorporated entity is the real party in interest that may "sue or be sued in its corporate name." Mich. Comp. Laws Ann. §§ 600.2051(3), 600.2041.

Indeed, the Complaint consistently describes one entity operating under two names. Catholic Charities acts "through its counseling ministry," VC ¶ 2, PageID.2, namely "through Cristo Rey," VC ¶¶ 75, 93, 97, 99, 113, PageID.14, 16, 17, 19. The Complaint uses the combined formulation "Catholic Charities/Cristo Rey" to describe the single entity. VC ¶¶ 112, 175, 206, 217, 219, 241, PageID.19, 27, 32, 34, 37. And Catholic Charities holds the substance-abuse-counseling and treatment-services contracts funded through the Block Grant. VC ¶ 14, PageID.3.

Every person who engaged with Defendants on these issues was a Catholic Charities official. The Complaint alleges that it was Catholic Charities personnel who attended the March 13 meeting, VC ¶¶ 124–133, PageID.22–23; Catholic Charities that submitted the Charitable Choice Notice, VC ¶¶ 143–146, PageID.23–24; and Catholic Charities that wrote to the Department seeking a stay and explanation, VC ¶¶ 164–170, PageID.26–27. Defendants simultaneously deal exclusively with Catholic Charities representatives and then, in a motion to dismiss, argue that the Complaint fails to allege Catholic Charities' connection to the de-designation. But that contrary characterization cannot overcome the Complaint's well-pleaded allegations and favorable inferences. *See* ECF No. 17, PageID.604. The Complaint adequately alleges standing.

## II. The Verified Complaint plausibly states claims for relief.

### A. Defendants violate the Free Exercise Clause.

The State Defendants' defense rests on a premise that the law does not support. The Women's Specialty Services and Enhanced Women's Services programs do not require referrals for abortion and contraception. Rather, the federal regulation at issue requires Women's Specialty Service providers to deliver "primary medical care for women," "gender specific substance abuse treatment," and "sufficient case management and transportation to ensure that women . . . have access to [those] services." 45 C.F.R. § 96.124(e). Catholic Charities, through Cristo Rey, does all that. Neither the text of the federal regulation, Treatment Policy #12, Technical Advisory #08, nor Catholic Charities' contract with Mid-State mentions—let alone requires—referrals for abortion or contraception that would conflict with a provider's sincerely held religious beliefs. VC ¶¶ 76–79, 94, PageID.14, 16–17. To the contrary, federal law defines "contraceptive methods" under the Substance Use Block Grant to include "natural family planning and abstinence." 45 C.F.R. § Pt. 96, App. A; VC ¶ 95, PageID.17. Catholic Charities provides both. VC ¶¶ 96–100, PageID.17.

Yet the State Defendants read these provisions to mandate comprehensive abortion and contraception referrals and justify excluding Catholic Charities. ECF No. 17, PageID.594–96. Their authority for this interpretation is not the text of any statute, regulation, or policy. It is Smith-Butterwick's own declaration—her *personal belief* that the federal regulation "require[s] an agency to refer clients to other providers for comprehensive contraception services or abortion services." ECF No. 13, PageID.222-23 (citing Smith-Butterwick Decl. ¶¶ 34, 36, 32–33, 35). Even worse, Smith-Butterwick says she formed this interpretation without consulting the Attorney General's office or the Department Director. *See* ECF No. 14-1, PageID.327 (Smith-Butterwick Decl. ¶¶ 37–38).

But it is improper to even consider the declaration. Defendants cannot add or change any facts in the Complaint, which all must be taken as true. And, State Defendants' interpretation is not only unsupported by the text; it is affirmatively prohibited by federal law. The Hyde Amendment prohibits federal funds from facilitating abortions, except in limited circumstances. Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, Div. B, §§ 506–507, 140 Stat. 173 (2026). And the Weldon Amendment provides that no state or local government receiving federal HHS funds may discriminate against any health care entity "on the basis that the entity does not provide, pay for, provide coverage of, or refer for abortions." Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, Div. B, § 507(d)(1), 140 Stat. 173, 317 (2026). The Department receives federal HHS funds through the Substance Use Block Grant. VC ¶¶ 61–65, PageID.11. The State Defendants cannot maintain that a federally funded program requires abortion referrals when federal law expressly forbids penalizing providers who decline to make them.

Under Supreme Court precedent, a plaintiff may establish "a free exercise violation in various ways." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). A plaintiff may show that the government targeted and exhibited hostility toward particular religious beliefs, *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 584 U.S. 617, 625 (2018); that government action burdens religious exercise and is neither neutral nor generally applicable, *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021); or that the government excluded a religious entity from an otherwise available public benefit because of its "religious character" or "religious exercise," *Carson v. Makin*, 596 U.S. 767, 780–81 (2022). The Complaint plausibly alleges a free exercise violation under all three theories. State Defendants' contrary inferences about motive, neutrality, and the basis for exclusion cannot be resolved on a motion to dismiss. VC ¶¶ 214–233, PageID.33–36.

### 1. Defendants targeted Catholic Charities for its religious beliefs.

State Defendants' denial of hostility depends on their competing account of the events and motive, which cannot be resolved at the pleading stage. Because the Free Exercise Clause protects against hostility that is "masked, as well as overt," courts must "survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). This requires examining "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Masterpiece*, 584 U.S. at 639. The Complaint plausibly alleges that State Defendants targeted Catholic Charities for its religious beliefs and practices. VC ¶¶ 1, 4, 217–221, PageID.2, 34.

The sequence of events reveals a progression from investigation to punishment—each step focused on Catholic Charities' faith. Mid-State demanded a meeting to address the ministry's Commitment to Mission; Department officials showed up; the questions focused on Catholic doctrine regarding abortion, contraception, gender ideology, and same-sex adoption; and five days later, Mid-State rolled out a new policy targeting precisely those beliefs—a policy the Department approved or acquiesced to. VC ¶¶ 19, 107, 109, 124–38, PageID.5, 18–19, 21–23; *see also* ECF No. 15, PageID.349. The culmination was the Discontinuation Letter, which cited only Catholic Charities' "internal policies and procedures" and conditioned reinstatement on "policy and procedural changes." VC ¶¶ 150–51, 156, 162, PageID.24–26.

Defendants' contemporaneous statements confirm the religious motivation. Mid-State characterized Catholic Charities' beliefs as conflicting with "objective, non-judgmental client support" and, in a written communication to the Department,

described those beliefs as "antithetical" to "open and nonjudgmental discussions about family planning, birth control, abortion, being non-binary/LGBTQ." VC ¶ 129, PageID.22; *see also* ECF No. 15-10, PageID.571. Defendant Nessel has publicly branded those who hold Catholic Charities' beliefs "anti-abortion extremists" and promised to "do everything in [her] power" to act against them. VC ¶¶ 187–89, PageID.29–30.

The historical background confirms a pattern. In *Buck v. Gordon*, this Court found "religious targeting" and "a hostility toward a religious viewpoint" where the same Department, involving several of the same officials, targeted Catholic Charities' predecessor for the same reason. 429 F. Supp. 3d 447, 462, 467 (W.D. Mich. Sept. 26, 2019); VC ¶¶ 182–84, 194–96, PageID.28–29, 30–31. The Department has now repeated that pattern in a different program context—which makes *Buck* more probative, not less.

Procedural irregularities compound the evidence. The Department bypassed every contractual protection—30-day notice, cure period, dispute resolution—and ignored Catholic Charities' letter requesting an explanation. VC ¶¶ 114–15, 164–75, PageID.19, 26–27. Courts find religious hostility where defendants flouted their own procedures. *See Mid Vermont Christian Sch. v. Saunders*, 151 F.4th 86, 95 (2d Cir. 2025); *Meriwether v. Hartop*, 992 F.3d 492, 514–15 (6th Cir. 2021).

These allegations, taken as true, plausibly establish religious targeting and hostility. *Masterpiece*, 584 U.S. at 638–39.

**2. Defendants' actions are not neutral and generally applicable.**

The Complaint also plausibly alleges that State Defendants' actions burden Catholic Charities' religious exercise and are neither neutral nor generally applicable. *Fulton*, 593 U.S. at 533.

The Faith-Based Disclosure policy discriminates on its face. It applies by its express terms only to "faith-based" providers whose services are "informed, restricted or shaped by a particular set of religious values, proscriptions, or doctrine." VC ¶ 138, PageID.23. Secular providers with non-religious service limitations face no comparable requirement. VC ¶¶ 139–40, PageID.23. The facial discrimination appears in the title itself: *Disclosure of Faith-Based Treatment Orientation*. VC ¶ 136, PageID.22–23. "The minimum requirement of neutrality is that a law not discriminate on its face." *Lukumi*, 508 U.S. at 533. This policy does not meet that minimum. And it is the Department's policy too. Mid-State operates under delegated Department authority, is subject to extensive oversight, and must seek State approval of its policies prior to implementation. VC ¶¶ 107, 109, PageID.18–19; ECF No. 15, PageID.349–50. The State Defendants either approved the Disclosure or stood by while its agent imposed a facially discriminatory policy on a single religious provider.

The Department's designation system also affords the kind of individualized discretion that destroys general applicability under *Fulton*. Strict scrutiny applies when officials burden religious exercise through "customized and selective assessment[s]"—"regardless whether any exceptions have been given, because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 593 U.S. at 535–37. Here, Treatment Policy #12 describes components only "in general terms," VC ¶ 74, PageID.13; Technical Advisory #08 lists requirements under a heading titled "RECOMMENDATIONS," VC ¶ 86, PageID.15; no statute defines objective criteria for granting or revoking designations; and the Discontinuation Letter rests on Smith-Butterwick's personal belief about what the program requires—formed without consulting the Attorney General or the Department Director. *See* ECF No. 14-1, PageID.327 (Smith-Butterwick Decl. ¶¶ 37–38). That is substantial discretion. *See Bates v. Pakseresht*,

146 F.4th 772, 796 (9th Cir. 2025) (strict scrutiny triggered by "the substantial discretion afforded to ODHS officials"). Discretionary burdens on religion "must run the gauntlet of strict scrutiny." *Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012).

Defendants also treat comparable secular conduct more favorably than Catholic Charities' religious exercise. Government actions trigger strict scrutiny "whenever they treat any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). The Complaint alleges that secular providers limit services for non-religious reasons without facing de-designation. VC ¶¶ 223, 273, 275, PageID.35, 42–43. Only Catholic Charities has been excluded—because it was religious reasons for limiting services that triggered Defendants' response. That is not generally applicable. *Fulton*, 593 U.S. at 534 ("A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.").

**3. Defendants exclude Catholic Charities from an otherwise available public benefit because of its religious exercise.**

Catholic Charities separately states a free exercise claim by alleging that the State Defendants stripped it of an otherwise available government benefit because of its religion. VC ¶¶ 228–29, PageID.35–36.

The government may not condition access to public programs on the abandonment of religious exercise. The Free Exercise Clause "protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" *Carson*, 596 U.S. at 778 (citation omitted). The Supreme Court has repeatedly held that excluding religious observers from public benefits because of their "religious character" or "religious exercise" triggers strict scrutiny. *Id.* at 778–82; *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 476 (2020); *see also Gracehaven,*

*Inc. v. Montgomery Cnty. Dep't of Job & Fam. Servs.*, No. 3:24-CV-325, 2025 WL 1158079, at *3 (S.D. Ohio Apr. 21, 2025) (applying strict scrutiny where an "otherwise eligible" entity was excluded from a public benefit on the basis of its religious exercise).

*Trinity Lutheran* held that an otherwise eligible church could not be excluded from a playground-resurfacing grant because of its "religious character." 582 U.S. at 466. *Espinoza* extended that principle to religious schools, holding that states may not disqualify them "from public benefits solely because of the religious character of the schools." 591 U.S. at 476, 487. And *Carson* rejected a distinction between status- and use-based exclusions, holding that Maine could not withhold tuition assistance because religious schools would put those funds to religious use. 596 U.S. at 782–83.

The Complaint states a plausible claim under these principles.

The Women's Specialty Services and Enhanced Women's Services designations—and the federal Substance Use Block Grant funds distributed through them—are public benefits. VC ¶¶ 61–65, PageID.11. Like the grants in *Trinity Lutheran*, the tax-credit scholarships in *Espinoza*, and the tuition assistance in *Carson*, these designations channel government funding to qualifying providers. Catholic Charities is otherwise eligible: it participated successfully for over a decade without complaint. VC ¶¶ 28, 60, 75, 93, PageID.7, 11, 14, 16. And no program requirement demands—or could legally demand—referrals for abortion or contraception. VC ¶¶ 76–79, 94, PageID.14, 16–17.

The State Defendants nevertheless revoked Catholic Charities' designation and excluded it from federal funds because of its faith. The Discontinuation Letter identified Catholic Charities' "internal policies and procedures"—a euphemism for its religious Commitment to Mission—as the exclusive basis for de-designation. VC ¶¶ 151, 162, PageID.25–26. It cited no service deficiency. No failed referral. No client complaint. No audit finding. VC ¶¶ 158–61, PageID.25–26. And it conditioned

any path to reinstatement on "policy and procedural changes"—that is, on Catholic Charities abandoning its Catholic beliefs. VC ¶ 156, PageID.25. The State Defendants would not have acted but for Catholic Charities' religious exercise.

The State Defendants do not meaningfully dispute any of this. They acknowledge that the Discontinuation Letter targeted Catholic Charities' "internal policies and procedures"—the Commitment to Mission rooted in Catholic teaching. ECF No. 17, PageID.611; *see* VC ¶¶ 151, 162, PageID.25–26. Their only move is to relabel that religious exclusion as "failure to comply with neutral and generally applicable program requirements." ECF No. 17, PageID.611–12.

But that is precisely the repackaging *Carson* rejected. Maine claimed it excluded religious schools not because of religion, but because they failed to meet a "nonsectarian" curricular standard. The Court saw through it: "[s]aying that Maine offers a benefit limited to private secular education is just another way of saying that Maine does not extend tuition assistance payments to parents who choose to educate their children at religious schools." 596 U.S. at 784. Nor can the State Defendants manufacture the "program non-compliance" they need to escape *Carson*. As explained above, the governing requirements do not require referrals for abortion or contraception, and federal law forecloses such a mandate. Catholic Charities meets the requirements as written; the State Defendants object only to the religious reasons behind its approach.

By conditioning Catholic Charities' continued participation in a federal grant program on its "willingness to abandon [its] sincere religious beliefs," the State Defendants have "burdened" the ministry's "free exercise rights." *Dahl v. Bd. of Trustees of W. Mich. Univ.*, 15 F.4th 728, 732 (6th Cir. 2021). That condition to surrender its religious exercise is precisely what *Carson* prohibits. 596 U.S. at 780 ("By conditioning the availability of benefits in that manner, [the program] . . . effectively penalizes the free exercise of religion.") (citation modified).

### B. Defendants violate the Free Speech Clause.

The Complaint plausibly alleges that Defendants compel and restrict Catholic Charities' religious expression by requiring abortion and contraception referrals, compelled religious limitation disclosures, and demanding changes to its internal religious policies. VC ¶¶ 151–156, 251–252, PageID.25, 39. State Defendants cannot avoid the First Amendment by relabeling these mandates as program requirements or professional conduct. *See* ECF No. 17, PageID.613–18.

#### 1. Defendants compel Catholic Charities' speech.

Defendants compel Catholic Charities to speak in three ways. First, they require Catholic Charities to make referrals for abortion and contraception—directing women toward the very services its Catholic beliefs prohibit. VC ¶¶ 51, 57, 252, PageID.9–10, 39. Second, they require Catholic Charities to disclose at first client contact the specific services it will not provide because of its faith, framing Catholic belief as a service deficiency. VC ¶¶ 138, 251, PageID.23, 39. Third, they condition reinstatement on Catholic Charities making "policy and procedural changes"—demanding that Catholic Charities rewrite its internal religious policy as the price of participation. VC ¶ 156, PageID.25. Each requirement compels Catholic Charities to contradict its own religious message and "seeks to compel speech [it] does not wish to provide." *303 Creative LLC v. Elenis*, 600 U.S. 570, 588 (2023).

The government may not force a private speaker to deliver the government's preferred message on abortion. In *NIFLA*, the Court struck down a law requiring pro-life pregnancy centers to provide government-drafted notices about state-subsidized abortions because providing such notice "plainly 'alters the content' of petitioners' speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018). Catholic Charities alleges the same compulsion: Defendants require it to facilitate access to abortion and contraception, introduce its ministry as religiously

limited, and rewrite its internal religious policies. VC ¶¶ 138, 151–156, 251–252, PageID.23, 25, 39.

Nor can State Defendants invoke the government's authority to define funded programs. *Rust v. Sullivan* upheld a restriction that regulated speech only within a funded project and did not require a speaker to adopt an opinion he did not hold. 500 U.S. 173, 193, 196, 200 (1991). Here, Defendants condition participation on Catholic Charities changing its Commitment to Mission—an internal religious policy applied both inside and outside the program—and treat adherence to that policy as grounds for de-designation. VC ¶¶ 54–58, 151, 156, PageID.10, 25. The government may not "recast a condition on funding as a mere definition of its program" or require recipients to adopt its view as their own. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15, 218 (2013) (internal citations omitted). Catholic Charities plausibly alleges that Defendants crossed that line. VC ¶¶ 151–157, 252–254, PageID.25, 39.

As to disclosure specifically, Charitable Choice requires only that clients be notified of their right to seek an alternative provider if they object to a provider's faith-based character. 42 U.S.C. § 300x-65(e); VC ¶ 141, PageID.23. Catholic Charities already provides that notice. VC ¶¶ 143–146, PageID.23–24. Defendants go further, requiring Catholic Charities to detail its religious limitations while secular providers with comparable gaps face no such obligation. VC ¶¶ 138–140, PageID.23. *NIFLA* rejected a comparable requirement. 585 U.S. at 769.

### 2. Defendants impose content- and viewpoint-based restrictions on Catholic Charities' speech.

State Defendants contend that the referral and disclosure requirements regulate professional conduct, not speech, and therefore escape First Amendment scrutiny. ECF No. 17, PageID.613–18. That is wrong. As alleged, Catholic Charities' counseling, its Commitment to Mission, its Charitable Choice Notice, and its

referral practices all constitute protected religious expression. VC ¶¶ 48–51, 56–57, 143–145, 250, PageID.9, 10, 23–24, 39. Defendants restrict and penalize that expression based on its content and viewpoint.

*NIFLA* forecloses State Defendants' "professional conduct" characterization: there is no freestanding professional-speech exception, and lower scrutiny applies only when the government regulates conduct and speech is merely incidental. 585 U.S. at 767–70. *Chiles v. Salazar* confirms that the State cannot avoid strict scrutiny by calling speech "treatment" when the rule turns on the message conveyed. 146 S. Ct. 1010, 1023–24 (2026); *accord Catholic Charities of Jackson, Lenawee, & Hillsdale Counties v. Whitmer*, 162 F.4th 686, 695–96 (6th Cir. 2025) (holding that Catholic counseling is speech subject to strict scrutiny when regulated based on content or viewpoint).

The referral mandate is content-based (triggered by abortion and contraception) and viewpoint-based (penalizes Catholic Charities for its Catholic position). VC ¶¶ 218–220, 252–253, PageID.34, 39. So is the disclosure requirement (applies only to limitations arising from "religious orientation"). VC ¶ 138, PageID.23. The demand to change the Commitment to Mission is also viewpoint-based on its face (conditions reinstatement on abandoning a religious viewpoint). VC ¶ 156, PageID.25.

Catholic Charities has plausibly alleged that Defendants compel and restrict its speech in violation of the First Amendment. VC ¶¶ 247–255, PageID.39–40.

### C. Defendants violate Charitable Choice.

The Charitable Choice Act imposes binding constraints on how government officials treat faith-based providers participating in the Substance Use Block Grant. It prohibits "discriminat[ion] against an organization . . . on the basis that the organization has a religious character," 42 U.S.C. § 300x-65(b)(2); guarantees

religious providers "independence from Federal, State, and local governments," including "control over the definition, development, practice, and expression of [their] religious beliefs," *id.* § 300x-65(c)(1); and forbids requiring a religious organization to "alter its form of internal governance," *id.* § 300x-65(c)(2). To enforce these protections, the statute creates a private right of action for injunctive relief. *Id.* § 300x-65(h); VC ¶ 259, PageID.40.

The State Defendants do not seriously dispute the threshold elements. The Women's Specialty Services and Enhanced Women's Services programs are funded through the Substance Use Block Grant. VC ¶¶ 61–65, PageID.11. Michigan delivers services through nongovernmental providers. VC ¶ 62, PageID.11. Catholic Charities is a religious organization providing covered services. VC ¶¶ 21, 52, 75, 93, PageID.6, 10, 14, 16. And the Department certified compliance with Charitable Choice as a condition of receiving grant funds. VC ¶ 120, PageID.20.

The Complaint plausibly pleads three violations of the Charitable Choice Act.

First, Defendants discriminated against Catholic Charities "on the basis that the organization has a religious character." 42 U.S.C. § 300x-65(b)(2). The Discontinuation Letter cited Catholic Charities' "internal policies and procedures"—its Commitment to Mission rooted in Catholic teaching—as the sole basis for de-designation and exclusion. VC ¶¶ 151, 162, PageID.25–26. The State Defendants' own brief acknowledges that those internal policies reflect Catholic Charities' religious beliefs about abortion and contraception. ECF No. 17, PageID.598–99. Excluding a provider because its internal religious policies animate its approach to care is discrimination based on religious character.

Second, Defendants interfered with Catholic Charities' statutory right to exercise "control over the definition, development, practice, and expression of its religious beliefs." 42 U.S.C. § 300x-65(c)(1). Defendants condition reinstatement on Catholic Charities making "policy and procedural changes." VC ¶ 156, PageID.25.

That is a demand that Catholic Charities surrender control over its religious policies—the precise independence Charitable Choice guarantees.

Third, Defendants required Catholic Charities to "alter its form of internal governance." *Id.* § 300x-65(c)(2). The Commitment to Mission is a diocesan governance document that defines how employees carry out the ministry's Catholic faith. VC ¶¶ 52–58, PageID.10–11. Conditioning program participation on abandoning that document is conditioning reinstatement on altering internal religious governance.

The State Defendants insist this is neutral program administration because they enforced their perception of program requirements and did not discriminate based on religious status. ECF No. 17, PageID.632–33. But Charitable Choice exists to prevent governments from inventing program requirements to exclude religious providers whose faith shapes how they deliver services. That is the purpose of guaranteeing "control over the . . . practice . . . of [their] religious beliefs." 42 U.S.C. § 300x-65(c)(1).

The State Defendants' referral argument turns Charitable Choice on its head. They invoke 42 U.S.C. § 290kk-1(f)(1), which provides that when a beneficiary "objects to the religious character" of the program participant, the participant shall refer the individual to an alternate provider. State Defendants argue that Catholic Charities violates the statute by refusing referrals. ECF No. 17, PageID.633. But this argument misreads the statute and inverts its purpose. Section 290kk-1(f)(1) addresses objections to a provider's religious *character*—not objections to a provider's inability to offer a *particular service*. A client who objects to Catholic Charities being Catholic is entitled to a transfer. Catholic Charities offers exactly that: its Charitable Choice Notice discloses its Catholic identity, informs clients of their right to seek treatment from a non-faith-based organization, and establishes a

referral mechanism through Mid-State Health Network's utilization management system. VC ¶¶ 144–45, PageID.24.

The statute does not require Catholic Charities to personally facilitate access to services that violate the very religious beliefs the statute protects. And the Weldon Amendment independently prohibits states like Michigan receiving HHS funds from discriminating against any health care entity based on whether the entity provides or refers for abortions. *See supra* Section II.A. Congress did not enact Charitable Choice to simultaneously force faith-based providers to refer for those services. The State Defendants' reading would transform Charitable Choice from a shield for religious providers into a mandate that those providers violate their own faith. Congress did not guarantee "control over the definition, development, practice, and expression of [a provider's] religious beliefs," 42 U.S.C. § 300x-65(c)(1), only to compel the abandonment of those beliefs through a back-door referral requirement.

**D. Defendants violate religious autonomy.**

The First Amendment grants religious organizations "a spirit of freedom . . . , an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). This "general principle of church autonomy" protects "the independence of religious institutions . . . with respect to internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746–47 (2020); *see also Pulsifer v. Westshore Christian Acad.*, 142 F.4th 859, 864 (6th Cir. 2025) ("Otherwise, the religious institution risks losing control over its religious function and purpose.").

The State Defendants respond to this claim by shrinking the church autonomy doctrine to hiring, firing, and corporate ownership—the specific contexts of *Our Lady of Guadalupe* and *Kedroff*—and arguing that this case concerns "how government-funded services should be provided," not internal management. ECF No. 17, PageID.632. But State Defendants provide no support for limiting the church autonomy doctrine in this way.

The Complaint plausibly alleges direct pressure on internal governance. The State Defendants do not meaningfully deny that Catholic Charities' Commitment to Mission is what triggered the entire sequence of events and exclusion. VC ¶¶ 124, 127–28, PageID.21–22. The Commitment to Mission is not a service manual or workplace preference. It is a diocesan governance document—subject to the reserved authority of the Bishop of Lansing—that articulates the ministry's Catholic teachings and defines how staff carry out the Catholic faith in their daily work. VC ¶¶ 52–58, PageID.10. It governs matters of faith and doctrine: church teachings on abortion, the sanctity of life, and the moral impermissibility of contraception. *Id.*

And the State Defendants' own Discontinuation Letter confirms that internal governance is exactly what they target. It conditions reinstatement on Catholic Charities making "policy and procedural changes." VC ¶ 156, PageID.25. The policies and procedures it references are—in the State Defendants' own words—Catholic Charities' "*internal* policies and procedures." VC ¶ 151, PageID.25 (emphasis added). Calling that demand "program eligibility" or "service delivery" does not change its object: Catholic Charities' religious rule for who may speak and minister in its name, and on what Catholic terms.

Put simply, the government may not condition participation in a public benefit on a religious ministry rewriting the internal religious standards that define its identity and mission. That is secular interference in "matters of church

government as well as those of faith and doctrine." *Kedroff*, 344 U.S. at 116. Moreover, Charitable Choice reinforces the point: Congress specifically guaranteed faith-based providers "control over the definition, development, practice, and expression of [their] religious beliefs" and barred the government from requiring them to "alter [their] form of internal governance." 42 U.S.C. § 300x-65(c)(1)–(2). The Complaint plausibly alleges that Defendants crossed the line from regulating services to dictating internal religious governance. VC ¶¶ 266–68, PageID.41.

### E. Defendants violate the Due Process Clause.

The Complaint also plausibly alleges a violation of the Due Process Clause.

State Defendants contend that Catholic Charities points only to procedural protections as its property interest. ECF No. 17, PageID.623. That misunderstands the argument. Catholic Charities does not claim a property interest in the procedures themselves. It claims an interest in the *designation and associated federal funding*—grounded in over a decade of continuous participation, a longstanding contract, and eligibility rules that it has for years satisfied without interruption or complaint. VC ¶¶ 28, 33, 60, 113–14, 237, PageID.7, 11, 19, 37. The contract's notice-and-cure provisions, formal appeal process, and payment-continuity guarantee are *evidence* of the interest—they demonstrate that continued participation was not discretionary grace revocable at will, but an entitlement secured by "rules or understandings" that substantially limited Defendants' discretion to terminate without cause. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541–42 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." (citation modified)). *Parrino v. Price* is inapplicable: it involved the Secretary of Health and Human Services excluding a physician based on a

criminal conviction, a statutory exclusion triggered by a defined event with its own built-in administrative process. 869 F.3d 392, 397–98 (6th Cir. 2017). Here, a provider participated without incident for over a decade and was suddenly stripped of its designation overnight with no notice of any specific violation, no opportunity to cure, and no process of any kind. VC ¶¶ 60, 150, 158–61, 239–40, PageID.11, 25–26, 37.

State Defendants provided no meaningful process before the deprivation. Due process requires notice of the basis for governmental action and a meaningful opportunity to respond before the deprivation occurs. *Loudermill*, 470 U.S. at 542, 545–46. State Defendants argue the March 13 meeting sufficed. ECF No. 17, PageID.627. It did not. That meeting was an interrogation into Catholic Charities' religious beliefs and practices—not notice of charges or a hearing on discontinuation. VC ¶¶ 124–33, PageID.21–22. No Defendant identified the specific rule violated, the evidence supporting it, or the consequence of staying true to the Catholic faith. The Discontinuation Letter came over two months later and was itself the deprivation, not the notice. VC ¶¶ 150, 239–40, PageID.25–26, 37. It gave Catholic Charities no chance to respond before the designation was stripped that same day. VC ¶ 163, PageID.26. Nor does a state-court appeal substitute for pre-deprivation process. *Loudermill*, 470 U.S. at 542.

The risk of erroneous deprivation underscores the inadequacy. The Discontinuation Letter cited "internal policies and procedures," but never specified what standard Catholic Charities violated or how. VC ¶¶ 151, 158–61, PageID.25–26. As discussed, the program texts do not require direct referrals for abortion or artificial contraception, and federal law forbids Defendants from mandating them. *Supra* Section II.A. Had State Defendants afforded Catholic Charities adequate notice and a meaningful opportunity to be heard, Catholic Charities could have demonstrated that its existing referral mechanism through Mid-State—combined

with the federal definition of "contraceptive methods" encompassing natural family planning—satisfied the program requirements. VC ¶¶ 95–100, 143–45, PageID.17, 23–24. Instead, State Defendants acted immediately and ignored Catholic Charities' written request for an explanation. VC ¶¶ 164–75, PageID.26–27*; see Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (holding that risk of erroneous deprivation under the procedures used is a factor in determining whether due process was satisfied).

Finally, the standards underlying the de-designation and exclusion are unconstitutionally vague. Neither Treatment Policy #12 nor Technical Advisory #08 contains any explicit requirement regarding abortion or contraception referrals. VC ¶¶ 76–77, 94, PageID.14, 16–17. The Department has never articulated an enforceable standard that would put a provider on notice that maintaining religious policies about contraception and abortion would result in immediate discontinuation. VC ¶ 244, PageID.38. This is precisely the scenario *FCC v. Fox Television Stations, Inc*. addressed: a sudden shift in enforcement against conduct the government had long tolerated, without fair notice that the standard had changed. 567 U.S. 239, 253–58 (2012).

### F. Defendants violate the Equal Protection Clause.

State Defendants contend that Catholic Charities "does not point to any 'similarly situated' comparator or any secular conduct that the State Defendants treated any differently." ECF No. 17, PageID.620. That argument ignores the facial discrimination in Defendants' own policy and mischaracterizes what the Complaint alleges.

Mid-State's "Disclosure of Faith-Based Treatment Orientation" policy—adopted under the Department's delegated authority and subject to State approval, VC ¶¶ 19, 107, 109, PageID.5, 18, 19; ECF No. 15, PageID.349—requires only faith-based providers to delineate service limitations related to "reproductive health,

family planning, sexual orientation, gender identity, gay marriage, or any other topics that may be restricted or otherwise influenced by the agency's religious orientation"—including limitations on contraception, abortion, and referrals. VC ¶¶ 136–38, PageID.22–23; ECF No. 1-7, PageID.89–90. Secular providers face no comparable obligation to disclose the services they do not offer and the referrals they do not make. VC ¶¶ 139–40, PageID.23. That is facial religious classification. *See Lukumi*, 508 U.S. at 533–34 (explaining that a law is not neutral if its object is to restrict conduct because of its religious motivation).

The Complaint further alleges that State Defendants have designated and maintained other providers in the Women's Specialty Services and Enhanced Women's Services programs who limit services for secular reasons without consequence. VC ¶¶ 272–74, PageID.42. It alleges that State Defendants have not applied the same standard to any other similarly situated provider. VC ¶ 223, PageID.35. At the pleading stage, these well-pleaded factual allegations must be accepted as true. *Parrino*, 869 F.3d at 397. Where the government enforces a requirement only against a religious provider while tolerating comparable secular non-compliance, it "devalues religious reasons . . . by judging them to be of lesser import than nonreligious reasons." *Lukumi*, 508 U.S. at 537–38.

Strict scrutiny applies because the disparate treatment is based on religion. *See Reform Am. v. City of Detroit*, 37 F.4th 1138, 1152 (6th Cir. 2022). State Defendants have identified no compelling interest justifying the exclusion of a religious provider that successfully served the program for over a decade. VC ¶¶ 279–80, PageID.44. And the means are not narrowly tailored: Catholic Charities' existing referral mechanism through Mid-State Health Network's utilization management system fully accommodated any interest in client access without requiring Catholic Charities to violate its faith. VC ¶¶ 143–45, 281, PageID.23–24, 44.

### G. Defendants retaliate against Catholic Charities because of their religious exercise.

State Defendants argue that Catholic Charities has not alleged facts showing a causal connection between protected conduct and the de-designation. ECF No. 17, PageID.622. The Complaint shows otherwise.

To state a First Amendment retaliation claim, a plaintiff must allege (1) it engaged in protected conduct, (2) an adverse action was taken that would deter a person of ordinary firmness from continuing to engage in that conduct, and (3) a causal connection between the two. *Sensabaugh v. Halliburton*, 937 F.3d 621, 627–28 (6th Cir. 2019). Catholic Charities plausibly alleges all three elements against the State Defendants.

State Defendants assume the only relevant protected conduct is the filing of the *Buck* lawsuit. ECF No. 17, PageID.622. It is not. Catholic Charities' protected conduct is its ongoing religious exercise and expression: requiring employees to sign the Commitment to Mission, maintaining its religious policies regarding abortion and contraception, and declining to make referrals antithetical to Catholic teaching. VC ¶¶ 48–51, 54–58, 284, PageID.9, 10, 44. That constitutionally protected activity is what triggered the Defendants' investigation and exclusion. VC ¶¶ 124–28, 151, PageID.21–22, 25.

*Buck* reinforces the claim. It established that the same Department and several of the same individuals previously targeted the same Catholic Charities organization for the same beliefs. This Court found "religious targeting" and "a hostility toward a religious viewpoint" in the prior iteration. *Buck*, 429 F. Supp. 3d at 462, 467. Here, Catholic Charities' protected conduct is *both* the day-to-day religious exercise and speech and its prior assertion of those rights in litigation.

The adverse action is undisputed: the Department's immediate revocation of Catholic Charities' Women's Specialty Services and Enhanced Women's Services

designations, with funding and referrals cut the same day. VC ¶¶ 150, 163, 286, PageID.24–25, 26, 45. That would deter any provider of ordinary firmness from continuing to exercise its rights.

Catholic Charities plausibly alleges the causal connection through the sequence of events. The Department learned of Catholic Charities' religious Commitment to Mission. VC ¶¶ 124–26, PageID.21. Department officials participated in a meeting focused on Catholic Charities' doctrinal positions. VC ¶¶ 125, 127–29, PageID.21, 22. The Department then issued the Discontinuation Letter citing Catholic Charities' "internal policies and procedures"—the religious policies—as the sole basis for exclusion. VC ¶¶ 151, 162, PageID.25, 26. That is a straight line from protected religious exercise to adverse State action, with no intervening neutral justification—no client complaint, no service deficiency, no audit finding. VC ¶¶ 158–61, PageID.25–26.

State Defendants' argument that no one involved in the de-designation knew about *Buck* or was involved in it is implausible and misses the point. *See* ECF No. 17, PageID.621–22. Defendant Hertel personally executed the *Buck* settlement on behalf of the Department. VC ¶ 195, PageID.30. She was on notice that the Department could not take adverse action against Catholic organizations because of their religious beliefs. The Complaint alleges that Defendant Nessel's office provided, approved, or continues to enforce the legal guidance underlying the discontinuation. VC ¶ 18, PageID.4–5. And the Department itself is the common actor in both *Buck* and this case—the same institution that this Court found engaged in "religious targeting" has now taken the same type of action against the same organization for the same reason. VC ¶¶ 194–96, PageID.30–31. Whether these State Defendants knew about Catholic Charities' religious beliefs and involvement in the *Buck* litigation— and were motivated by it—are fact-bound inquiries into knowledge and motive that cannot be resolved on a motion to dismiss.

## III. The State Defendants' partial-dismissal arguments fail.

### A. Catholic Charities properly alleges Hertel directed and authorized the challenged conduct.

State Defendants argue that the claims against former Director Hertel should be dismissed because the Complaint does not allege facts showing her personal involvement in the de-designation decision beyond her supervisory role. ECF No. 17, PageID.607. But Catholic Charities alleges that Defendant Hertel "directed, supervised, or authorized the Department's investigation into Catholic Charities' religious beliefs and practices and the Department's ultimate decision to discontinue Cristo Rey's designation." VC ¶ 15, PageID.3–4. At the pleading stage, this allegation must be accepted as true.

Moreover, as Director of the Department, Hertel bears ultimate responsibility for the Department's policies (including Treatment Policy #12 and Technical Advisory #08) and the Discontinuation Letter. VC ¶ 15, PageID.3–4 (citing E.R.O. No. 2015-1; MCL § 400.227). She also personally executed the *Buck* settlement on behalf of the Department, demonstrating her direct connection to the alleged retaliation, her supervisory role, and her awareness that the Department cannot target Catholic Charities for its beliefs. VC ¶ 195, PageID.30. State Defendants' attempt to frame the issue as one of "respondeat superior" or "vicarious[] liability" is a red herring. *See* ECF 17, PageID.607. Catholic Charities alleges that Hertel is directly involved in the actions against Catholic Charities based on her authoritative role, her responsibility for Department policies and discontinuations, and her involvement in *Buck*. These allegations, taken in the light most favorable to Plaintiff, plausibly state a claim against Hertel.

### B. Nessel's enforcement authority and documented animus tie her to this case.

Catholic Charities alleges that Defendant Nessel and her office "provided, approved, ratified, or continue[] to enforce the legal guidance on which the

Department relied in discontinuing Cristo Rey's designation." VC ¶ 18, PageID.4–5. The Complaint further alleges that Nessel has a documented history of using her office to alter state policy affecting Catholic service providers. She made numerous public statements characterizing those who hold sincere religious beliefs about abortion and contraception as "anti-abortion extremists" and "anti-abortion crusaders." VC ¶¶ 186–90, PageID.29–30. This Court previously found her statements reflected "a hostility toward a religious viewpoint." *Buck*, 429 F. Supp. at 462, 467. These well-pleaded allegations—Nessel's documented hostility toward Catholic organizations, this Court's prior finding of religious targeting against the same entity, and Nessel's ongoing enforcement role—more than suffice at the motion to dismiss stage.

Further, Nessel is a proper defendant for prospective injunctive relief for two reasons. First, the Attorney General possesses broad, independent authority under MCL § 14.28 to "appear for the people of this state . . . in any cause or matter . . . in which the people of this state may be a party or interested"—"when in [her] own judgment the interests of the state require it." Courts treat this as sweeping authority to act in the public's interest. *See Kelley v. C.R. Equip. Sales*, 898 F. Supp. 509, 514 (W.D. Mich. 1995) (recognizing "merger of purpose, by reason of public policy, when the interests of the State call for action by its chief law officer and there is no express legislative restriction to the contrary"). The Sixth Circuit has confirmed that courts should only prohibit the Attorney General from acting when doing so "is clearly inimical to the public interest." *Associated Builders v. Perry*, 115 F.3d 386, 390 (6th Cir. 1997). Catholic Charities alleges that Nessel's office continues to enforce the legal guidance on which the Department relied in discontinuing Cristo Rey's designation. VC ¶ 18, PageID.4–5. As Michigan's chief legal officer and legal counsel to the Department, Nessel has the authority to direct, sustain, or reverse the legal position underlying Catholic Charities' exclusion.

Nessel's independent enforcement authority supports prospective relief. Courts have repeatedly rejected Nessel's efforts to disclaim the enforcement connection necessary for prospective relief. *See Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826, 856–57 (6th Cir. 2024) (reversing dismissal and permitting two separate constitutional challenges and holding that each plaintiff plausibly alleged standing to pursue relief against Nessel); *Right to Life of Michigan v. Nessel*, No. 1:26-cv-390, 2026 WL 2117175, at *19–20 (W.D. Mich. July 10, 2026) (rejecting Nessel's claim that she lacked enforcement authority and denying dismissal).

Second, the Department itself lacks clear statutory authority over the Women's Specialty Services/Enhanced Women's Services designations. No statute or regulation authorizes the Department to create, grant, or revoke these program designations; the entire designation system exists only in internal policy documents. *See* Treatment Policy #12; Technical Advisory #08. Where the Legislature has not delegated rulemaking authority to an agency on a subject, the agency's policy statements lack the force of law and cannot alter rights, impose obligations, or bind regulated entities. *Michigan Farm Bureau v. Dep't of Env't, Great Lakes, & Energy*, 515 Mich. 481, 521 (2024). Because the Department has no exclusive statutory authority over these designations, it cannot claim a walled-off zone that excludes the Attorney General. To the contrary, the Attorney General's role as chief law enforcement officer is directly implicated where an agency acts outside its statutory boundaries—making Nessel's connection to the challenged conduct all the more plausible. Catholic Charities has therefore plausibly alleged that Nessel has "some connection with the alleged unconstitutional act or conduct," sufficient to sustain prospective relief against her. *Top Flight Entm't, Ltd. v. Schuette*, 729 F.3d 623, 634 (6th Cir. 2013).

### C. Nessel's anti-religious statements are material to the claims and should not be stricken.

State Defendants move to strike Paragraphs 18, 182–90, 193–96, and 276 of the Complaint as "immaterial" and "impertinent." Those paragraphs allege that Nessel has repeatedly characterized those who hold sincere religious beliefs about the sanctity of life as "anti-abortion extremists" and "anti-abortion crusaders," and has promised to "do everything in [her] power to protect Michiganders from anti-abortion extremists." VC ¶¶ 187–89, PageID.29–30.

This motion should be denied. Motions to strike are a disfavored and drastic remedy, and "should be granted only when the pleading to be stricken has no possible relation to the controversy." *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819 (6th Cir. 1953). Federal Rule of Civil Procedure 12(f) permits the Court to strike only matter that is "redundant, immaterial, impertinent, or scandalous." Nessel's prior statements are both material and pertinent: they bear directly on Nessel's connection to the challenged conduct and the Free Exercise animus inquiry.

First, Nessel's promise to "do everything in [her] power" to act against those who hold these beliefs underscores the plausibility that she would use her broad independent authority under MCL § 14.28 to enforce the very program exclusion at issue. *See* VC ¶ 189, PageID.30.

Second, Nessel's statements go to the heart of the hostility and retaliation claims. Michigan's chief legal officer made hostile statements toward the same entity regarding its Catholic beliefs at issue here. The Supreme Court has made clear that evaluating government hostility toward religion includes "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decision-

making body." *Lukumi*, 508 U.S. at 540; *see also Masterpiece*, 584 U.S. at 634–38 (relying on commissioners' statements to find impermissible hostility). The *Buck* litigation establishes that the hostility is institutional, not isolated: the same Department, under the same Attorney General, targeted the same Catholic organization for the same reason—because its Catholic beliefs conflicted with the government's preferred policy outcomes. This Court found "religious targeting" and "a hostility toward a religious viewpoint." 429 F. Supp. 3d at 462, 467. A different program context does not make *Buck* irrelevant—it makes it more damaging. *Lukumi* instructs courts to look for this type of pattern evidence: the same religious organization, by the same government actors, for the same beliefs.

**D. Defendants are not entitled to qualified immunity.**

State Defendants argue that they "are entitled to qualified immunity with respect to the claims against them in their personal capacities." ECF No. 17, PageID.634. Defendants contend that they did not violate a right that was "clearly established" at the time of the challenged conduct. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (same).

Qualified immunity cannot be resolved at the motion to dismiss stage on the facts of this case. The Sixth Circuit has repeatedly emphasized that it is generally inappropriate to grant qualified immunity on a Rule 12(b)(6) motion. Even though "qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015) (internal citations omitted); *see also Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016) (same); *Buddenberg v. Weisdack*, 939 F.3d 732, 738–39 (6th Cir. 2019) (same). The Sixth Circuit recognizes that "the fact-intensive nature of the applicable tests make it 'difficult for a defendant to claim qualified immunity on the pleadings

before discovery.'" *Wesley*, 779 F.3d at 421, 434 (citing *Evans–Marshall v. Bd. of Educ. of Tipp City Exempted Village Sch. Dist.*, 428 F.3d 223, 235 (6th Cir.2005)). Whether State Defendants targeted Catholic Charities for its religious beliefs—and thus, whether the law was clearly established as to Defendants' specific conduct—depends on fact-bound inquiries into internal communications, the decision-making process, and Defendants' treatment of secular providers that cannot be resolved without discovery.

In any event, Catholic Charities plausibly alleges a violation of clearly established rights. "[T]he precise factual scenario need not have been found unconstitutional for . . . the right to be 'clearly established.'" *Baynes v. Cleland*, 799 F.3d 600 (6th Cir. 2015); *accord Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019). Officials can have fair warning that their conduct is unconstitutional even in novel factual circumstances; no prior case need be "fundamentally similar." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (internal quotation marks omitted).

Courts have denied qualified immunity on analogous facts. This Court denied qualified immunity for individual capacity claims where officials made hostile statements about a plaintiff's religious beliefs. *Kloosterman v. Metro. Hosp.*, No. 1:22-CV-944, 2023 WL 12081259, at *8 (W.D. Mich. Sept. 20, 2023). Catholic Charities alleges comparable hostility: Nessel publicly labeled those who hold its beliefs "anti-abortion extremists" and promised to "do everything in [her] power" to act against them. VC ¶¶ 187–89, PageID.29–30. The government cannot "base laws or regulations on hostility to a religion or religious viewpoint." *Masterpiece*, 584 U.S. at 618. And in *InterVarsity Christian Fellowship/USA v. Board of Governors of Wayne State University*, 534 F. Supp. 3d 785 (E.D. Mich. 2021), the court denied qualified immunity where officials revoked a religious organization's registered status while tolerating comparable secular conduct—the same pattern alleged here. *See* VC ¶¶ 223, 273, 275, PageID.35, 42, 43.

## Conclusion

Based on the above, the Court should deny State Defendants' Motion to Dismiss.

Respectfully submitted this 8th day of September, 2026.

By: *s/ Jeremiah Galus*

David A. Cortman
Georgia Bar No. 188810
**Alliance Defending Freedom**
1000 Hurricane Shoals Rd. NE,
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@adflegal.org

Mikayla Douglas
Texas Bar No. 24138378
**Alliance Defending Freedom**
7250 Dallas Parkway, Suite 700
Plano, TX 75024
(469) 894-8705
mculbertson@ADFlegal.org

John J. Bursch
Michigan Bar No. P57679
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-435
jbursch@adflegal.org

Ryan J. Tucker
Arizona Bar No. 034382
Jeremiah Galus
Arizona Bar No. 030469
Mark Lippelmann
Arizona Bar No. 036553
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
rtucker@ADFlegal.org
jgalus@ADFlegal.org
mlippelmann@ADFlegal.org

*Attorneys for Plaintiff*

**Certificate of Compliance**

I hereby certify that this brief contains 10,593 words in compliance with W.D. Mich. LCivR 7.2(b), and that this brief was prepared using Microsoft® Word for Microsoft 365 MSO (Version 2605 Build 20026.20112).

s/ *Jeremiah Galus*
Jeremiah Galus
*Attorney for Plaintiff*

## Certificate of Service

I hereby certify that on the 8th day of September, 2026, I electronically filed the foregoing document with the Clerk of Court using the ECF system which will send notification of such filing to all counsel of record who are registered users of the ECF system.

s/ *Jeremiah Galus*
Jeremiah Galus
*Attorney for Plaintiff*