**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**Catholic Charities of Ingham, Eaton & Clinton Counties**,

Plaintiff,

v.

**Elizabeth Hertel**, individually as former Director of the Michigan Department of Health and Human Services; **Amy Epkey**, in her official capacity as Acting Director of the Michigan Department of Health and Human Services; **Angela Smith-Butterwick**, individually and in her official capacity as Director of the Department's Substance Use, Gambling & Epidemiology Division; **Dana Nessel**, individually and in her official capacity as Attorney General of Michigan; and **Mid-State Health Network**,

Defendants.

Case No. 1:26-cv-01941-HYJ-RSK

Hon. Judge Hala Y. Jarbou

**Plaintiff's Response in Opposition to Mid-State Health Network's Motion to Dismiss**

## Table of Contents


Table of Authorities ........ iii

Introduction ........ 1

Legal Standard ........ 3

Factual Background ........ 3

A. Defendants administer federal block grant funds for women's services programs. ........ 3

B. Cristo Rey's Women's Specialty Services/Enhanced Women's Services work is a long-running Catholic Charities ministry. ........ 4

C. The Complaint plausibly alleges that Defendants targeted Catholic Charities' religious beliefs in a coordinated investigation. ........ 6

D. Mid-State adopted—and State Defendants approved—the Faith-Based Disclosure policy targeting Catholic Charities' beliefs identified in the investigation. ........ 7

E. State Defendants revoked Catholic Charities' designation and Mid-State cut off referrals and funding. ........ 8

Argument ........ 10

I. Mid-State's threshold arguments for dismissal fail. ........ 10

A. Catholic Charities has standing because Cristo Rey is one of its internal ministries and not a separate entity. ........ 10

B. The Complaint alleges that Defendants acted together and specifically identifies Mid-State's alleged misconduct. ........ 11

II. The Verified Complaint plausibly states claims for relief. ........ 14

A. Mid-State's actions violate the Free Exercise Clause. ........ 15

1. Mid-State targeted and expressed hostility towards Catholic Charities' religious beliefs. ........ 15

2. Mid-State's actions are not neutral or generally applicable. ........ 19

3. Mid-State excluded Catholic Charities from a public benefit solely because of its religious character and exercise. ............... 22

B. Mid-State violates the Free Speech Clause. .................................... 24

1. Mid-State compels Catholic Charities' speech. .......................... 24

2. Mid-State imposes content- and viewpoint-based restrictions on Catholic Charities' speech. .................................................. 27

C. Mid-State violates the Charitable Choice Act. ................................ 28

D. Mid-State violates Catholic Charities' right to religious autonomy. ............................................................................ 30

E. Mid-State's actions violated the Due Process Clause. ..................... 31

III. There is no need to convert Mid-State's motion. ....................................... 33

Conclusion ........................................................................................... 35

Certificate of Compliance ..................................................................... 36

Certificate of Service ........................................................................... 37

# Table of Authorities

## Cases

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ........ 25

*Agency for International Development v. Alliance for Open Society International, Inc.*,
570 U.S. 205 (2013) ........ 26

*Bassett v. National Collegiate Athletic Association*,
528 F.3d 426 (6th Cir. 2008) ........ 3, 34

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 3

*Board of Regents v. Roth*,
408 U.S. 564 (1972) ........ 32

*Buehner v. City of Cleveland*,
788 F. Supp. 3d 827 (N.D. Ohio 2025) ........ 14

*Carson v. Makin*,
596 U.S. 767 (2022) ........ 15, 18, 22, 23

*Catholic Charities of Jackson v. Whitmer*,
162 F.4th 686 (6th Cir. 2025) ........ 27

*Chiles v. Salazar*,
146 S. Ct. 1010 (Mar. 31, 2026) ........ 27

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ........ 16, 20, 22

*Cleveland Board of Education v. Loudermill*,
470 U.S. 532 (1985) ........ 31

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984) ........ 10

*Dahl v. Board of Trustees of Western Michigan University*,
15 F.4th 728 (6th Cir. 2021) ........ 24

*Espinoza v. Montana Department of Revenue*,
591 U.S. 464 (2020) ........ 22, 23

*Estate of Barney v. PNC Bank, National Association*,
714 F.3d 920 (6th Cir. 2013) .......... 13

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) .......... 15, 19, 22

*Geiling v. Wirt Financial Services, Inc.*,
No. 14-11027, 2014 WL 8473822 (E.D. Mich. Dec. 31, 2014) .......... 33, 34

*Gold Crest, LLC v. Project Light, LLC*,
525 F. Supp. 3d 826 (N.D. Ohio 2021) .......... 11

*Igo v. Sun Life Assurance Co. of Canada*,
652 F. Supp. 3d 929 (S.D. Ohio 2023) .......... 13, 14

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*,
344 U.S. 94 (1952) .......... 30, 31

*Kennedy v. Bremerton School District*,
597 U.S. 507 (2022) .......... 15

*Larson v. Valente*,
456 U.S. 228 (1982) .......... 18

*Marcilis v. Township of Redford*,
693 F.3d 589 (6th Cir. 2012) .......... 14

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
584 U.S. 617 (2018) .......... 15, 16, 17, 18

*Musleh v. American Steamship Co.*,
326 F. Supp. 3d 507 (E.D. Mich. 2018) .......... 34

*National Institue of Family & Life Advocates v. Becerra* (“*NIFLA*”),
585 U.S. 755 (2018) .......... 25, 27

*Our Lady of Guadalupe School v. Morrissey-Berru*,
591 U.S. 732 (2020) .......... 30, 31

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
487 U.S. 781 (1988) .......... 25

*Rosenberger v. Rector & Visitors of University of Virginia*,
515 U.S. 819 (1995) .......... 28

*Rust v. Sullivan*,
500 U.S. 173 (1991) ... 26

*Smith v. City of Atlantic City*,
138 F.4th 759 (3d Cir. 2025) ... 21

*Tandon v. Newsom*,
593 U.S. 61 (2021) ... 21

*Teen Ranch, Inc. v. Udow*,
389 F. Supp. 2d 827 (W.D. Mich. 2005) ... 28

*Teen Ranch, Inc. v. Udow*,
479 F.3d 403 (6th Cir. 2007) ... 28

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017) ... 22

*Will v. Michigan Deparment of State Police*,
491 U.S. 58 (1989) ... 15

**Statutes**

42 U.S.C. § 300x-65 ... 18, 27, 28

Mich. Comp. Laws Ann. § 600.2041 ... 9

Mich. Comp. Laws Ann. § 600.2051 ... 9

**Other Authorities**

Consolidated Appropriations Act, 2026, Pub. L. No. 119-75. Div. B, §§ 506–507, 140 Stat. 173 (2026) ... 20

Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, Div. B, § 507(d)(1), 140 Stat. 173 (2026) ... 20, 29

**Rules**

Fed. R. Civ. P. 56 ... 32

**Regulations**

45 C.F.R. Pt. 96, App. A ... 3

## Introduction

For over a decade, Catholic Charities of Ingham, Eaton & Clinton Counties—through its ministry Cristo Rey Counseling Services—has served mothers struggling with substance-use disorders as a state-designated Women's Services provider. It met every program requirement. It drew no complaints, no adverse findings, and no audit concerns. And it did all this while remaining true to its Catholic faith—offering natural family planning and support to women who wanted it rather than abortion or contraception.

The Verified Complaint alleges that Defendants ended all of that because of those beliefs. For its part, Mid-State Health Network obtained Catholic Charities' internal "Core Values and Commitment to Mission" document, underlined in red the Catholic teachings it found objectionable, and warned the Department that it might discontinue the contract unless the ministry reconciled its "religious orientation" with "open and nonjudgmental discussions about family planning, birth control, abortion, being non-binary/LGBTQ, etc." *See* Verified Compl. (VC) ¶¶ 123–26, PageID.21; Mid-State's Mot. to Dismiss, Ex. J, PageID.878.[1]

The Complaint further alleges that Mid-State then demanded a meeting to interrogate Catholic Charities about those beliefs and disparaged them as incompatible with "objective, non-judgmental client support." VC ¶ 129, PageID.22. Five days later, Mid-State adopted a policy aimed at faith-based providers and at those very topics. *Id.* ¶¶ 134–38, PageID.22–23. A letter from the Department followed, stripping Catholic Charities of its Women's Services designation and citing nothing but the ministry's faith-based "policies and procedures." *Id.* ¶¶ 150–62, PageID.25–26. The Complaint alleges that Mid-State enforced that decision, immediately halting all related referrals and funding. *Id.* ¶ 163, PageID.26.

[1] As explained below (infra pp. 33–35), while the Court can (and should) ignore the extrinsic evidence attached to Mid-State's motion, those exhibits prove that the Complaint's allegations are not just plausible but true.

Mid-State now moves to dismiss. But it fundamentally misconceives the Court's role at this stage. The question here is not who will prevail. It is whether the Complaint pleads facts that, taken as true and read in Catholic Charities' favor, state plausible claims for relief. Mid-State never engages that question. It disputes the allegations, recasts its own conduct, and asks the Court to credit its version of events—all of which Rule 12(b)(6) forbids.

Mid-State's threshold arguments for dismissal fail. The Complaint explains that Cristo Rey is not a separate entity suing through a stranger; it is an internal ministry of Catholic Charities, the sole incorporated party and the real party in interest. And the Complaint is no group pleading. It names Mid-State more than fifty times and pleads its specific acts at every stage: launching the investigation, handing the ministry's internal religious document to the Department, leading the meeting, writing the Faith-Based Disclosure policy, and immediately halting referrals and funding when the discontinuation issued.

The merits arguments fail too. The Complaint plausibly alleges that Mid-State targeted Catholic Charities' religious beliefs, acted through a policy that is neither neutral nor generally applicable, and excluded the ministry from a public benefit because of its religious character and exercise. It also plausibly alleges that Mid-State's actions compel and restrict speech based on viewpoint, violate the Charitable Choice Act, interfere with religious autonomy, and violate due process by removing a decade-old designation without adequate notice or an opportunity to be heard. Nor should the Court convert the motion to summary judgment, even though doing so would require judgment for Catholic Charities, not Mid-State. Discovery has not begun, and Mid-State never identifies which material facts it claims are undisputed. The Constitution and federal law do not allow the government to drive a Catholic ministry out of a public program because of its faith. The Court should deny the motion.

## Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts that "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In determining facial plausibility, the Court must construe the complaint in the light most favorable to the plaintiff, accept the factual allegations as true, and draw all reasonable inferences in favor of the plaintiff. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion so long as they are referred to in the Complaint and are central to the claims contained therein." *Id.*

## Factual Background

### A. Defendants administer federal block grant funds for women's services programs.

The Verified Complaint alleges that the federal Substance Use Block Grant distributes funds to every state for the prevention and treatment of substance abuse. VC ¶ 61, PageID.11. Michigan has participated since the program's inception, receiving hundreds of millions of dollars. *Id.* ¶¶ 63–64, PageID.11. Participating states must devote a minimum share of those funds to services for pregnant women and women with dependent children. *Id.* ¶ 66, PageID.12. The Complaint asserts that Michigan satisfies this obligation through two programs: Women's Specialty Services and Enhanced Women's Services. *Id.* ¶ 68, PageID.12.

According to the Complaint, the Department oversees the Substance Use Block Grant and controls provider designations for both programs. *Id.* ¶¶ 70, 80, PageID.13, 15. The Complaint further alleges that to receive these federal funds, Michigan certified that it would comply with federal Charitable Choice

requirements—including the prohibition on discriminating against religious providers. *Id.* ¶ 120, PageID.20.

As alleged, two Department policy documents govern provider eligibility. Treatment Policy #12 addresses Women's Specialty Services and describes required components only in general terms; it does not mention abortion or contraception. *Id.* ¶¶ 73–77, PageID.13–14. Technical Advisory #08 addresses Enhanced Women's Services and references "promot[ing] effective use of contraceptive methods" through "appropriate use of family planning methods." *Id.* ¶ 88, PageID.16. The Complaint alleges that neither policy requires providers to furnish or facilitate abortions, nor to offer any specific contraceptive method that would conflict with sincerely held religious beliefs. *Id.* ¶ 94, PageID.16–17. Federal law defines "contraceptive methods" under the Block Grant to include "natural family planning and abstinence." 45 C.F.R. Pt. 96, App. A; VC ¶ 95, PageID.17.

The Complaint explains that Mid-State is a prepaid inpatient health plan that contracts with the Department to administer and distribute grant funds regionally. VC ¶ 19, PageID.5. Mid-State in turn contracts with local providers—including Catholic Charities—to deliver substance-abuse treatment services at the community level. *Id.* ¶ 112, PageID.19.

### B. Cristo Rey's Women's Specialty Services/Enhanced Women's Services work is a long-running Catholic Charities ministry.

The Verified Complaint alleges that Catholic Charities is a Michigan nonprofit corporation formed through the merger of St. Vincent Catholic Charities and Cristo Rey Community Center. VC ¶ 12, PageID.3. It operates under the Catholic Diocese of Lansing and is subject to the Bishop's authority. *Id.* ¶ 52, PageID.10. Catholic Charities' mission is "[r]ooted in Jesus's love and guided by the teachings of the Catholic Church," promoting "respect for the dignity and sanctity of human life." *Id.* ¶ 21, PageID.6. The Complaint further alleges that Catholic

Charities serves approximately 79,000 individuals each year across ministries in healthcare, counseling, refugee resettlement, adoption, and legal assistance. *Id.* ¶¶ 23, 25, PageID.6.

As the Complaint explains, Cristo Rey Counseling Services is an internal ministry of Catholic Charities, sharing the same beliefs, teachings, and mission. *Id.* ¶ 26, PageID.6. It is not a separate legal entity. Indeed, every meeting and piece of correspondence at issue here involved Catholic Charities personnel. *See id.* ¶¶ 12–13, 124–133, 164–170, PageID.3, 21–22, 26–27. The Complaint contends that Cristo Rey has held state designations as both a Women's Specialty Services and Enhanced Women's Services provider for over a decade, performing these federally funded services under contract with Mid-State. VC ¶¶ 28, 33, PageID.7. The Complaint further alleges that throughout that period, Cristo Rey complied with all program requirements and received no complaints, adverse findings, or quality concerns. *Id.* ¶ 60, PageID.11. In fiscal years 2024 and 2025, Cristo Rey delivered 394 Women's Specialty Services therapy sessions to 16 clients and achieved a 94 percent retention rate. *Id.* ¶¶ 29–30, PageID.7. The Complaint alleges it remains the only provider offering these programs in the Lansing region; the nearest alternative is roughly 30 miles away. *Id.* ¶ 31, PageID.7.

The Complaint explains that Catholic Charities holds as central to its faith that human life is sacred from conception and that abortion and contraception are morally impermissible. *Id.* ¶¶ 34–35, PageID.7–8. All its ministries are grounded in these beliefs. Rather than referring clients to abortion or artificial-contraceptive services, Catholic Charities provides natural family planning counseling and abstinence support—both federally recognized "contraceptive methods" under the Block Grant. *Id.* ¶¶ 48, 51, 95–100, PageID.9, 17.

According to the Complaint, every Catholic Charities employee must review and sign the ministry's "Core Values and Commitment to Mission." *Id.* ¶ 54,

PageID.10. That document, rooted in Catholic Moral and Social Teaching, explains that "[s]taff are expected to be guided in every way by the teachings of the Catholic faith in their daily work," including teachings on "abortion, sterilization, abstinence, and the sanctity of the family." *Id.* ¶ 56, PageID.10. It instructs that staff may not refer clients to services that conflict with Catholic teaching. *Id.* ¶ 57, PageID.10.

### C. The Complaint plausibly alleges that Defendants targeted Catholic Charities' religious beliefs in a coordinated investigation.

In early 2026, Mid-State notified the Department that it had "been made aware" that "one of our providers" expects employees "to support approaches that are in line with the [C]atholic [C]hurch." MTD Br., Ex. I, PageID.876. A month later, after "receiv[ing] some more information," Mid-State told the Department that "Cristo Rey/Catholic Charities of Ingham, Eaton & Clinton (one of our WSS providers) has developed the attached 'Core Values & Commitment to Mission' document." Mid-State's Br. in Supp. of Mot. to Dismiss ("MTD Br."), Ex. J, PageID.878.

According to Mid-State, the religious beliefs and practices reflected in that document were "antithetical" to "open and nonjudgmental discussions about family planning, birth control, abortion, being non-binary/LGBTQ, etc." *Id.* Mid-State considered Catholic Charities' "expected adherence to Catholic teachings" to be "more explicit and proscriptive than any faith-based provider [Mid-State] worked with in the past, e.g., Wedgewood and Samaritas." *Id.* Mid-State "[u]nderlined in red" the beliefs it found objectionable and told the Department that it may "discontinu[e]" Catholic Charities' contract if the ministry could not "reconcile [its] religious orientation with the expectations for WSS and prevention programming." *Id.*

The Complaint further alleges that a couple of weeks later, in March 2026, Mid-State demanded a meeting with Catholic Charities to address the ministry's religious beliefs as set forth in its Core Values and Commitment to Mission document. VC ¶ 124, PageID.21. Although the agenda identified only Catholic Charities and Mid-State as participants, Department officials attended as well. *Id.* ¶ 125, PageID.21.

According to the well-pleaded allegations, the discussion centered on Catholic Charities' doctrinal positions regarding "[u]nplanned pregnancies & abortion," "[c]ontraception," "[g]ender identity / gender ideology," and "[a]doption placements with same-sex couples." *Id.* ¶ 128, PageID.21–22. The Complaint alleges that during that meeting, Mid-State and Department officials disparaged Catholic Charities' beliefs as incompatible with requirements for "objective, non-judgmental client support." *Id.* ¶ 129, PageID.22. Catholic Charities clarified that while its staff cannot directly recommend or assist with abortion referrals, they may refer clients to "general options." *Id.* ¶ 131, PageID.22. The Department conceded that Catholic Charities was a "critical community partner" but stated it would evaluate "whether participation can continue." *Id.* ¶ 133, PageID.22. These allegations, entitled to all reasonable inferences in Catholic Charities' favor, plausibly establish that Defendants conducted a targeted investigation into the ministry's religious beliefs.

### D. Mid-State adopted—and State Defendants approved—the Faith-Based Disclosure policy targeting Catholic Charities' beliefs identified in the investigation.

The Complaint next alleges that just five days after interrogating Catholic Charities about its faith, Mid-State adopted a brand-new "Disclosure of Faith-Based Treatment Orientation" policy (the "Faith-Based Disclosure"). VC ¶ 135, PageID.22. That policy mandates that faith-based providers disclose "[a]ny known service limitations related to reproductive health, family planning, sexual orientation,

gender identity, gay marriage, or any other topics that may be restricted or otherwise influenced by the agency's religious orientation." *Id.* ¶ 138, PageID.23. The Complaint further alleges—and the Court must accept as true—that secular providers face no comparable obligation to disclose their own service limitations. *Id.* ¶¶ 139–140, PageID.23.

Mid-State's motion confirms that the Faith-Based Disclosure policy materialized with the Department's knowledge and approval. *See* MTD Br., Ex. J, PageID.878 (sharing the "draft procedure" with the Department); MTD Br., Ex. C at ¶ 4, PageID.791 ("By law and contract, Mid-State must also seek State approval of policies prior to implementation.").

The Complaint explains that Catholic Charities did what it could to cooperate with the new policy. It submitted an updated Charitable Choice Notice to Mid-State explaining that Cristo Rey does not provide abortion, contraceptive, or gender-altering services because of its religious beliefs, and establishing a referral mechanism through Mid-State's utilization management system for clients who wish to seek alternative services. VC ¶¶ 143–145, PageID.23–24. That was not enough for Defendants.

### E. State Defendants revoked Catholic Charities' designation and Mid-State cut off referrals and funding.

The Complaint alleges that despite Catholic Charities' cooperation and its unblemished decade of participation, Defendants punished the ministry for its beliefs. On May 22, 2026, Defendant Smith-Butterwick issued a letter revoking Cristo Rey's Women's Specialty Services and Enhanced Women's Services designations, effective immediately. VC ¶ 150, PageID.25. The letter attributed the revocation to Catholic Charities' "internal policies and procedures" and asserted that Cristo Rey "cannot provide the required services." *Id.* ¶ 151, PageID.25.

Reinstatement was conditioned on "policy and procedural changes"—that is, on changes to the ministry's religious policies. *Id.* ¶ 156, PageID.25.

The letter cited no service deficiency, no client complaint, no referral failure, and no audit finding or quality concern. *Id.* ¶¶ 158–161, PageID.25–26. The Complaint alleges that the Catholic Charities received no notice of any alleged violation and no opportunity to cure before the discontinuation took effect. *Id.* ¶¶ 239–40, PageID.37. That same day, Mid-State's Chief Clinical Officer ordered Catholic Charities to stop accepting new admissions immediately. *Id.* ¶ 163, PageID.26.

According to the Complaint, the contract between Catholic Charities and Mid-State requires 30 days' written notice of any alleged breach, an opportunity to cure, a formal provider appeal process for disputes, and a guarantee that payments will not be interrupted during the pendency of any dispute. *Id.* ¶ 114, PageID.19. It contends that Defendants disregarded every one of these protections. *Id.* ¶ 115, PageID.19.

Five days later, Catholic Charities wrote to the Department and copied Mid-State seeking a stay of the discontinuation, asking which specific policies or service requirements Cristo Rey had allegedly violated, and requesting a written response within five business days. *Id.* ¶¶ 164–70, PageID.26–27. According to the well-pleaded allegations, the Department never responded, leading to this lawsuit.

Drawing all reasonable inferences in Catholic Charities' favor—as this Court must—the factual record plausibly establishes that Defendants targeted and excluded Catholic Charities because of its religious beliefs.

## Argument

### I. Mid-State's threshold arguments for dismissal fail.

#### A. Catholic Charities has standing because Cristo Rey is one of its internal ministries and not a separate entity.

Mid-State first suggests that Catholic Charities lacks standing to vindicate injury to Cristo Rey "[b]ecause the Complaint does not plead the relationship between [them] with sufficient precision." MTD Br. 14, PageID.664. But the law and the Verified Complaint confirm that Catholic Charities and Cristo Rey are the same legal entity. An incorporated nonprofit and its unincorporated internal ministries are a single juridical person. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 770 (1984) ("operations of a corporate enterprise organized into divisions must be judged as the conduct of a single actor"). And the incorporated entity is the real party in interest that may "sue or be sued in its corporate name." Mich. Comp. Laws Ann. §§ 600.2051(3), 600.2041.

The Complaint establishes that Catholic Charities is the only incorporated entity, providing some of *its* services under the name Cristo Rey Counseling Services. VC ¶¶ 12–13, PageID.3. It further explains that Catholic Charities was formed through the merger of Cristo Rey Community Center and St. Vincent Catholic Charities. *Id.* And it alleges that Catholic Charities acts "through *its* counseling ministry," *id.* ¶ 2 (emphasis added), namely "through Cristo Rey," *id.* ¶¶ 75, 93, 97, 99, 113, PageID.14, 16–17, 19. According to the Complaint, Cristo Rey is "a ministry of Catholic Charities" holding the same beliefs, teachings, and mission. *Id.* ¶¶ 13, 26, PageID.3, 6. Catholic Charities takes action for Cristo Rey, *id.* ¶¶ 143, 221, PageID.23, 34, and Cristo Rey's circumstances directly impact Catholic Charities, *id.* ¶¶ 202, 212, 260, 267, PageID.31, 33, 40–41. The Complaint also describes one entity using two names: "Catholic Charities/Cristo Rey." *Id.* ¶¶ 112,

175, 206, 217, 219, 241, PageID.19, 27, 32, 34, 37. In short, Cristo Rey *is* Catholic Charities, not a separate entity.

Mid-State cannot seriously contend otherwise. The Complaint alleges that Mid-State dealt directly with *Catholic Charities* officials throughout the events giving rise to this lawsuit, *see* VC, Ex.6, PageID.83–86, and forced *Catholic Charities* to alter its Charitable Choice Notice, VC ¶¶ 134–48, PageID.22–23. And Mid-State's own motion reveals that it told the Department that it had concerns about the faith-based practices of "one of [its] WSS providers"—"[n]amely, Cristo Rey/Catholic Charities of Ingham, Eaton & Clinton," MTD Br., Ex. J, PageID.878. What's more, the amendment to the contract between Mid-State and Cristo Rey is signed by *Catholic Charities*' Interim CEO, Bob Bauer. MTD Br., Ex. B, PageID.786.

The Complaint plausibly alleges that Catholic Charities has standing to vindicate injuries it suffered while operating its internal Cristo Rey ministry.

### B. The Complaint alleges that Defendants acted together and specifically identifies Mid-State's alleged misconduct.

Mid-State next argues that the Complaint should be dismissed for improper group pleading because portions of it refer collectively to "Defendants." MTD Br. 12, PageID.662. That argument fails twice over.

First, Mid-State moved under Rule 12(b)(6), not Rule 8. And "[c]ollecting defendants under a single defined term is permissible and, on its own, is not a basis for dismissal under Rule 12(b)(6)." *Gold Crest, LLC v. Project Light, LLC*, 525 F. Supp. 3d 826, 835 (N.D. Ohio 2021).

Second, the Complaint does not engage in improper group pleading. To the contrary, it repeatedly identifies Mid-State by name and alleges its specific conduct. This includes allegations that Mid-State:

- Initiated the investigation into Catholic Charities' religious beliefs and practices, VC ¶ 124, PageID.21;
- Provided Department officials with Catholic Charities' internal Core Values and Commitment to Mission document, obtained from a former employee, VC ¶ 126, PageID.21; *see also* MTD Br. 6–7, PageID.656–57 (admitting this);
- Expressed concerns about Catholic Charities' core values and religious employment expectations, VC ¶ 127, PageID.21; *see also* MTD Br., Ex. J, PageID.878 (identifying the specific values Mid-State "view[ed] as antithetical" to program requirements);
- Participated in the March 2026 meeting that resulted in "significant conversation" about Catholic Charities' religious employment expectations, including "restrictions related to client discussions and/or referrals" for matters such as "[u]nplanned pregnancies & abortion," "[c]ontraception," "[g]ender identity / gender ideology," and "[a]doption placements with same-sex couples," VC ¶ 128, PageID.21–22;
- Demeaned Catholic Charities' beliefs as conflicting with "objective, non-judgmental client support," VC ¶ 129, PageID.22; *see also* MTD Br., Ex. J, PageID.878 (email showing Mid-State "view[ed]" certain beliefs as "antithetical" to program requirements, "in particular related to open and nonjudgmental discussions about family planning, birth control, abortion, being non-binary/LGBTQ, etc.");
- Created the Faith-Based Disclosure policy shortly after the March meeting, covering the very beliefs discussed in that meeting, VC ¶¶ 134–36, PageID.22–23;

- Forced Catholic Charities to alter its Charitable Choice Notice to include religious disclosures not required by federal law, VC ¶¶ 137–43, PageID.23–24; and
- Aggressively enforced the discontinuation decision by immediately stopping referrals and demanding client transition procedures the same day, VC ¶¶ 176–79, PageID.27–28.

Taken as true, these allegations foreclose any "dismissal" based on "impermissible group pleading." *Igo v. Sun Life Assurance Co. of Canada*, 652 F. Supp. 3d 929, 935 (S.D. Ohio 2023). Far from lumping Defendants together, the Complaint pleads defendant-specific facts that distinguish Mid-State's conduct and devotes separate sections to Mid-State's role. Mid-State's own brief acknowledges the specific acts it took—confirming that these allegations are anything but conclusory.

That some allegations refer to both Mid-State and the State Defendants does not make them "group pleading." Those allegations pair the Defendants because both are responsible for the conduct alleged. *See, e.g.*, VC ¶ 127, PageID.21 ("[B]oth the Department and Mid-State Health Network raised concerns about [Catholic Charities'] core values and religious expectations for employees."). And allegations referring generally to "Defendants" mean *all* Defendants, typically when describing the impact of their actions. *See, e.g.*, VC ¶ 123, PageID.21 ("Defendants have singled out Catholic Charities—and punished it—for its Catholic beliefs and practices.").

When, as here, multiple defendants act in concert toward a common unlawful objective, collective pleading that identifies each defendant's participation in the scheme satisfies federal pleading standards.

Mid-State's cited cases do not apply. *Estate of Barney v. PNC Bank, Nat'l Ass'n*, 714 F.3d 920, 928–29 (6th Cir. 2013), involved a single defendant, never addressed group pleading, and does not even contain the language Mid-State

quotes. *See* MTD Br. 12, PageID.662.[2] And the complaint in *Marcilis v. Township of Redford*, 693 F.3d 589, 596 (6th Cir. 2012), named two DEA agents but mentioned them just once, for the sole "purpose[ ] of identifying them as [DEA] employees"—unlike the Complaint here, which names Mid-State more than 50 times.

This case is more like *Buehner v. City of Cleveland*, 788 F. Supp. 3d 827, 893–94 (N.D. Ohio 2025), where a complaint alleging two detectives worked in tandem on an investigation, conducted interviews together, and brought suspects into custody together sufficiently placed both on notice of § 1983 claims against them.

So too here. The Complaint alleges that Mid-State and the Department worked together throughout the investigation and exclusion of Catholic Charities, identifying Mid-State's specific conduct at each stage. The Complaint alleges that Mid-State initiated the investigation, VC ¶¶ 124, 126, PageID.21; participated in the March 2026 meeting interrogating Catholic Charities about its beliefs, VC ¶ 128, PageID.21–22; adopted a new policy five days after targeting those beliefs, VC ¶¶ 135–38, PageID.22–23; and enforced the discontinuation and exclusion by immediately halting referrals and funding, VC ¶¶ 163, 176–79, PageID.26–28.

Of course, Catholic Charities "must ultimately prove its case." *Igo*, 652 F. Supp. 3d at 935. But the Complaint "sufficiently puts [Mid-State] on notice of [its] alleged misconduct." *Id.*

## II. The Verified Complaint plausibly states claims for relief.

Mid-State's motion should also be denied because the Verified Complaint plausibly states free-exercise, free-speech, Charitable-Choice, religious-autonomy, and due-process claims.[3] On a motion to dismiss under Rule 12(b)(6), the Court

[2] This problem recurs throughout Mid-State's brief. *See, e.g.*, MTD Br. 15, PageID.665 (including quotations from *Teen Ranch* and *Lukumi* that do not exist).

[3] Despite seeking total dismissal, Mid-State's motion does not address the retaliation or equal-protection claims. Nor does it explain why dismissal would be

must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. The Court may not weigh evidence, resolve factual disputes, or consider extrinsic materials outside the pleadings. Mid-State's motion repeatedly asks the Court to do exactly that—to credit Mid-State's version of events, accept its contested factual assertions, and resolve disputed issues in its favor. That is improper at this stage. Applying the correct standard, the Complaint plausibly states each of Catholic Charities' claims.

### A. Mid-State's actions violate the Free Exercise Clause.

Under Supreme Court precedent, a plaintiff may establish "a free exercise violation in various ways." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). A plaintiff may show that the government targeted and exhibited hostility toward particular religious beliefs, *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 625 (2018); that government action burdens religious exercise and is neither neutral nor generally applicable, *Fulton v. City of Phila.*, 593 U.S. 522, 533 (2021); or that the government excluded a religious entity from an otherwise available public benefit because of its "religious character" or "religious exercise," *Carson v. Makin*, 596 U.S. 767, 780–81 (2022).

The Complaint plausibly alleges a free-exercise violation under all three theories. Mid-State's contrary inferences about motive, neutrality, and the basis for exclusion cannot be resolved on a motion to dismiss.

#### 1. Mid-State targeted and expressed hostility towards Catholic Charities' religious beliefs.

Because the Free Exercise Clause protects against religious hostility that is "masked, as well as overt," courts must "survey meticulously the circumstances of

---

proper under Rule 12(b)(7) "for failure to join the Department as a necessary and indispensable party." MTD Br. ix, PageID.649. The Complaint names Department officials in their official capacity, which is "no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

governmental categories to eliminate, as it were, religious gerrymanders." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). This requires examining "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Masterpiece*, 584 U.S. at 639.

Under this framework, the Complaint plausibly alleges that Mid-State "targeted Catholic Charities for its religious beliefs and practices." VC ¶ 19, PageID.5. The Court must accept these allegations as true and draw all reasonable inferences in Catholic Charities' favor.

Start with the historical background and the events leading to the challenged actions. The Complaint alleges that Mid-State launched an investigation into Catholic Charities' religious beliefs and practices after obtaining the ministry's Core Values and Commitment to Mission document from a former employee. VC ¶¶ 124, 126, PageID.21. Mid-State then shared that internal religious document with Department officials and led the March 2026 meeting, which featured "significant conversation" about Catholic Charities' religious beliefs—including "restrictions related to client discussions and/or referrals" concerning "[u]nplanned pregnancies & abortion," "[c]ontraception," "[g]ender identity / gender ideology," and "[a]doption placements with same-sex couples." VC ¶¶ 126–28, PageID.21–22; *see also* MTD Br. 6–7, PageID.656–57. Mid-State then created—with Department approval—a new policy singling out the very beliefs and practices discussed at that meeting. VC ¶¶ 134–38, PageID.22–23; *see also* MTD Br., Ex. C at ¶ 4, PageID.791 ("By law and contract, Mid-State must also seek State approval of policies prior to implementation.").

These allegations alone are sufficient to defeat Mid-State's motion. As the Supreme Court admonished, "upon even *slight suspicion* that proposals for state

intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." *Masterpiece*, 584 U.S. at 638–39 (citation modified; emphasis added).

But there is more. The Complaint asserts that Mid-State's contemporaneous statements, reflected in its own meeting notes, demeaned Catholic Charities' beliefs as conflicting with "objective, non-judgmental client support." VC ¶ 129, PageID.22. And Mid-State's written correspondence to the Department—sent two weeks before the March meeting—expressed the view that Catholic Charities' beliefs were "antithetical" to "open and nonjudgmental discussions about family planning, birth control, abortion, being non-binary/LGBTQ, etc." MTD Br., Ex. J, PageID.878. Mid-State then underlined, in red, the specific beliefs it found objectionable. MTD Br., Ex. H, PageID.870–72. Those beliefs, Mid-State told the Department, flunked the government's orthodoxy test: Mid-State would "look at discontinuing" Catholic Charities' contract unless the ministry "reconcile[d]" its "religious orientation with the expectations for WSS and prevention programming." MTD Br., Ex. J, PageID.878.

Taken as true and construed in Catholic Charities' favor, these contemporaneous statements plausibly establish religious hostility and refute Mid-State's litigation position that no one "made or intended any demeaning or disparaging remark about Plaintiff's religious beliefs." MTD Br. 19, PageID.669. Mid-State's assertion to the contrary asks the Court to weigh evidence and credit its contested version of events, which is improper at this stage. The contemporaneous statements likewise belie Mid-State's assertion that it played no role in Catholic Charities' disqualification or exclusion. *See* MTD Br. 18, PageID.668.

Mid-State's "decade-long history of contracting with faith-based providers" does not change the analysis. MTD Br. 17, PageID.667. It is no defense that *some* faith-based providers may participate while others with disfavored practices may

not. In *Carson*, Maine likewise argued that its funding condition excluded not all religious providers but only those engaged in prohibited religious activity. The Supreme Court rejected that argument. 596 U.S. at 788. So should this Court—particularly given Mid-State's stated reason for why some religious groups are in and Catholic Charities is out: its "expected adherence to Catholic teachings" is "more explicit and proscriptive than any faith-based provider [Mid-State has] worked with in the past." MTD Br., Ex. J, PageID.878. An admission that faith-based participation turns on how "explicit" and "proscriptive" a provider's beliefs are does not dispel constitutional concerns—it magnifies them. *See Larson v. Valente*, 456 U.S. 228 (1982) (state statute treating some religious denominations more favorably than others violated the Establishment Clause).

Mid-State's remaining arguments fare no better.

Mid-State's contention that it initiated the investigation and created the Faith-Based Disclosure policy "to satisfy mandatory legal obligations," MTD Br. 18, PageID.668, rests on a contested factual premise that the Court may not resolve in Mid-State's favor at this stage. In any event, the Supreme Court has struck down government action when the *decision-making process itself* was infected by religious hostility, because such hostility is always "inconsistent with the First Amendment's guarantee that our laws be applied in a manner that is neutral toward religion." *Masterpiece*, 584 U.S. at 640.

Mid-State's actions also were not legally mandated. As alleged in the Complaint, neither Treatment Policy #12, Technical Advisory #08, nor Catholic Charities' contract with Mid-State mentions—let alone requires—referrals for abortion or contraception that would violate Catholic Charities' sincerely held religious beliefs. VC ¶¶ 76–79, 94, PageID.14, 16–17. To the contrary, federal Charitable Choice provisions require Mid-State to accommodate Catholic Charities' religious beliefs and practices. 42 U.S.C. § 300x-65(b), (c)(1). And the federal Weldon

Amendment expressly prohibits any state or local government receiving federal HHS funds—such as Mid-State—from discriminating against any health care entity "on the basis that the entity does not provide, pay for, provide coverage of, or refer for abortions." Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, Div. B, § 507(d)(1), 140 Stat. 173, 317 (2026). Yet that is what Mid-State has done.[4]

Nor does it matter that the Department—rather than Mid-State—signed the discontinuation letter. *Contra* MTD Br. 20, PageID.670. The Complaint plausibly alleges that Mid-State acted in concert with the Department at every stage: initiating the investigation, sharing Catholic Charities' internal religious document with Department officials, planning and participating in the March 2026 interrogation meeting, adopting a policy targeting the beliefs discussed in that meeting, and aggressively enforcing the discontinuation the very day it was issued. VC ¶¶ 124–28, 135–38, 163, PageID.21–23, 26. Mid-State cannot evade liability for unconstitutional conduct merely because the Department delivered the final blow.

**2. Mid-State's actions are not neutral or generally applicable.**

The Complaint also plausibly alleges that Mid-State's actions burden Catholic Charities' religious exercise while being neither neutral nor generally applicable. That, too, states a free-exercise claim under *Fulton*, 593 U.S. at 533 (2021). Mid-State's contrary arguments again ask the Court to weigh evidence and resolve disputed facts—precisely what Rule 12(b)(6) forbids.

In addition to alleging that Defendants targeted Catholic Charities for its beliefs and imposed unnecessary burdens, the Complaint contends that Mid-State created a facially non-neutral policy that applies only to faith-based providers and only to decisions taken for religious reasons. VC ¶¶ 134–40, PageID.22–23. When

---

[4] The federal Hyde Amendment similarly prevents federal funds from facilitating abortions, except in limited circumstances. Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, Div. B, §§ 506–507, 140 Stat. 173, 317 (2026).

"the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Lukumi*, 508 U.S. at 533.

Mid-State insists that the Faith-Based Disclosure policy adopted after the March 2026 meeting is "facially neutral because its object is not to suppress religion." MTD Br. 15, PageID.665. But "[t]o determine the object of a law, we must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face." *Lukumi*, 508 U.S. at 533. And here, the facial discrimination is unmistakable—it appears in the title itself: "Disclosure of *Faith-Based* Treatment Orientation." By its express terms, the policy reaches only faith-based providers—or, as Mid-State puts it, "any provider whose services are shaped by *religious values*." Mid-State Resp. to Mot. for Prelim. Inj. at 14, PageID.361 (emphasis added).

The facial non-neutrality extends beyond the title. The policy's plain text mandates disclosure of treatment orientation only when it is "informed by a specific religious framework." VC, Ex.7, PageID.88. It requires disclosure of service limitations only when they are "informed, restricted or shaped by a particular set of religious values, proscriptions, or doctrine." *Id.* And it forces faith-based providers alone to notify clients at first contact how services will be delivered if they have needs related to "[f]amily planning," "[b]irth control," "[p]regnancy," "[a]bortion," "[s]exual orientation," "[g]ender identity," and "[m]arriage or relationship structures." *Id.*, PageID.89. Because that notification requirement applies only to "Requests for Services Potentially Affected by Religious Doctrine," secular providers need not make similar disclosures. *Id.*

Mid-State says it adopted this non-neutral policy "to implement" its interpretation of federal law. MTD Br. 15, PageID.665. That justification is legally irrelevant. A policy that singles out religion for unique treatment is not neutral, whatever the reason. *Lukumi*, 508 U.S. at 533. "There is no state or federal

regulatory exception" to the First Amendment. *Smith v. City of Atl. City*, 138 F.4th 759, 771 (3d Cir. 2025). So Mid-State's "policy, the state regulation, and the federal regulation all necessarily yield to the Constitution." *Id.*

The Complaint plausibly alleges that Mid-State's actions are not generally applicable for the same reasons. Government action is "not neutral and generally applicable" whenever it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (citation omitted) (emphasis in original). Comparability is measured "against the asserted government interest that justifies the regulation at issue." *Id.*

Here, Mid-State asserts a purported interest in facilitating access to abortion and contraception. *See* MTD Br. 16, PageID.666 (claiming an interest in ensuring "access to evidence-based treatment"). But that interest is not grounded in program requirements and is not pursued evenhandedly. As alleged, nothing in Treatment Policy #12, Technical Advisory #08, or Catholic Charities' contract with Mid-State demands referrals for abortion or contraception that would violate Catholic Charities' sincerely held religious beliefs. VC ¶¶ 76–79, 94, PageID.14, 16–17. Nor could such requirements exist, given that the substance-abuse treatment and prevention program is federally funded. *See* supra pp. 18–19 (discussing Charitable Choice provisions and the Weldon Amendment).

Nor does Mid-State pursue evenhandedly its asserted interests in "client autonomy" and "informed consent." MTD Br. 16, PageID.666. Secular providers that decline to offer abortion, contraception, or other services for *non-religious* reasons undermine that interest in precisely the same way. Yet Mid-State adopted a policy aimed exclusively at faith-based providers whose services may be influenced by a "religious orientation." VC ¶¶ 136–140, PageID.22–23. The Complaint alleges (and the Court must accept as true) that Mid-State does not scrutinize secular providers that limit services for non-religious reasons—whether staffing constraints, resource

limitations, programmatic focus, or philosophical disagreement. VC ¶ 223, PageID.35.

The Complaint plausibly alleges that those secular limitations threaten the government's asserted interest just as much. In either case, clients may not receive every conceivable option from a single provider. Yet only Catholic Charities has been penalized and excluded. That exclusion is not generally applicable because it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534 (citing *Lukumi*, 508 U.S. at 542–46).

**3. Mid-State excluded Catholic Charities from a public benefit solely because of its religious character and exercise.**

The Complaint also plausibly states a free-exercise claim by alleging that Mid-State, together with the Department, excluded Catholic Charities from a government benefit program because of its religion. VC ¶¶ 123–81, 229, PageID.21–28, 36.

The Free Exercise Clause forbids "indirect coercion or penalties on the free exercise of religion" just as much as "outright prohibitions." *Carson*, 596 U.S. at 778. The Supreme Court has thus "repeatedly held" that the government cannot "exclude[ ] religious observers from otherwise available public benefits" because of their "religious character" or "religious exercise." *Id.* at 778–81 (2022); *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020).

In *Trinity Lutheran*, the Supreme Court held that a state could not exclude "otherwise eligible" churches from a playground resurfacing program because of the churches' "religious character." 582 U.S. at 462. In *Espinoza*, the Court applied the same principle to a state program giving tax credits for private-school scholarships: the state could not bar "religious schools from public benefits solely because of the

religious character of the schools." 591 U.S. at 476, 487. And in *Carson*, the Court extended this protection further, holding that Maine could not exclude religious schools from a tuition assistance program based on their religious use of state funds. 596 U.S. at 787.

These "unremarkable principles" control here. *Id.* at 780 (citation modified).

First, Mid-State—through its partnership with the State—offers a "benefit" that Catholic Charities is "otherwise eligible" to receive: federal Substance Use Block Grant funds. *Id.* at 779–80. Government funding is a quintessential public benefit, and the block grant funds here fall squarely within that category, just as the grants in *Trinity Lutheran*, the scholarships in *Espinoza*, and the tuition assistance in *Carson* did. *Contra* MTD Br. 21, PageID.671 (wrongly characterizing the benefit as merely a "state contract").

Second, Mid-State excludes Catholic Charities solely because of its religion. *Carson*, 596 U.S. at 778–81. The Complaint alleges that Catholic Charities holds sincerely held religious beliefs that prevent it from providing or otherwise facilitating access to abortions and contraception. VC ¶¶ 34–51, PageID.7–9. And there can be no dispute that Defendants would have continued funding Catholic Charities had the ministry agreed to abandon or violate its religious beliefs on these matters of life and death.

Mid-State does not meaningfully dispute this. It instead deflects blame to the Department, arguing that it bears no responsibility for Catholic Charities' "disqualification" and "exclusion" because the Department has the final word on the Women's Specialty Services and Enhanced Women's Services designations. MTD Br. 22, PageID.672. That argument fails for two reasons. First, it asks the Court to resolve contested facts in Mid-State's favor, which is improper on a motion to dismiss. Second, it ignores the Complaint's plausible allegations that Mid-State initiated—and remained intimately involved in—the discontinuation decision and

exclusion. Third, it overlooks Mid-State's own statement that Catholic Charities' religious beliefs and practices are "fundamentally incompatible with the federal and state regulatory framework governing the very programs in which it sought to participate." Mid-State Resp. to Mot. for Prelim. Inj. at 15, PageID.348. Mid-State cannot now distance itself from a decision it initiated, endorsed, and stood ready to implement.

By conditioning participation in the federal grant program on Catholic Charities' "willingness to abandon [its] sincere religious beliefs," Mid-State "burdened" the ministry's "free exercise rights." *Dahl v. Bd. of Trustees of W. Mich. Univ.*, 15 F.4th 728, 732 (6th Cir. 2021). The Free Exercise Clause forbids this kind of coercion.

### B. Mid-State violates the Free Speech Clause.

Mid-State cannot escape the free-speech claim by relabeling its speech violations as program requirements, professional conduct, or factual disclosures. MTD Br. 23–25, PageID.673–75. The Complaint plausibly alleges that Mid-State and the State Defendants alike require Catholic Charities to make abortion and contraception referrals and to change its Commitment to Mission. It further alleges they require first-contact disclosures describing Catholic Charities' services as "restricted" by Catholic doctrine. VC ¶ 138, PageID.23. Accepting these allegations as true, Mid-State's actions both compel and restrict speech in violation of the First Amendment.

#### 1. Mid-State compels Catholic Charities' speech.

Catholic Charities' counseling, Core Values and Commitment to Mission document, Charitable Choice Notice, and referral practices express the ministry's religious beliefs. Forcing Catholic Charities to alter that speech, direct clients toward services and procedures its religion forbids, and warn clients that its care is

limited because it is religious changes Catholic Charities' own message. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 586–89 (2023).

*NIFLA* controls. In that case, California required pro-life pregnancy centers to "notify women that California provides free or low-cost services, including abortions, and give them a phone number to call." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* ("*NIFLA*"), 585 U.S. 755, 760 (2018). The Supreme Court struck down the requirement. By compelling pregnancy centers "to inform women how they can obtain state-subsidized abortions—at the same time [those centers] try to dissuade women from choosing that option—the [disclosure requirement] plainly 'alters the content' of [the centers'] speech." *Id.* at 766 (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)).

This case is no different. The Complaint plausibly alleges that Mid-State compels Catholic Charities to inform women about abortion and contraception and to facilitate access to those services. Defendants' attempted distinctions fail because these mandates are neither informed-consent rules tied to a medical procedure nor "purely factual and uncontroversial" commercial disclosures. *See NIFLA*, 585 U.S. at 768–70. Rules of that kind require providers only to convey factual, noncontroversial information about procedures they are about to perform. *Id.* The referral requirement and religious disclosures here do nothing of the sort: they are indifferent to whether Catholic Charities explains "the risks or benefits" of abortion to women. *Id.* at 770. They instead compel the ministry to describe its own work as "restricted" by religion and to steer clients toward a procedure its faith teaches is the intentional destruction of an innocent human life. That is not informed consent.

Nor is it accurate to say that the Faith-Based Disclosure policy simply "asks" Catholic Charities to "disclose that its services are informed by a religious framework." MTD Br. 23, PageID.673. Catholic Charities already does that, as the Complaint alleges. *See* VC ¶ 134, PageID.22. The policy demands far more: Catholic

Charities must tell everyone at first contact that its services are "restricted or shaped by a particular set of religious values, proscriptions, or doctrine," and then disclose—verbally and in writing—the "relevant religious limitations on treatment" concerning "[a]bortion," "[b]irth control," "[g]ender identity," and other religiously sensitive issues. VC, Ex.7, PageID.88–89. It must then offer a "referral" and "warm handoff to a different provider" for the very services its faith forbids. *Id.*, PageID.89.

*Rust* does not help Mid-State either. That case upheld a funding restriction because it regulated only speech within the federally funded Title X project, leaving the grantee free to speak outside that project with separate funds; nor did it require a doctor to represent as his own an opinion he did not hold. *Rust v. Sullivan*, 500 U.S. 173, 193, 196, 200 (1991). By contrast, Mid-State does not stop at defining what a Women's Services project may say with public funds. The Complaint alleges that Mid-State reaches into Catholic Charities' faith-based policies—its Commitment to Mission and referral rules—that the ministry must and does apply both inside and outside the program, and treats adherence to those policies in the counseling relationship as grounds for exclusion. Mid-State does all this despite its contract stating that Catholic Charities is "solely responsible for all decisions regarding the medical care and treatment of [Mid-State] consumers that are referred for treatment" and promising that "[t]he traditional relationship between [Catholic Charities] and consumer shall in no way affected by the terms of this Agreement." MTD Br., Ex.D, PageID.819.

*AOSI* confirms the limit. The government may define a funded program, but it may not "recast a condition on funding as a mere definition of its program," require recipients to adopt the government's view as their own, or impose a condition that "by its very nature" reaches beyond the funded program and defines the recipient. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* ("*AOSI*"), 570 U.S. 205, 214–15, 218–19 (2013). The Complaint alleges that Mid-State crosses that line

by defining program participation to require Catholic Charities to communicate and facilitate a message about abortion and contraception that the ministry rejects, that the program agreement does not require, and that federal law expressly forbids. *See* Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, Div. B, § 507(d)(1), 140 Stat. 173, 317 (2026) (Weldon Amendment) (state and local governments receiving federal HHS funds cannot discriminate against any health care entity "on the basis that the entity does not provide, pay for, provide coverage of, or refer for abortions").

#### 2. Mid-State imposes content- and viewpoint-based restrictions on Catholic Charities' speech.

The Complaint plausibly alleges that the same mandates are also content- and viewpoint-based. And *NIFLA* forecloses any attempt to characterize the speech as professional conduct. That case rejects any freestanding "professional speech" exception and permits lower scrutiny only when the government regulates conduct and the speech is merely incidental—not when the government regulates the communicative content of the interaction itself. *NIFLA*, 585 U.S. at 767–70.

*Chiles* confirms that the government cannot avoid strict scrutiny by calling speech "treatment" when the rule turns on the message conveyed. *Chiles v. Salazar*, 146 S. Ct. 1010, 1023–24 (Mar. 31, 2026). The Sixth Circuit applied the same principle to Michigan counseling restrictions, holding that Catholic counseling consisting of "spoken words and nothing more" is speech and that content- and viewpoint-based regulation of that counseling triggers strict scrutiny. *Cath. Charities of Jackson v. Whitmer*, 162 F.4th 686, 688, 695–96 (6th Cir. 2025).

The Complaint plausibly alleges that Defendants' referral mandate is content-based because it is triggered by abortion and contraception, and viewpoint-based because Catholic Charities is penalized for declining to facilitate those services. The Faith-Based Disclosure policy shares the same defect: it applies to faith-based providers precisely because their care is religiously informed, compels

speech about religious limitations, and imposes no parallel requirement on secular providers with secular limits.

*Teen Ranch* does not excuse any of this. *Contra* MTD Br. 24, PageID.674. That case held only that government contracting for residential services did not create a forum for private speech; it did not approve singling out religious providers for compelled disclosure. *Teen Ranch, Inc. v. Udow*, 389 F. Supp. 2d 827, 840 (W.D. Mich. 2005), *aff'd*, 479 F.3d 403, 410 (6th Cir. 2007).

### C. Mid-State violates the Charitable Choice Act.

The Verified Complaint also plausibly states a claim under the Charitable Choice Act. Indeed, Mid-State does not dispute that claim's elements: the programs are funded through block grants; Defendants deliver services through nongovernmental providers; Catholic Charities provides covered services; and Mid-State agrees it is bound by the Act. 42 U.S.C. § 300x-65(b), (h), (k); MTD Br. 28, PageID.678. At this stage, then, the only question is whether the Complaint plausibly alleges a violation—not whether Catholic Charities will ultimately prevail on the merits. It does.

Charitable Choice forbids discrimination "on the basis that the organization has a religious character," and preserves a religious provider's "control over the definition, development, practice, and expression of its religious beliefs." 42 U.S.C. § 300x-65(b), (c)(1). The Complaint plausibly alleges that Defendants together violated these protections by discontinuing Cristo Rey's designation because of its "internal policies and procedures" and by conditioning reinstatement on "policy and procedural changes." VC ¶¶ 151, 156, PageID.25. Accepting these allegations as true—as the Court must—that is not neutral program administration; it is a demand that a religious provider alter how it defines and practices its religious commitments as the price of participation.

Mid-State again tries to shift blame, arguing that the Department alone demanded "policy and procedural changes." MTD Br. 29, PageID.679. But that argument improperly asks the Court to credit Mid-State's contested version of facts and to ignore the Complaint's plausible allegations that Mid-State initiated, participated in, and enforced the discontinuation and exclusion. VC ¶¶ 123–81, PageID.21–28. The Court cannot resolve these factual disputes in Mid-State's favor on a motion to dismiss. And Mid-State has made clear its view that Catholic Charities' religious beliefs and practices are "fundamentally incompatible with the federal and state regulatory framework governing the very programs in which it sought to participate." Mid-State Resp. to Mot. for Prelim. Inj. at 1, PageID.348. So Mid-State actually agrees with the Department: Catholic Charities must alter its internal policies and practices to participate.

Mid-State's argument that the Faith-Based Disclosure policy merely implements federal law fares no better. MTD Br. 29, PageID.679. This argument, too, rests on a contested factual premise that the Court may not accept in Mid-State's favor at this stage. The argument is also plainly wrong.

While Charitable Choice does anticipate referrals to another provider when a beneficiary objects to a provider's "religious character," 42 U.S.C. § 300x-65(e)(1), that provision contemplates situations like an atheist objecting to a faith-based provider or a Jewish beneficiary objecting to a Christian provider. And even then, it is "the appropriate Federal, State, or local government entity" that must furnish services "from an alternative provider." *Id.* § 300x-65(e)(1)(A). Nothing in Charitable Choice allows—let alone requires—Mid-State to single out faith-based providers in advance, compel them to announce religious "limitations" at first contact, impose disclosure burdens secular providers never bear, or force them to facilitate procedures that conflict with their sincerely held beliefs. Congress enacted Charitable Choice to ensure faith-based participation, not to stamp it out.

Mid-State also cannot defeat the Charitable Choice claim by saying Catholic Charities remains free to affirm Catholic doctrine in the abstract. Charitable Choice plainly allows faith-based providers to participate in the federal grant program without surrendering control over the "practice" or "expression" of their religious beliefs. 42 U.S.C. § 300x-65(c)(1).

### D. Mid-State violates Catholic Charities' right to religious autonomy.

For similar reasons, the Complaint plausibly alleges a violation of the First Amendment's protection of religious autonomy. *See* VC ¶¶ 266–69, PageID.41–42.

The First Amendment's Religion Clauses jointly grant "a spirit of freedom for religious organizations, an independence from secular control or manipulation." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). This "general principle of church autonomy" encompasses the "independence of religious institutions . . . with respect to internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746–47 (2020).

The Complaint alleges that Catholic Charities' internal policies and procedures—including its Commitment to Mission and referral rules—are rooted in Catholic teachings and doctrine. VC ¶¶ 47–48, 56–58, PageID.9, 10. It further alleges that Defendants demand that Catholic Charities make "policy and procedural changes" abandoning those teachings as a condition of reinstatement. VC, Ex.9, PageID.96. Accepting these allegations as true—as the Court must—this is precisely the kind of governmental interference in "matters of faith and doctrine" that the First Amendment forbids. *Our Lady of Guadalupe*, 591 U.S. at 747.

Mid-State's response is to shrink religious autonomy to hiring, firing, and corporate form. That is not the law. The First Amendment protects a religious institution from secular control over "matters of church government as well as those

of faith and doctrine." *Kedroff*, 344 U.S. at 116. This "broad principle" includes "internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe*, 591 U.S. at 746–47.

This case falls within that protection. Catholic Charities' Core Values and Commitment to Mission is neither a workplace preference nor a service manual; it is an internal ministry rule governing how staff carry out Catholic teaching. The Complaint plausibly alleges that this rule triggered Mid-State's response, that Defendants investigated Catholic Charities over its interpretation and application of that internal religious policy, and that Defendants discontinued Cristo Rey's designation once the ministry confirmed that its beliefs preclude abortion and contraception services. The government may not condition public participation on revising the internal religious standards that define a ministry. Religious autonomy forbids "any attempt by government to dictate *or even to influence* such matters." *Id.* at 746 (emphasis added).

### E. Mid-State's actions violated the Due Process Clause.

Catholic Charities also plausibly alleges a due-process claim. "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542–44 (1985) (internal quotation omitted). Defendants provided neither here. The Complaint alleges that Mid-State and the Department worked together to strip Catholic Charities of its longstanding designation and excluded it from the federal block grant program because of the ministry's internal religious policies—without identifying any concrete violation, holding any hearing, or affording any opportunity to cure. VC ¶¶ 234–46, PageID.37–38.

Mid-State argues that Catholic Charities lacks any property interest because contract provisions are mere procedural protections that "do not themselves create a substantive entitlement." MTD Br. 30, PageID.680. That argument attacks a straw man. Catholic Charities does not claim a property interest in procedures alone. It claims an interest in an existing designation and service line secured by a longstanding contract. Protected property interests "take many forms"; they are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents v. Roth*, 408 U.S. 564, 576–77 (1972).

Here, the Complaint plausibly alleges that Catholic Charities (through Cristo Rey) has contracted with Mid-State for more than a decade to provide substance abuse services. VC ¶ 113, PageID.19. The contract's notice, cure, appeal, and payment-continuity provisions—combined with the ministry's decade of continuous participation under defined eligibility criteria—demonstrate that the relevant property interest did not depend on discretionary grace but was instead grounded in "rules or understandings." *Roth*, 408 U.S. at 576. In addition to this protected property interest, the Complaint alleges that Catholic Charities has a protected liberty interest in practicing its religious ministry free from arbitrary governmental interference. VC ¶ 237, PageID.37.

The Complaint also plausibly alleges that Defendants supplied no meaningful process. According to the Complaint, the March 13 meeting was an interrogation about Catholic Charities' religious beliefs and practices—not notice of charges or a hearing on discontinuation. The Complaint explains that no Defendant identified the precise rule violated, the evidence supporting it, the required cure, or the consequences. And the Discontinuation Letter came too late; it was the deprivation. The Complaint thus plausibly alleges that Mid-State deprived Catholic Charities of

its protected interests "without adequate notice or any meaningful opportunity to address Defendants' concerns." *Id.* ¶ 238, PageID.37. That is enough to state a due-process claim.

Nor can Mid-State hide behind the Department. The Complaint plausibly alleges that Mid-State initiated and participated in the investigation of the ministry's religious beliefs and practices, created the Faith-Based Disclosure policy, and enforced the discontinuation and exclusion by immediately halting referrals and funding. The contract's funding-loss clause does not help Mid-State either, *contra* MTD Br. 31–32, PageID.681–82, because the Complaint plausibly alleges that the loss of funds flowed directly from the targeted investigation Mid-State itself initiated.

In short, terminating a longstanding designation and related government funding without notice or a hearing is administrative fiat, not due process.

## III. There is no need to convert Mid-State's motion.

By labeling its responsive pleading a "Motion to Dismiss and for Summary Judgment," Mid-State suggests that the Court could convert its motion to summary judgment. The Court should decline the invitation.

First, conversion would be improper because Mid-State's motion asks the Court to weigh evidence and resolve factual disputes—precisely what Rule 12(b)(6) forbids and what summary judgment cannot accomplish without a developed record.

Second, summary judgment at this early stage would be premature. "While conversion to summary judgment rests in the Court's discretion, the case law cautions courts against hasty conversions, particularly where discovery has not yet commenced." *Geiling v. Wirt Fin. Servs., Inc.*, No. 14-11027, 2014 WL 8473822, at *3 (E.D. Mich. Dec. 31, 2014). Here, Catholic Charities has not had the chance to depose a single Mid-State or Department witness, nor has it obtained Defendants'

internal communications about the discontinuation decision. Resolving every claim against Mid-State on that record would deny Catholic Charities a fair opportunity to develop the facts underlying its claims.

Third, Mid-State's motion does not meet the basic requirements for summary judgment. Under Rule 56, "[t]he court shall grant summary judgment" only when "the movant *shows that there is no genuine dispute as to any material fact* and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). Mid-State never attempts that showing. Its motion instead mirrors its response to Catholic Charities' preliminary-injunction motion and attaches the same exhibits, without explaining why those exhibits entitle it to judgment or identifying which material facts it claims are undisputed. Without that threshold showing, there is nothing for Catholic Charities to controvert and nothing for the Court to review. A movant cannot shift the summary-judgment burden by attaching exhibits and leaving everyone else to construct its argument.

Fourth, "many of the attached documents here can be considered without conversion." *Geiling*, 2014 WL 8473822, at *13. In fact, most of the exhibits attached to Mid-State's motion are either (1) already attached to or referenced in the Verified Complaint or (2) public records. That includes the relevant contracts, Mid-State's written policies, and the Department's and Mid-State's letters related to the discontinuation decision. *See* MTD Br., Exs. A, B, D, E, F, G, K, and L. Such materials can be considered without converting the motion. *See Bassett*, 528 F.3d at 430; *Musleh v. Am. Steamship Co.*, 326 F. Supp. 3d 507, 514 (E.D. Mich. 2018).

The Court can disregard the rest. *See Geiling*, 2014 WL 8473822, at *4 ("Many courts have excluded such materials and considered the motion to dismiss without reference to them."). Mid-State's extrinsic evidence—including the Meier Affidavit (Ex. C), the underlined version of the Core Values and Commitment to Mission document (Ex. H), and Mid-State's emails to the Department (Exs. I and

J)—cannot be considered on a motion to dismiss and should be disregarded. But even if the Court were to consider these materials, they would not help Mid-State: each confirms that Mid-State knew of Catholic Charities' religious commitments and acted against the ministry because of them. If those documents establish anything at this stage, it is that Catholic Charities—not Mid-State—is entitled to summary judgment.

## Conclusion

For all these reasons, the Court should deny Mid-State's motion to dismiss.

Respectfully submitted this 8th day of September, 2026.

By: *s/ Jeremiah Galus*

John J. Bursch
Michigan Bar No. P57679
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-435
jbursch@adflegal.org

Ryan J. Tucker
Arizona Bar No. 034382
Jeremiah Galus
Arizona Bar No. 030469
Mark Lippelmann
Arizona Bar No. 036553
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rtucker@ADFlegal.org
jgalus@ADFlegal.org
mlippelmann@ADFlegal.org

David A. Cortman
Georgia Bar No. 188810
**Alliance Defending Freedom**
1000 Hurricane Shoals Rd. NE,
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@adflegal.org

Mikayla Douglas
Texas Bar No. 24138378
**Alliance Defending Freedom**
7250 Dallas Parkway, Suite 700
Plano, TX 75024
(469) 894-8705
mculbertson@ADFlegal.org

*Attorneys for Plaintiff*

**Certificate of Compliance**

I hereby certify that this brief contains 9,952 words in compliance with W.D. Mich. LCivR 7.2(b), and that this brief was prepared using Microsoft® Word for Microsoft 365 MSO (Version 2605 Build 20026.20112).

s/ *Jeremiah Galus*
Jeremiah Galus

*Attorney for Plaintiff*

## Certificate of Service

I hereby certify that on the 8th day of September, 2026, I electronically filed the foregoing document with the Clerk of Court using the ECF system which will send notification of such filing to all counsel of record who are registered users of the ECF system.

s/ *Jeremiah Galus*
Jeremiah Galus

*Attorney for Plaintiff*