UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHOLIC CHARITIES OF INGHAM,
EATON & CLINTON COUNTIES,

Plaintiff,

v.

ELIZABETH HERTEL, et al.,

Defendants.
______________________________/

Case No. 1:26-cv-1941

Hon. Hala Y. Jarbou

## OPINION

Plaintiff Catholic Charities of Ingham, Eaton & Clinton Counties ("CCIEC") brings this civil rights action against Elizabeth Hertel, former Director of the Michigan Department of Health and Human Services ("MDHHS");[1] Angela Smith-Butterwick, Director of MDHHS's Substance Use, Gambling & Epidemiology Division; Dana Nessel, Michigan's Attorney General; and Mid-State Health Network ("Mid-State"), a regional government entity formed under Michigan state law. Before the Court are CCIEC's motion for a preliminary injunction (ECF No. 7) and Defendants' motions to dismiss the complaint (ECF Nos. 16, 18). For the reasons herein, the Court will deny the motion for a preliminary injunction and grant the motions to dismiss.

## I. BACKGROUND

### A. CCIEC/Cristo Rey

CCIEC is a Michigan nonprofit organization that runs a ministry called Cristo Rey Counseling Services Center. (Verified Compl. ¶¶ 12-13, ECF No. 1.) Through Cristo Rey, CCIEC

[1] Amy Epkey is the current Director of MDHHS and replaces Hertel as a defendant in her official capacity. Fed. R. Civ. P. 25(d) (providing for automatic substitution of a public officer in their official capacity when the officer ceases to hold office). Hertel remains a defendant in her personal capacity.

provides substance-abuse counseling and treatment services. Cristo Rey receives reimbursement for some of its services through funds provided by the federal government to Michigan under the "Substance Use Prevention, Treatment, and Recovery Services Block Grant Program" ("Substance Use Block Grant"). (*Id.* ¶ 14.)

**B. Michigan's Programs for Substance Use**

Michigan has participated in the Substance Use Block Grant since the program's inception. Under federal law, states receiving funds under this program must spend a minimum amount on "treatment services designed for pregnant women and women with dependent children." *See* 42 U.S.C. § 300x-22(b)(1)(A). Per federal regulations, programs receiving funding for these services must, "at a minimum, . . . provide or arrange for" the following:

> (1) primary medical care for women, including referral for prenatal care and, while the women are receiving such services, child care;
>
> (2) primary pediatric care, including immunization, for their children;
>
> (3) gender specific substance abuse treatment and other therapeutic interventions for women which may address issues of relationships, sexual and physical abuse and parenting, and child care while the women are receiving these services;
>
> (4) therapeutic interventions for children in custody of women in treatment which may, among other things, address their developmental needs, their issues of sexual and physical abuse, and neglect; and
>
> (5) sufficient case management and transportation to ensure that women and their children have access to services provided by paragraphs [(1) through (4)].

45 C.F.R. § 96.124(e) (2026).

To satisfy these requirements, Michigan created two programs for pregnant or parenting women with substance use disorders: "Women's Specialty Services" ("WSS") and "Enhanced Women's Services" ("EWS"). (Verified Compl. ¶ 68.)

To qualify as a WSS provider, and be eligible for federal funding, a provider must be designated as "gender-responsive" by MDHHS. (*Id.* ¶ 70.) Qualification requires offering the

services identified in 45 C.F.R. § 96.124(e) above, as well as complying with MDHHS's Substance Abuse Treatment Policy #12. (*See* Verified Compl. ¶ 73.) Among other things, that policy requires

> A client-centered, goal-oriented approach to accessing and coordinating services across multiple systems by:
>
> 1. assessing needs, resources and priorities,
> 2. planning for how the needs can be met,
> 3. establishing linkages to enhance a woman's access to services to meet those identified needs,
> 4. coordinating and monitoring service provision through active cross-system communication and coordinated treatment/service plans, and
> 5. removing barriers to treatment and advocating for services.

(MDHHS Treatment Policy #12 (Sept. 30, 2010), ECF No. 1-2, PageID.61.)

The policy also recognizes that

> [p]renatal care for women using/abusing substances is especially important, as their babies are at risk for serious physical, neurological and behavioral problems. Early identification and intervention for children's physical and emotional growth and development, and for other health issues in a family is essential.

(*Id.*, PageID.65.) As such, providers are expected to "identify and address the client's needs" in several areas, including "family planning," and to "refer the client to appropriate services." (*Id.*, PageID.66.)

Under MDHHS's Treatment Technical Advisory #08, a designated WSS provider is "eligible to offer [EWS]" to its clients; EWS is a program that incorporates "long-term case management and advocacy programming for pregnant, and up to twelve months post-partum, women with dependent children." (MDHHS Treatment Technical Advisory #08 (Jan. 31, 2012), ECF No. 1-4, PageID.73, 76.) The intended outcomes for this program include "increased retention, decreased use, increased family planning, and a decrease in unplanned pregnancies[.]" (*Id.*, PageID.73.)

To further these outcomes, the EWS model has three primary prongs: "The first is to eliminate or reduce the use of alcohol or drugs." (*Id.*, PageID.76.) "The second is to promote the

effective use of contraceptive methods," because "[i]f a woman is in control of when she becomes pregnant, there is a higher likelihood that the birth will be alcohol and drug-free." (*Id.*) Under this prong, "[r]eferrals for family planning, connecting with a primary care physician, and appropriate use of family planning methods are all considered interventions." (*Id.*) The third prong is "to teach women how to effectively use community-based service providers, including accessing primary and behavioral health care." (*Id.*) "One of the core components of [EWS] is transportation." (*Id.*) In other words, service providers must "provide reasonable transportation services for their enrolled clients to relevant appointments and services." (*Id.*)

The following are some of the "[s]ervice [r]equirements" for providers in the EWS program: "[m]aintain engaged and consistent contact . . . in a home visitation/community based services model"; "[c]oordinate primary and behavioral health"; "[p]rovide transportation assistance through peer advocates"; and "[d]evelop [a] referral agreement with [a] community agency to provide family planning options and instruction." (*Id.*, PageID.77–78.)

**C. Mid-State**

Mid-State is a state-created governmental entity known as a Prepaid Inpatient Health Plan ("PIHP") that has contracted with Michigan to administer Medicaid and Substance Use Block Grant services within a designated region of Michigan. (Verified Compl. ¶¶ 102-03.) Under that contract, Mid-State is responsible for maintaining a provider network and paying for services that it authorizes for treatment of substance use disorders. (PIHP Contract, ECF No. 15-1, PageID.397, 400.) It pays for these services using state and federal funds, including Medicaid funds and Substance Use Block Grant funds allocated to Michigan by the federal government. (Verified Compl. ¶ 106.)

**D. Cristo Rey's History as a WSS/EWS Provider**

Until 2026, Cristo Rey had served as a designated WSS and EWS provider for over 10 years. (*Id.* ¶ 28.) In 2014, when Mid-State assumed responsibility for the substance use disorder provider network in the Lansing area, it contracted with Cristo Rey to provide treatment for substance use disorder. (Meier Aff. ¶ 6, ECF No. 15-3; *see* Fiscal Year 2025 Substance Use-Disorder – Treatment Contractual Agreement ("FY 2025 SUD Contract"), ECF No. 15-4.) In the 2025 version of the contract between Mid-State and Cristo Rey, Cristo Rey agreed to comply with MDHHS's policies and technical advisories. (FY 2025 SUD Contract, PageID.499.) Among other things, Cristo Rey also agreed that when a consumer "requires services that [Cristo Rey] does not customarily render," Cristo Rey must "abide by the procedures [in Mid-State's manual for] transferring the consumer to an appropriate source of care"; that manual contains guidelines for "integrated coordination of care, transfer, and warm transfer." (*Id.*, PageID.513.) And Cristo Rey agreed to follow "Charitable Choice" rules applicable to faith-based providers of services using federal funds; those rules give consumers "who object to the religious character" of a faith-based organization the "right to notice, referral, and alternative services" of equivalent value. (*Id.*, PageID.533.) Consequently, Cristo Rey was required to "[p]rovide notice to all potential and actual consumers of their right to alternative services" and to "[r]efer program consumers to alternative services as needed / requested." (*Id.*)

According to its Chief Clinical Officer, Dani Meier, Mid-State has "been aware of the Catholic Church's stance on abortion, contraception, and related matters" throughout Mid-State's relationship with Cristo Rey, and until December 2025, Cristo Rey's "religious affiliation [had] never presented a compliance issue." (Meier Aff. ¶ 7.) That is, Mid-State "had no reason to believe that Cristo Rey's services were impacted in any way by its religious affiliation." (*Id.*)

**E. CCIEC's Core Values Pledge**

Mid-State's perspective changed in December 2025, after it learned that Cristo Rey's Clinical Director, Rob Powell, had resigned. (*Id.* ¶ 9.) Cristo Rey's "departing staff" subsequently informed Mid-State that CCIEC had mandated that its employees (including the employees at Cristo Rey) sign a "Core Values and Commitment to Mission" pledge within 30 days—until approximately November 30, 2025—or be terminated. (*Id.*)

Relevant here, the pledge states the following:

> Catholic teachings oppose abortion and contraception, as they involve actions that disregard the human dignity of the unborn or disrupt the openness to life that the Church believes is intrinsic to marital love. Gender ideology, when it promotes self-identity apart from biological sex, denigrates human dignity, as it does not fully honor the embodied nature of the person.
>
> * * *
>
> Subsidiarity particularly respects the family, which is the foundational unit of society and essential to personal development and societal health. Abortion, contraception, and gender ideology can impact family integrity by redefining human identity and relationships in ways that conflict with the natural order. Gender ideology, particularly when it encourages children to explore gender identities that are disconnected from their biological sex, is harmful to this structure.
>
> * * *
>
> Employees are expected to not only perform duties consistent with the doctrines of the Catholic faith, but outside of the workplace, they are expected to refrain from publishing any communication and any form, electronic or otherwise, that affiliates them with [CCIEC] in a manner that is inconsistent with the doctrine of the Roman Catholic Church.
>
> * * *
>
> In all situations, [CCIEC] staff must adhere to the moral compass set forth by the Catholic Church; always speaking with care, compassion, and honesty. Any advice given, or services extended, must be in accord with the moral, ethical, and religious directives set forward by the Church. [CCIEC] staff should welcome and serve all persons, but *we must not be an accessory to actions that are not in accord with these values. [CCIEC] staff may not refer clients who are seeking services that are*

> *in opposition to Catholic teaching to a resource that will assist the client procuring those services.*

(CCIEC, Core Values and Commitment to Mission, ECF No. 1-1, PageID.51, 53 (emphasis added).) The pledge expressly applies to situations where "[a]n unmarried or same-sex couple requests to adopt a child," "[a] pregnant client asks where she may be able to secure an abortion," "[a] therapy client asks if you can help them as they transition from their sex at birth to another gender identity," or "[a] young mother who is fearful of becoming pregnant again asks where to find low-cost birth control options." (*Id.*, PageID.53.)

CCIEC's Interim CEO, Bob Bauer, explains that the organization's religious beliefs include the following: "the sanctity of human life from conception to natural death; that marriage is the union of one man and one woman; and that abortion, contraception, and abortifacient drugs are morally impermissible." (Bauer Decl. ¶ 5, ECF No. 7-1.) Because these beliefs are central to the organization's religious identity and operations, the Core Values pledge "prohibits staff from referring clients to resources that would assist in procuring services contrary to Catholic teaching—including abortion and contraception." (*Id.* ¶ 7.) "[R]ather than refer clients to abortion or contraceptive services, [CCIEC] offer[s] natural family planning counseling and abstinence support." (Verified Compl. ¶ 51.)

**F. Mid-State's Investigation of the Pledge**

Meier believed that the pledge raised concerns about whether Cristo Rey could (1) offer its clients "objective and unbiased dialogue in regard to family planning, birth control, abortion, and services related to sexual orientation and gender identity" or (2) "make referrals for those services if requested by the client." (Meier Aff. ¶ 10.) According to Meier, Mid-State has contracts with a number of other religious providers—including Catholic entities like Catholic Charities of

Genesee & Shiawassee Counties—but those providers' religious affiliations have never "surfaced as a compliance issue." (*Id.* ¶ 8.)

On January 26, 2026, Mid-State contacted Smith-Butterwick at MDHHS for guidance as to whether Cristo Rey should be designated a "Charitable Choice provider." (*Id.* ¶ 11.) The Charitable Choice Act prohibits federal, state, and local governments from discriminating against nongovernmental organizations in the provision of federal funds for substance abuse services on the basis that the organization "has a religious character." 42 U.S.C. § 300x-65(b)(2). Religious organizations that provide such services are to be considered "on the same basis as other nongovernmental organizations," so long as their programs "are implemented in a manner consistent with the Establishment Clause of the [F]irst [A]mendment to the Constitution." *Id.* In addition, the religious organization that provides such services "shall retain its independence from Federal, State, and local governments, including such organization's control over the definition, development, practice, and expression of its religious beliefs." *Id.* § 300x-65(c)(1). For instance, the government cannot require the religious organization to "alter its internal governance" or to "remove religious art, icons, scripture, or other symbols . . . in order to be eligible to provide [substance abuse] services[.]" *Id.* § 300x-65(c)(2).

To protect individuals receiving assistance from a religious organization, the law provides that if a person receiving or applying for services under a substance abuse program "has an objection to the religious character of the organization" providing services, then the government must provide such services through an alternative provider. *Id.* § 300x-65(e)(1). The government is also obligated to ensure that beneficiaries receive notice of this right to choose an alternative provider. *Id.* § 300x-65(e)(2). The applicable regulations further require the *religious organization receiving funds* to provide notice to the beneficiary of their right to an alternative

provider *and to refer the beneficiary* to an alternative provider within a reasonable time after an objection is made. 42 C.F.R. § 54.8(b), (c)(1) (2026). The religious organization must also "*ensure that the program beneficiary makes contact with the alternative provider* to which he or she is referred." *Id.* § 54.8(c)(5) (emphasis added); *accord* 42 U.S.C. § 290kk-1(f)(3)(B). These regulations are part of the "Charitable Choice" rules issued by the Substance Abuse and Mental Health Services Administration (SAMHSA) for substance abuse prevention and treatment services. *See* 42 C.F.R. pt. 54.

On February 26, 2026, Mid-State contacted MDHHS again to determine whether CCIEC's new policy would "alter Cristo Rey's WSS/EWS eligibility." (Meier Aff. ¶ 11.)

**G. Meeting Between Cristo Rey, Mid-State, and MDHHS**

Meier and Heather Rosales, a representative from MDHHS, met with Cristo Rey staff on March 13, 2026, to discuss the staff departures, the Core Values pledge, and their impact on the WSS and EWS programs. (*Id.* ¶ 12; *see* MSHN-CCIEC Meeting Agenda, ECF No. 1-5, PageID.82; Smith-Butterwick Decl. ¶ 29, ECF No. 14-1.) According to notes from the meeting, Mid-State questioned whether the pledge would conflict with "WSS/EWS requirements for objective, non-judgmental client support of all pathways facing a woman in recovery?" (3/13/2026 Meeting Notes, ECF No. 1-6, PageID.84.) Cristo Rey staff responded that they could refer clients to "general 'options' but cannot directly recommend or assist with referrals for abortion or certain reproductive services." (*Id.*; *see* Verified Compl. ¶ 131.) Staff could also "process topics brought up by clients but must avoid searches on their phone or computer that refer to potential resources like Planned Parenthood." (*Id.*)

Trisha Thrush, an MDHHS representative, purportedly emphasized her view that WSS/EWS contracts require more than merely providing clients with information about alternative

treatment providers; they require "[w]arm handoffs,"[2] "[a]ctive care coordination," and "[c]losing the loop on referrals." (*Id.*, PageID.85.) She also expressed concern that "[r]estrictions on staff assisting with abortion-related or certain reproductive health resources conflict with contractual expectations" and/or "WSS/EWS federal requirements." (*Id.*)

In addition, Meier indicated that Mid-State had a "Charitable Choice" program that was "still in draft form," but that would be "formalize[d] soon." (*Id.*) The meeting ended with a plan to review contract requirements and for Meier to provide a draft of Mid-State's Charitable Choice guidelines to CCIEC. (*Id.*, PageID.86.)

**H. Mid-State Adopts New Charitable Choice Procedure**

After the meeting, Mid-State adopted (apparently with MDHHS's approval)[3] a new Charitable Choice procedure for religious organizations requiring them to notify clients of their religious orientation at the first point of contact and to disclose "any limitations or exclusions in services that may result" from that orientation. (Disclosure of Faith-Based Treatment Orientation (Mar. 24, 2026), ECF No. 1-7, PageID.88.) Up to that point, Mid-State's contract with Cristo Rey only required Cristo Rey to provide the "model" notice set forth in federal regulations:

> No provider of substance abuse services receiving Federal funds from the U.S. Substance Abuse and Mental Health Services Administration, including this organization, may discriminate against you on the basis of religion, a religious belief, a refusal to hold a religious belief, or a refusal to actively participate in a religious practice.
>
> If you object to the religious character of this organization, Federal law gives you the right to a referral to another provider of substance abuse services. The referral, and your receipt of alternative services, must occur within a reasonable period of time after you request them. The alternative provider must be accessible to you and have the capacity to provide substance abuse services. The services provided to you

[2] A warm handoff apparently "involves introducing clients to the new provider." *See* SAMHSA, Enhancing Motivation for Change in Substance Use Disorder Treatment 106 (2019), https://library.samhsa.gov/sites/default/files/tip-35-pep19-02-01-003.pdf [https://perma.cc/XTZ9-KGZ5].

[3] Mid-State asserts that it "must seek State approval of its policies prior to implementation." (Mid-State Br. in Opp'n to Mot. for Prelim. Inj. 3, ECF No. 15.)

> by the alternative provider must be of a value not less than the value of the services you would have received from this organization.

(FY 2025 SUD Contract, PageID.533–34 (quoting App'x to 42 C.F.R. part 54a).)

The new procedure requires CCIEC to disclose "[a]ny known service limitations related to reproductive health, family planning, sexual orientation, gender identity, gay marriage, or any other topics that may be restricted or otherwise influenced by the agency's religious orientation." (Disclosure of Faith-Based Treatment Orientation, PageID.89.) The procedure also requires the religious organization to notify clients of the option to receive a referral to another provider of the client's choosing, which would be facilitated by the organization through a "warm handoff to a provider of the client's choosing." (*Id.*)

**I. CCIEC Responds to New Procedure**

CCIEC says it "tried to cooperate" with this new policy by providing Mid-State with an updated version of its own Charitable Choice notice. (Verified Compl. ¶ 143.) The notice stated, in pertinent part:

> All individuals have the right to seek treatment in non-faith based organizations and will be supported in a warm transfer, referral, or alternative services depending on the individual's needs and requests.
>
> [A]s a Catholic Organization, [CCIEC] does not provide services such as assistance in seeking contraception (birth control), abortion, or gender altering services because to do so would conflict with the agency's sincerely held religious beliefs.

(CCIEC's Charitable Choice Notice, ECF No. 1-8, PageID.92.) It also indicated that if a client requested "transfer/referral/alternative service," CCIEC would "notify the alternative provider via [Mid-State's] Utilization Management Department . . . to facilitate the transfer." (*Id.*)

**J. MDHHS Discontinues Cristo Rey's WSS and EWS Designations**

In a letter dated May 22, 2026, Smith-Butterwick notified Cristo Rey that the State was discontinuing the clinic's WSS and EWS designations because Cristo Rey "cannot provide the

required services" in state policies. (5/22/2026 Letter, ECF No. 1-9, PageID.95.) Among other things, the letter listed the minimum required services for WSS that are set forth in 45 C.F.R. § 96.124 and noted that the "goal of EWS is to prevent additional substance exposed births"; thus, MDHHS's policy requires providers to "promote the effective use of contraceptive methods" and to provide "[r]eferrals for family planning." (5/22/2026 Letter, PageID.95.) Finally, the letter indicated that Cristo Rey would be considered for redesignation if it made "policy and procedural changes" to fulfill the foregoing requirements. (*Id.*, PageID.96.) At the time, Cristo Rey had two clients enrolled in the WSS/EWS program. (Meier Aff. ¶ 22.)

On May 27, 2026, CCIEC asked MDHHS to stay the discontinuation of the WSS and EWS designations for Cristo Rey, arguing that MDHHS did not provide sufficient notice and an opportunity to cure Cristo Rey's purported deficiencies, and did not provide sufficient detail about the alleged deficiencies. (5/27/2026 Letter, ECF No. 1-10, PageID.98.) Cristo Rey argued that its programming complied with federal and state requirements, particularly when considering the protections that the federal Charitable Choice program gives to religious providers of federally funded services. MDHHS did not respond to that letter. (Verified Compl. ¶ 171.)

One day after receiving a copy of CCIEC's letter to MDHHS, Mid-State told CCIEC to immediately stop receiving admissions into its WSS and EWS programs and to develop a plan to transition existing clients. (*Id.* ¶ 177.) CCIEC has not accepted new admissions into those programs since that time, and Mid-State has stopped referring women to CCIEC for those services. CCIEC also notified existing clients and gave them the option to transfer to another provider. Later, however, MDHHS concluded that CCIEC could continue providing those services using its own funding, as long as it did not advertise itself as a "WSS or EWS program." (6/16/2026 Rosales Email, ECF No. 14-1, PageID.336.)

**K. CCIEC's Complaint**

In June 2026, CCIEC brought this civil rights action under 42 U.S.C. § 1983, asserting violations of the following: the Free Exercise Clause of the First Amendment (Counts I, V); the Due Process Clause of the Fourteenth Amendment (Count II); the Free Speech Clause of the First Amendment (Count III); and the Equal Protection Clause of the Fourteenth Amendment (Count VI). CCIEC also asserts that Defendants violated the Charitable Choice Act, 42 U.S.C. § 300x-65 (Count IV). Finally, CCIEC claims that Defendants retaliated against it for engaging in constitutionally protected speech and religious exercise, and for taking action to protect its rights (Count VII).

Several weeks after filing its complaint, CCIEC moved for a preliminary injunction based on its due process, religious liberty, and free speech claims, as well as its claim under the Charitable Choice Act. Its motion asks the Court to restore Cristo Rey's designation as a WSS and EWS provider and to require Defendants to perform their contractual obligations in connection with those services.

## II. PRELIMINARY INJUNCTION STANDARD

The Court considers four factors when deciding whether to grant a preliminary injunction:

> (1) whether the movant has a "strong" likelihood of success on the merits;
>
> (2) whether the movant would otherwise suffer irreparable injury;
>
> (3) whether issuance of a preliminary injunction would cause substantial harm to others; and
>
> (4) whether the public interest would be served by issuance of a preliminary injunction.

*McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc).

In general, "[t]hese factors are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Leary v. Daeschner*, 228 F.3d

729, 736 (6th Cir. 2000). However, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000). Moreover, irreparable harm is an "indispensable" requirement for a preliminary injunction, and "even the strongest showing" on the other factors cannot justify a preliminary injunction if there is no "imminent and irreparable injury." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019).

## III. PRELIMINARY INJUNCTION ANALYSIS

### A. Standing

At the outset, Defendants argue that CCIEC lacks standing to assert claims on behalf of Cristo Rey. Defendants apparently believe that Cristo Rey is its own entity separate from CCIEC, and that CCIEC was not impacted by Cristo Rey's loss of federal funding. But the verified complaint indicates otherwise, describing Cristo Rey as a "ministry of" CCIEC (Verified Compl. ¶¶ 13, 26), and alleging that CCIEC provided treatment "through" Cristo Rey (*id.* ¶ 75) and that CCIEC is the entity that contracted with Mid-State to provide these services (*id.* ¶ 79). Also, as part of its reply brief, CCIEC provides a declaration from Bauer, its Interim CEO, clarifying that "Cristo Rey is not a separately incorporated entity" (Suppl. Bauer Decl. ¶ 7, ECF No. 23-1); instead, CCIEC provides services "under the name Cristo Rey Counseling Center" (*id.* ¶ 6). Thus, it appears that Cristo Rey is merely the name under which CCIEC runs its substance use counseling program, and that CCIEC is, in fact, the entity that lost its WSS and EWS designations. Consequently, CCIEC has standing to bring this action.

### B. Likelihood of Success

#### 1. Free Exercise Clause

CCIEC first argues that Defendants violated its rights under the First Amendment by discriminating against it due to its religious beliefs. In *Employment Division, Department of*

*Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), the Supreme Court "held that laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). "Such laws are subject to rational basis review, meaning the law must be rationally related to a legitimate government interest." *Doe No. 1 v. Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 23-3740, 2025 WL 2453836, at *6 (6th Cir. Aug. 26, 2025).

**(a) Hostility**

CCIEC argues that rational basis review does not apply because there is evidence that Defendants were hostile toward its beliefs. The "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533; *see Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 638 (2018) ("[T]he government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices."). "State actors must give 'neutral and respectful consideration' to a person's sincerely held religious beliefs." *Meriwether v. Hartop*, 992 F.3d 492, 512 (6th Cir. 2021) (quoting *Masterpiece Cakeshop*, 584 U.S. at 634). "When they apply an otherwise-neutral law with religious hostility, they violate the Free Exercise Clause." *Id.*; *see Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1 (2022) ("A plaintiff may . . . prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany laws or policies burdening religious exercise." (quoting *Masterpiece Cakeshop*, 584 U.S. at 639)).

"Factors relevant to the assessment of governmental neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including

contemporaneous statements made by members of the decisionmaking body.'" *Masterpiece Cakeshop*, 584 U.S. at 639 (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993)).

In *Masterpiece Cakeshop*, a Colorado state commission required a bakery to sell wedding cakes for same-sex weddings in spite of its religious opposition to same-sex marriages. *Id.* at 621–22. The Supreme Court concluded that the State had failed to properly consider the bakery's objections with the neutrality required by the First Amendment. *Id.* at 639. There, the evidence of hostility included statements by the decisionmakers for the government. For instance, some commissioners "endorsed the view that religious beliefs cannot legitimately be carried into the public sphere or commercial domain, implying that religious beliefs and persons are less than fully welcome in Colorado's business community." *Id.* at 634. And one commissioner indicated that the plaintiff's religion was "one of the most despicable pieces of rhetoric that people can use" to harm others. *Id.* at 635. These statements "cast doubt on the fairness and impartiality of the Commission's adjudication of [the plaintiff's] case." *Id.*

The Court also noted the difference in treatment the plaintiff had received compared to other bakers who had refused to create cakes "with images that conveyed disapproval of same-sex marriage, along with religious text"; those bakers' actions were found to be lawful by the same commission. *Id.* at 636. Considered together, the commissioners' statements and differential treatment of the plaintiff sufficed to demonstrate animosity toward the plaintiff's religious beliefs, in violation of its rights under the Free Exercise Clause of the First Amendment. *Id.* at 639.

When assessing a similar claim of religious hostility under the First Amendment, the district court in *Buck v. Gordon*, 429 F. Supp. 3d 447 (W.D. Mich. 2019), found a substantial likelihood of success on that claim based on evidence that the State of Michigan had targeted the

plaintiff's religious beliefs. There, MDHHS (led at the time by Robert Gordon) opened an investigation into St. Vincent Catholic Charities (CCIEC's predecessor), which placed children for adoption and in foster care using state and federal funds, because the organization refused to provide written recommendations and endorsements for certification of unmarried or LGBTQ couples seeking to adopt or foster children. *Id.* at 451–53, 455. Although the organization would place children with any certified couple, it would refer certification requests from unmarried and LGBTQ couples to other agencies. MDHHS threatened to terminate its contract with St. Vincent due to its purported violation of MDHHS's non-discrimination policy. But the record indicated that MDHHS's real motivation was religious hostility.

That record included campaign statements from 2018 by Michigan's Attorney General, Dana Nessel, that St. Vincent's beliefs were based in "hate," as well as the fact that, shortly after Nessel took office, Nessel reversed the State's litigating position on whether St. Vincent could refer same-sex couples to other agencies for assistance with certification (while still placing children for adoption with same-sex couples), and then the State opened its investigation into St. Vincent. *Id.* at 462.

There is no comparable evidence of religious hostility here. CCIEC argues that Mid-State's investigation of the Core Values pledge, an internal policy document, is evidence of hostility. But CCIEC ignores that this investigation stemmed from new information learned by Mid-State–namely, a newly enacted (or newly enforced) policy that imposed restrictions on the scope of counseling and referral services that CCIEC's employees could provide to its clients. Unlike in *Buck*, there is no evidence that employees of MDHHS or Mid-State made derogatory statements about CCIEC's beliefs or changed their positions before investigating CCIEC. Notably, CCIEC does not contend that it has always prohibited its employees from providing

clients with information about contraception other than natural family planning and abstinence, and from assisting clients with referrals to sources that provide artificial contraceptive services,[4] with Mid-State's and MDHHS's awareness and tacit approval. Indeed, CCIEC does not provide any facts to contest Mid-State's understanding that Cristo Rey's employees had been given a deadline by which to agree to the Core Values pledge, which suggests that the pledge altered the existing practices of CCIEC's employees. And in light of MDHHS's express focus on preventing unwanted pregnancies in clients of the WSS and EWS programs through family planning, effective use of contraceptive methods, and referrals for family planning services, it was entirely reasonable for Mid-State to investigate the impact of the pledge's restrictions on CCIEC's ability to serve its clients in compliance with state policies.

Though CCIEC asserts that its family planning services consist of natural family planning counseling and support for abstinence, MDHHS could reasonably conclude that such counseling and support do not equate to identifying client-specific needs and promoting the effective use of contraceptive methods, as is required of EWS programs under MDHHS Treatment Technical Advisory #08. Similarly, MDHHS could conclude that CCIEC's prohibition on referring clients to resources that would assist them with obtaining contraception would prevent CCIEC from adequately addressing each client's family planning needs through referral to appropriate services, as is required of WSS programs under MDHHS Treatment Policy #12. Neither of those policies limits family planning and contraceptive methods to natural family planning and abstinence. And neither policy suggests that promoting those two methods alone would satisfy the objectives of the WSS and EWS programs with regard to family planning for pregnant or parenting women with

[4] CCIEC contends that Cristo Rey has "provided counseling services consistent with its religious beliefs" throughout its tenure as a WSS and EWS provider. (Verified Compl. ¶ 60; Bauer Decl. ¶ 11.) It does not elaborate on what that means.

substance use disorders. Instead, the policies refer to "family planning" and "contraceptive methods" generally, while emphasizing a "client-centered" approach focused on identifying and supporting the needs of each client.[5] It is difficult to square that client-centered approach with the restrictions in the Core Values pledge, which limit CCIEC's ability to provide its clients with, or refer them to, a range of widely-used and low-cost[6] contraceptive options.[7] Thus, Mid-State's investigation is not persuasive evidence of religious hostility.

CCIEC also relies on a statement by Mid-State at the March 13, 2026, meeting that CCIEC's Core Values pledge might conflict with CCIEC's obligation under WSS and EWS policies to provide "objective, non-judgmental client support." CCIEC believes this statement was hostile because it was a "negative normative evaluation" of its beliefs. (Pl.'s Br. in Supp. of Mot. for Prelim. Inj. 11, ECF No. 8.) In context, however, the statement did not display animus toward CCIEC's beliefs; rather, it reflected a legitimate concern about the manner in which CCIEC could provide services to its clients because its policy precluded it from identifying and supporting

[5] Smith-Butterwick avers that "women with a substance use disorder struggle across multiple domains of their lives," sometimes facing "chaotic, abusive, and unsupportive" partners, sexual violence, and human trafficking, making natural family planning and abstinence support inadequate to address the family planning needs of every client. (Smith-Butterwick Decl. ¶ 35.)

[6] The Core Values pledge expressly prohibits assisting a client request for "where to find low-cost birth control options."

[7] MDHHS's approach is in accord with SAMHSA publications, which also emphasize the need to provide pregnant and parenting women who have a substance use disorder with multiple options for family planning and contraception. *See* SAMHSA, Clinical Guidance for Treating Pregnant and Parenting Women with Opioid Use Disorder and Their Infants 54 (Jan. 2018), https://library.samhsa.gov/sites/default/files/sma18-5054.pdf [https://perma.cc/G2PH-STBS] (noting that "[p]reventing unintended pregnancies and planning for future pregnancies is critical" and recommending that healthcare professionals provide new mothers with "non-coercive contraceptive counseling and discuss different forms of birth control and the effectiveness of each method before they are discharged from the hospital"); SAMHSA Factsheet, Good Care for You and Your Baby While Receiving Opioid Use Disorder Treatment, https://library.samhsa.gov/sites/default/files/sma18-5071fs4.pdf [https://perma.cc/DLF6-ZMVP] (recommending that women being treated for opioid use disorder "[t]alk to [their] healthcare provider about the full range of birth control options, including long-acting reversible contraception and the best birth control options while [they] are breastfeeding"). The Court can take judicial notice of these publications, though the Court's decision would be the same without them.

certain client needs regarding contraception and family planning, which is inconsistent with the family planning objectives and client-centered framework for the WSS and EWS programs.

Though not applicable here, federal regulations governing federal grants for family planning programs likewise require those programs to provide services in a manner that is "client-centered." 42 C.F.R. § 59.5(a)(3) (2026). Specifically, the programs must provide pregnant women with "a broad range of acceptable and effective medically approved family planning methods (including natural family planning methods) and services," as well as "neutral, factual information and nondirective counseling" on options for prenatal care, delivery, infant care, foster care, adoption, and pregnancy termination, if requested. *Id.* § 59.5(a)(1), (a)(5)(ii). The regulations expressly prohibit "subjecting individuals to any coercion to accept services or to employ or not to employ any particular methods of family planning." *Id.* § 59.5(a)(2). In other words, these regulations appear to require entities receiving federal funding to present clients with various options for family planning upon request, without directing or coercing the client to choose one option over another. Mid-State's stated concerns about the Core Values pledge were consistent with this neutral approach.

To be sure, the regulations for Substance Use Block Grants are not as prescriptive. They simply define "family planning services" as

> educational, comprehensive medical or social services or activities which enable individuals, including minors, to determine freely the number and spacing of their children and to select the means by which this may be achieved. These services and activities include a broad range of acceptable and effective methods and services to limit or enhance fertility, including contraceptive methods (including natural family planning and abstinence), and the management of infertility (including referral to adoption).

45 C.F.R. pt. 96, App'x A (2026). They do not expressly *require* a client-centered approach or a broad range of contraceptive methods. Nevertheless, MDHHS had leeway to craft additional

requirements when creating its own program. The Substance Use Block Grant regulations set forth the "minimum" requirements for services, *see* 45 C.F.R. § 96.124(e), not the exclusive ones.[8]

Next, CCIEC argues that Mid-State's Charitable Choice policy is evidence of religious hostility because it applies only to faith-based organizations; it does not require secular organizations to disclose limitations on their services. Also, it mandates more disclosure than the statute requires. The statute requires that the client receive notice of their rights, i.e., the right not to be discriminated against on the basis of religion and the right to receive services from an alternative provider if they object to the "religious character" of the entity providing services. 42 U.S.C. § 300x-65(e)(2). The statute does not require the religious entity to disclose the limitations on its services stemming from its religious beliefs. CCIEC's argument that this is evidence of hostility is not persuasive for two reasons.

First, *MDHHS* discontinued CCIEC's WSS and EWS designations, not Mid-State, and MDHHS appears to have done so because CCIEC could not provide the services required by state policies, not because CCIEC refused to comply with Mid-State's new Charitable Choice procedure. Smith-Butterwick at MDHHS issued the discontinuation letter. That letter discussed only the services required by the WSS and EWS standards. It did not mention CCIEC's Charitable Choice notice.[9] In other words, there is no evidence that Mid-State's Charitable Choice procedure was the cause of CCIEC's loss of funding. For similar reasons, a finding that the procedure is unconstitutional would serve no purpose because it would not give CCIEC the relief it seeks in its

[8] CCIEC argues that federal law prohibits Defendants from requiring it to refer clients for abortion or contraception. The Weldon Amendment prohibits states receiving federal funds from discriminating against entities on the basis that the entity "does not provide, pay for, provide coverage of, or refer for abortions." *See Ohio v. Becerra*, 87 F.4th 759, 774 n.8 (6th Cir. 2023). But CCIEC provides no support for its assertion that federal law prohibits Defendants from requiring CCIEC to provide or refer individuals for contraceptive services.

[9] Similarly, Smith-Butterwick explains that she believed Cristo Rey's existing policies prevented it from meeting federal and state requirements for identifying client needs and referring them to appropriate contraception and/or abortion services. (Smith-Butterwick Decl. ¶¶ 32–35.)

motion for a preliminary injunction, which is the restoration of its WSS and EWS designations. Even without the requirements set forth in Mid-State's Charitable Choice procedure, CCIEC does not qualify for funding under MDHHS's policies.

Second, Mid-State's Charitable Choice procedure is not evidence of hostility because it stems from federal law, which aims, in part, to protect the autonomy of beneficiaries receiving services from federally funded, faith-based service providers. Those procedures are inherently tied to, and expressly targeted at, religious entities, ostensibly due to concerns that a religious entity might discriminate against recipients of services for religious reasons or require them to adopt the entity's preferred religious beliefs or practices, in violation of the First Amendment. Congress chose that target, not Mid-State.

CCIEC is correct that Mid-State's procedure goes farther than what the law requires in terms of its disclosure requirements. And to the extent it does so by requiring the religious entity to disclose their beliefs and resulting service limitations, it puts a greater burden on religious entities than secular ones. But the Court is not persuaded that this deviation is evidence of religious hostility by Mid-State. Mid-State's policy clearly aims to protect client autonomy (through informed decision-making about an organization's services), which is a goal shared by the Charitable Choice provisions. That the policy does so in ways that are more stringent than required by the statute and its regulations does not suggest animus toward CCIEC or its beliefs. Instead, it reflects a choice to use slightly different means to achieve substantially the same ends. And in some ways, the policy appears to treat religious entities more favorably than their secular counterparts, which cuts against a finding of animus. It implies that religious entities can provide fewer services than their secular counterparts while still relying on state and federal funding, so long as the client consents to those limitations or receives a referral to another provider.

CCIEC next argues that "procedural irregularities" in MDHHS's and Mid-State's actions provide evidence of religious hostility. CCIEC contends that its contract with Mid-State requires 30 days' notice of any alleged breach and an opportunity to cure before termination (Verified Compl. ¶ 114; *see* FY 2025 SUD Contract, PageID.522), yet Defendants purportedly failed to comply with that requirement. But MDHHS is the one who removed CCIEC's eligibility designations, not Mid-State; MDHHS was not a party to CCIEC's agreement with Mid-State. Furthermore, the agreement provides that it can be terminated immediately "in the event of unavailability, reduction or loss of funding whatever the cause." (FY 2025 SUD Contract, PageID.522.) CCIEC does not explain how Mid-State, which derives its authority from the State of Michigan, could have continued to provide funds to CCIEC for its WSS and EWS programs after MDHHS had decided that CCIEC was not eligible for those funds. Also, Mid-State asserts that it did not terminate its contract with CCIEC. (Meier Decl. ¶ 24.) It continues to contract with Cristo Rey "for the provision of regular outpatient and prevention services."[10] (*Id.*)

Finally, CCIEC's complaint relies on statements made by Nessel between 2018 and 2024 as historical evidence of religious animosity. As indicated above, in 2018, Nessel described organizations that opposed same-sex marriage as "hate-mongers." (Verified Compl. ¶ 185.) And in recent years, she has apparently referred to individuals or organizations that oppose abortion as "anti-abortion extremists" who "will stop at nothing to control women's bodies." (*See id.* ¶ 188.) But CCIEC offers no evidence that Nessel was involved in any of the decisions at issue in this case. CCIEC simply makes a vague and conclusory allegation "[u]pon information and belief" that "Nessel and her office provided, approved, ratified, or continues to enforce the legal guidance

[10] Likewise, CCIEC acknowledges that its contract with Mid-State continues. After the motions were briefed, Bauer filed a supplemental declaration asserting that CCIEC signed a new contract with Mid-State in September 2026. (2d Suppl. Bauer Decl. ¶ 3, ECF No. 38.) That contract covers more than the funding at issue in this case.

on which [MDHHS] relied in discontinuing Cristo Rey's designation" as a WSS and EWS provider. (*Id.* ¶ 18.) CCIEC does not identify this legal guidance or provide any additional specifics about Nessel's personal involvement. Meanwhile, Smith-Butterwick avers that she did not "seek or receive advice or direction from the Michigan Attorney General or anyone in the Michigan Department of Attorney General['s office] regarding the decision to de-designate Cristo Rey." (Smith-Butterwick Decl. ¶ 37.) Thus, Nessel's statements are irrelevant; they do not demonstrate that Mid-State's and MDHHS's decisions were tainted by improper animosity.

**(b) Exemptions**

CCIEC next argues that Defendants' actions are subject to strict scrutiny because Defendants had discretion to determine whether CCIEC complied with federal and state requirements. "[A] policy that provides a 'mechanism for individualized exemptions' is not generally applicable." *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 733 (6th Cir. 2021) (quoting *Fulton*, 593 U.S. at 533). In *Fulton*, the City of Philadelphia stopped referring children to a Catholic foster care agency because the agency "would not certify same-sex couples to be foster parents due to its religious beliefs about marriage." *Fulton*, 593 U.S. at 527. The city argued that its contract with the agency contained a generally applicable non-discrimination requirement that the city relied upon for its actions. The Court disagreed because the non-discrimination provision expressly permitted exceptions where "granted by the Commissioner . . . in his/her sole discretion." *Id.* at 535. The Court held that this "formal system of entirely discretionary exceptions" rendered the non-discrimination requirement "not generally applicable" and therefore the city's actions were subject to strict scrutiny. *Id.* at 537, 541; *see also Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012) ("At some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny.").

Unlike in *Fulton*, CCIEC does not point to a "system of exceptions" for providers of WSS and EWS services. *See Fulton*, 593 U.S. at 542. CCIEC does not point to any language in MDHHS's policies or Mid-State's contract that suggests either of those entities has the authority to grant exceptions to the services requirements in the WSS and EWS policies. Nor does it point to any practice of granting exceptions. Instead, CCIEC relies on the fact that the WSS and EWS policies do not expressly mention the provision of artificial contraceptives and referrals for such, and that Defendants purportedly have discretion to determine whether a particular entity satisfies the stated criteria.

But as discussed above, even if the WSS and EWS standards do not mention artificial contraceptives, they do expressly require providers like CCIEC to identify client needs for medical care and family planning generally, and to refer clients to appropriate resources. By strictly limiting the types of family planning options CCIEC can discuss with its clients and the resources to which CCIEC can refer them, CCIEC's Core Values pledge plainly prevents it from satisfying these requirements because, as a matter of common sense, not all clients will desire or be adequately served by natural family planning counseling and abstinence support. And while it may be true that MDHHS and Mid-State have some discretion to interpret and enforce their own policies, that sort of discretion is inherent in every government system that distributes benefits. Neither *Fulton* nor *Ward* hold that such discretion on its own is sufficient to trigger strict scrutiny. If that were the rule, then "[e]very legal standard or criterion that required some degree of professional judgment in its application would suddenly run afoul of the Free Exercise Clause," which cannot be the case. *Perry v. Marteney*, 172 F.4th 315, 324 (4th Cir. 2006).[11]

[11] This case does not involve the same sort of "uniquely opaque," "subjective" criteria at issue in *Bates v. Pakseresht*, 146 F.4th 772 (9th Cir. 2025), where the State of Oregon had to determine whether a prospective adoptive parent could sufficiently "respect, accept, and support a child's sexual orientation, gender identity, and gender expression." *Id.* at 797–98. Thus, that case is distinguishable.

**(c) Less Favorable Treatment**

CCIEC further argues that Defendants' conduct was not neutral or generally applicable because it treated religious activity less favorably than comparable secular activity. "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.*

Mid-State's Charitable Choice procedure specifically targets religious groups, i.e., entities whose services might be "influenced" by a "religious orientation." (Disclosure of Faith-Based Treatment Orientation, PageID.88.) It requires such groups to disclose service limitations tied to those beliefs but does not require secular groups to disclose any limitations that might stem from staffing, programmatic focus, or philosophical disagreements with state policy. CCIEC argues that those types of limitations pose the same risk to the government's interests. In both cases, there are services that the provider cannot offer, but only the religious entity is required to disclose its limitations.

Even accepting that the disclosure requirement improperly targets religious groups, CCIEC has not shown that this requirement was the cause of the harm it suffered in this case and that it seeks to remedy through its complaint and preliminary injunction, i.e., the loss of the WSS and EWS designations and associated funding. As discussed above, MDHHS determined that CCIEC could not provide the services required by those programs for reasons unrelated to CCIEC's lack of compliance with Mid-State's Charitable Choice policy. Indeed, even if the Court were to determine that the disclosure requirement in that policy was unconstitutional, CCIEC's Core Values pledge would still prevent it from meeting its underlying obligations under state policies

to refer clients to appropriate family planning services. That requirement applies equally to all providers, religious and otherwise. CCIEC offers no evidence (or allegation) that Defendants have applied that requirement unequally.[12]

In addition, even if the Court were to determine that the notice requirement in Mid-State's Charitable Choice policy was unconstitutional, CCIEC would not be able to meet that policy's requirement to make a "warm handoff to a different provider." (*Id.*, PageID.89.) That requirement apparently stems from federal Charitable Choice regulations requiring the religious provider to "refer the beneficiary to an alternative provider" and to "ensure that the program beneficiary makes contact with the alternative provider to which he or she is referred." 42 C.F.R. § 54.8(c)(1), (c)(5). If, for instance, a client sought referral to an alternative provider that offered contraceptive services, CCIEC's policy would apparently prevent it from assisting with that referral and ensuring that the client contacted the alternative provider.

CCIEC insists that its proposed Charitable Choice notice addresses the referral and handoff issues by offering clients seeking an alternative provider a "warm transfer, referral, *or* alternative services *depending on the individual's needs and requests*," and by notifying the alternative provider via Mid-State's electronic health record system. (Verified Compl. ¶¶ 144–45 (emphases added).) Neither of those provisions satisfies CCIEC's obligation to provide a warm handoff for every client seeking an alternative provider. Thus, even without the notice requirement, CCIEC could not comply.

CCIEC's reliance on *Carson v. Makin*, 596 U.S. 767 (2022), is misplaced. There, the Supreme Court held that Maine could not exclude religious schools from otherwise generally

[12] CCIEC offers only a conclusory assertion that "Defendants have not applied the same standard to any other similarly situated provider." (Verified Compl. ¶ 223.)

available tuition assistance payments. *Id.* at 789. Maine's program required eligible schools to provide a "nonsectarian" education. *Id.* at 774. That practice violated the Free Exercise Clause of the First Amendment because it excluded "otherwise eligible schools on the basis of their religious exercise." *Id.* at 789. By contrast, MDHHS excluded CCIEC from funding because it could not fulfill generally applicable program requirements for services, not because of its beliefs or religious practices. A "nonsectarian" education requirement expressly excludes activity solely because of its religious character. *See Carson*, 596 U.S. at 780. A requirement to consider client needs and refer them to appropriate contraceptive services does not.

**(d) Religious Autonomy**

CCIEC argues that Defendants violated its right to religious autonomy. The First Amendment "protect[s] the right of churches and other religious institutions to decide matters 'of faith and doctrine' without government intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012)). The "general principle of church autonomy" protects a religious institution's "independence in matters of faith and doctrine and in closely linked matters of internal government." *Id.* at 747. The principle "does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission." *Id.* at 746.

Here, Defendants' actions do not involve CCIEC's internal management decisions. They involve CCIEC's decision not to provide certain contraceptive and related referral and case management services to its external clients. The religious autonomy principle is not implicated here.

* * *

In summary, CCIEC has not demonstrated a substantial likelihood of success on its religious exercise claim. The Court is not persuaded that strict scrutiny applies. And MDHHS's decision satisfies rational-basis review. It is rationally related to the government's interest in allocating public funds to meet the purposes for which they were intended. In this case, MDHHS determined that WSS and EWS programs should aid women with substance use disorder by identifying their family planning needs and actively assisting them with obtaining appropriate services as needed, both for the sake of the woman undergoing treatment and for the sake of preventing substance-exposed births. MDHHS then reasonably determined that CCIEC's Core Values pledge prevents CCIEC from satisfying those requirements.

**2. Free Speech**

CCIEC claims that Defendants' policies and conduct abridge its right to freedom of speech. "The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018). That freedom includes the right to speak one's views and the right not to be compelled to speak messages with which one disagrees. *Id.*

CCIEC argues that Defendants compelled its speech in two ways: (1) by conditioning funding upon changes to CCIEC's policy and (2) by requiring CCIEC to affirmatively disclose that it cannot provide certain services. But the first does not count as compelled speech. MDHHS did not deny CCIEC funding based on its speech or require it to change its speech. Instead, it denied funding based on CCIEC's practices that were directly related to the WSS and EWS programs. That decision did not hinge on CCIEC's protected speech. The "government may impose 'conditions that define the limits of the government spending program'"; it cannot "seek to leverage funding to regulate speech outside the contours of the program itself." *Brown v. Yost*, 133 F.4th 725, 740–41 (6th Cir. 2025) (quoting *Agency for Int'l Dev. v. Alliance for Open Society*

*Int'l, Inc.*, 570 U.S. 205, 214–15 (2013)). Removing CCIEC's funding for not meeting program requirements falls under the first category and is permissible.

As to the disclosure requirement in Mid-State's Charitable Choice procedure, that requirement was not the basis for MDHHS's funding decision, so it did not cause any identifiable harm to CCIEC. In summary, CCIEC has not shown a substantial likelihood of success on its free-speech claim.

**3. Charitable Choice Act**

CCIEC also argues that Defendants violated the Charitable Choice Act. As discussed above, that Act prohibits states from discriminating against religious organizations (i.e., organizations that have a "religious character") when distributing Substance Use Block Grants; those organizations are to be considered for funding "on the same basis as other nongovernmental organizations." 42 U.S.C. § 300x-65(b)(2). The state cannot require such an organization to "alter its form of internal governance" or to "remove religious art, icons, scripture, or other symbols." *Id.* § 300x-65(c)(2). The religious organization must be permitted to "retain its independence" by maintaining "control over the definition, development, practice, and expression of its religious beliefs." *Id.* § 300x-65(c)(1). The Charitable Choice Act permits an organization to enforce its rights through a civil action for injunctive relief against the agency or official that allegedly violated the statute. *Id.* § 300x-65(h).

For reasons discussed, CCIEC does not have a substantial likelihood of success on its claim that Defendants discriminated against it on the basis of its religious character. Instead, MDHHS determined that CCIEC did not qualify for funding because it could not provide the required services. There is no evidence that MDHHS applied its policies to CCIEC in a manner different from the way it applied them to other nongovernmental organizations. The Charitable Choice Act

does not require states to modify their generally applicable program requirements to accommodate religious entities.

Also, Defendants did not require CCIEC to alter its internal form of governance or to relinquish control over the practice and expression of its religious beliefs. Thus, CCIEC does not have a substantial likelihood of success on its claim under the Charitable Choice Act.

**4. Due Process**

CCIEC claims that Defendants deprived it of its right to procedural due process by withdrawing its funding designation without notice, a hearing, and sufficient explanation. When faced with a such a claim, the Court engages in a "two-part inquiry." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). The "first question asked . . . is whether a life, liberty, or property interest within the meaning of the Due Process Clause is implicated in the case." *Walker v. Hughes*, 558 F.2d 1247, 1250 (6th Cir. 1977). "If such an interest is present, then the second question for resolution is what process must be granted before the person can be deprived of the protected interest." *Id.*

CCIEC asserts a property interest in its designation as a WSS and EWS provider. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). The person must "have a legitimate claim of entitlement to it." *Id.* "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*

Defendants argue that no property interest exists because, as a general matter, medical providers "do not have a property interest in continued participation" in federal health care

programs like Medicare and Medicaid, even where the loss of participation causes "financial loss," because the providers are "not the intended beneficiaries" of those programs and the government has not clearly promised a right to participation. *Parrino v. Price*, 869 F.3d 392, 398 (6th Cir. 2017). Likewise, CCIEC is not the intended beneficiary of the funds at issue in this case, which are used to pay for services provided by CCIEC to women with substance use disorders. CCIEC does not adequately respond to this argument.

CCIEC argues that its interest stems from its contract with Mid-State to provide substance use disorder treatment services. But nothing in that contract protects CCIEC's designation as a qualified provider of services. Indeed, the contract expressly contemplates immediate termination in the event that funds are not available. CCIEC offers no other basis for concluding that it has a legitimate expectation of entitlement to its designations. Accordingly, its claim is unsupported.

CCIEC also asserts that it has a liberty interest in operating its ministry without arbitrary government interference. But Defendants did not deprive CCIEC of that interest. Instead, MDHHS determined that CCIEC did not qualify for funding for certain substance use disorder services. CCIEC can continue to operate its ministry and exercise its religious rights without funding.

CCIEC also claims that MDHHS's requirements are too vague. Because "clarity in regulation is essential to the protections provided by the Due Process Clause," *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012), "an enactment is void for vagueness if its prohibitions are not clearly defined," *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The vagueness inquiry asks whether a regulation "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously

discriminatory enforcement." *Fox Television*, 567 U.S. at 253 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

The Court is not persuaded that MDHHS's policies are so standardless or vague that they failed to provide sufficient notice or that they encourage discriminatory enforcement. As indicated, the policies plainly require a client-centered approach to assessing client needs (including family-planning needs), referral to appropriate services, and active assistance with managing clients' care across multiple providers. And here, CCIEC's Core Values pledge plainly prevents it from fulfilling these requirements. Accordingly, CCIEC has not shown a substantial likelihood of success for its due process claim.

**C. Other Injunction Factors**

Though there is a "presumption of irreparable harm" for a violation of constitutional rights, CCIEC has not shown a substantial likelihood of success on its constitutional claims, so it is not entitled to that presumption. *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). At any rate, CCIEC asserts that it continues to serve its two existing clients using its own funds, though it contends it is harmed because its capacity to serve other clients is diminished and it cannot fill an open staff position. (Verified Compl. ¶¶ 204-06.) But its potential clients' inability to receive services from CCIEC is not harm to CCIEC. And even accepting that the loss of funding constitutes irreparable harm, rather than a monetary injury for which there is an adequate remedy at law, the other factors do not weigh strongly in CCIEC's favor. There is little evidence that others would be substantially harmed in the absence of an injunction. CCIEC is apparently able to continue supporting clients with its own funds. The public interest might be served by requiring Defendants to continue funding CCIEC's programs so that CCIEC can serve additional clients, but Defendants are better positioned to determine how their funds should be used for the public's benefit. And any harm to CCIEC or others is not sufficient

to overcome CCIEC's weak showing on the likelihood of success. On balance, the equities do not favor preliminary injunctive relief. Accordingly, the Court will deny the motion for a preliminary injunction.

## IV. DISMISSAL STANDARD

Also before the Court are Defendants' motions to dismiss the complaint for failure to state a claim.[13] Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint may be dismissed for failure to state a claim if it fails "to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.

When considering a motion to dismiss under Rule 12(b)(6), courts "construe the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true." *Parrino*, 869 F.3d at 397. The court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to

[13] Though Mid-State seeks summary judgment in the alternative, the Court will construe its motion solely as one for dismissal under Rule 12(b)(6). The Court will not convert it to a motion for summary judgment.

defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).

## V. DISMISSAL ANALYSIS

### A. Claims

#### 1. Free Exercise and Religious Autonomy (Counts I, V)

For reasons discussed above, CCIEC does not state a plausible claim under the Free Exercise Clause. The Court's conclusion does not change when looking solely at the complaint and its exhibits. Meier's affidavit provides more context for the timing of Mid-State's decision to investigate CCIEC, but even without that evidence, the complaint lacks facts that would plausibly suggest that Defendants' actions were motivated by religious hostility, or that Defendants targeted CCIEC for its religious beliefs or treated it differently from secular providers with regard to the WSS and EWS designations.

Setting aside Smith-Butterwick's declaration that Nessel was not involved in MDHHS's decision to revoke the WSS and EWS designations, CCIEC's allegations regarding Nessel's involvement are vague and conclusory. CCIEC provides no facts to support its assertions about her approval or ratification of MDHHS's decision. (*See* Verified Compl. ¶¶ 18, 192.) Thus, Nessel's statements do not provide support for hostility by Defendants. And for reasons discussed, neither do Mid-State's stated concerns about CCIEC's ability to provide "objective, non-judgmental client support." In context, that statement was not hostile. And CCIEC's assertion that there were procedural irregularities is not supported because MDHHS was not a party to the contract on which CCIEC relies, and that contract does not guarantee notice and a cure period when CCIEC loses its eligibility for funds.

Also, Mid-State's decision to investigate was plainly reasonable. Though CCIEC alleges it has provided services consistent with its beliefs for many years, it does not contend that it has

always refused to refer clients to sources that provide contraceptive services, with Defendants' knowledge. In fact, the meeting notes attached to the complaint suggest otherwise. They state that the Core Values pledge was signed "in late 2024." (Meeting Notes, PageID.84.) Those same notes also indicate that Mid-State was concerned about "recent leadership and staffing changes," including the need for the new supervisor of the EWS program to have adequate "training and credentials." (*Id.*) Those apparently recent developments undermine CCIEC's assertion that Mid-State's (and MDHHS's) investigation was motivated by hostility toward CCIEC's religious beliefs.

In addition, the complaint and its exhibits (which include MDHHS's WSS and EWS policies, CCIEC's Core Values pledge, and MDHHS's discontinuation letter) reveal the reasons for MDHHS's decision. Those reasons are grounded in MDHHS's generally applicable policies for providing WSS and EWS services, not CCIEC's religious identity or beliefs. CCIEC's complaint offers no plausible basis for concluding that MDHHS treated CCIEC differently from other providers because of CCIEC's religious affiliation. It does not plausibly allege that MDHHS grants, or has express discretionary authority to grant, exceptions to its WSS and EWS requirements. It provides no examples of other WSS/EWS providers who continue to receive funding despite their objection to, and inability to offer referral assistance for, services required by MDHHS's policies. CCIEC alleges that secular providers are allowed to continue operating as WSS and EWS providers "despite limiting the provision of certain services for secular reasons" (Verified Compl. ¶ 273), but this allegation is too vague to support a plausible claim of discriminatory treatment because it does not identify any such providers or specify what services

are limited and to what extent.[14] Thus, it is impossible to discern whether such limitations make the secular providers comparable to CCIEC.

The complaint also makes clear that MDHHS was responsible for revoking CCIEC's WSS and EWS designations, not Mid-State. The complaint provides no plausible basis for concluding that Mid-State was involved in that decision or that the decision stemmed from CCIEC's refusal to comply with Mid-State's new Charitable Choice procedure, which targets religious organizations. CCIEC apparently argues that the timing of MDHHS's decision suggests it was motivated by CCIEC's refusal to comply with Mid-State's procedure. But MDHHS raised its concerns about compliance with its policies at the meeting *before* Mid-State adopted that procedure. And at that meeting, CCIEC confirmed its stance that it could not refer clients for contraceptive services (other than natural family planning and abstinence). (*See* Verified Compl. ¶ 131.) MDHHS subsequently sent CCIEC a letter discontinuing the WSS and EWS designations. The letter did not mention Mid-State's Charitable Choice policy; it mentioned only the WSS and EWS requirements regarding contraceptive methods and referrals for appropriate care.

Also, it is unclear whether MDHHS was even aware of CCIEC's refusal to comply with Mid-State's new policy or of CCIEC's suggested alternative. And even if MDHHS had been aware of them, CCIEC's proposed notice would have confirmed that CCIEC could not provide the active referral assistance required by MDHHS's policies (and federal regulations).

Moreover, for reasons discussed above, the facts alleged in the complaint do not plausibly suggest that Defendants interfered with CCIEC's religious autonomy. Defendants did not interfere with CCIEC's internal management decisions. Thus, none of CCIEC's arguments for strict

[14] CCIEC does not contend that secular providers who have limits on what services they can provide are unable to actively assist clients with receiving those services from other providers.

scrutiny apply here. And MDHHS's decision plainly satisfies rational basis review. Thus, CCIEC does not state a plausible free exercise claim.

**2. Due Process (Count II)**

CCIEC's due process claim fails because it does not adequately identify a property or liberty interest that was subject to deprivation by Defendants. CCIEC was not deprived of a liberty interest in its right to practice its religion. And it does not identify a basis for its asserted property interest "in its contracts and continued participation in the [WSS and EWS] programs." (Verified Compl. ¶ 237.) Though its contract with Mid-State is not attached to the complaint, the Court can consider the contract provided by Mid-State because it is mentioned in the complaint and essential to CCIEC's claim. As discussed, that contract does not give CCIEC a right to continued designation as a WSS or EWS provider. Moreover, MDHHS's policies are not unconstitutionally vague.

**3. Free Speech (Count III)**

CCIEC does not state a free-speech claim because MDHHS's decision does not impair its right to speak or compel it to speak. At most, that decision impacts CCIEC's speech incidentally based on constitutionally permissible requirements for participating in MDHHS's funding programs. To the extent CCIEC challenges the disclosure requirements in Mid-State's Charitable Choice procedure, those requirements were not the cause of the injury suffered by CCIEC, i.e., its loss of WSS and EWS designations and associated loss of eligibility for funding for certain substance use disorder services to women.

**4. Charitable Choice Act (Count IV)**

CCIEC does not state a claim under the Charitable Choice Act because it is not plausible to infer that MDHHS's designation decision was based on religious discrimination. In addition, as discussed above, Defendants did not improperly exert control over the definition, development,

practice, or expression of CCIEC's religious beliefs. To the extent CCIEC challenges the disclosure requirement in Mid-State's Charitable Choice procedure, injunctive relief would serve no purpose because that requirement is not the reason for CCIEC's loss of its WSS and EWS designations.

**5. Equal Protection Clause (Count VI)**

CCIEC's claim under the Equal Protection Clause is effectively a reiteration of its claim of religious discrimination. CCIEC contends that Defendants treated it differently from other similarly-situated providers solely because of CCIEC's religious character and beliefs. That claim fails for reasons discussed above with respect to Count I.

**6. Retaliation (Count VII)**

CCIEC claims that Defendants retaliated against it for exercising its constitutional rights by excluding it from the WSS and EWS programs. But the complaint does not allege facts plausibly suggesting that the adverse action CIEC suffered (the loss of its WSS and EWS designations and associated funding) was motivated by CCIEC's protected conduct, i.e., the exercise of its freedom of speech and its religious beliefs. Instead, the complaint demonstrates that it lost these designations because it cannot provide the services required by state policies.

**B. Specific Defendants**

**1. Nessel**

"As with all § 1983 claims brought against an individual officer, personal involvement in the alleged constitutional violation is a prerequisite to liability." *Alford v. Deffendoll*, 165 F.4th 490, 496 (6th Cir. 2026). "Section 1983 liability of supervisory personnel 'must be based on more than the right to control employees.'" *Sexton v. Cernuto*, 18 F.4th 177, 185 (6th Cir. 2021) (quoting *Griffith v. Franklin County*, 975 F.3d 554, 579 (6th Cir. 2020)). "[T]here must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way

directly participated in it." *Id.* (quoting *Doe v. Claiborne County*, 103 F.3d 495, 511 (6th Cir. 1996)) "An official cannot be held liable for the constitutional violations of subordinates under a theory of *respondeat superior*[.]" *Venema v. West*, 133 F.4th 625, 633 (6th Cir. 2025). And there must be a "causal relationship between the government official's actions and the alleged constitutional violation." *Sexton*, 18 F.4th at 185. A plaintiff must allege "some active unconstitutional behavior on the part of the supervisor . . . that is directly correlated with [its] injury." *Venema*, 133 F.4th at 633 (quoting *Essex v. County of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013)) (cleaned up).

As discussed above, CCIEC's allegations about Nessel's approval and ratification of legal guidance relied upon by MDHHS are vague and conclusory. They are not sufficient to state a claim against her. CCIEC insists that "[p]rospective relief against Defendant Nessel is needed because her office's ongoing legal guidance and enforcement position continue to constrain the Department and cause Cristo Rey's exclusion." (Verified Compl. ¶ 18.) This assertion is also unsupported by any facts. Unlike the cases cited by CCIEC, *see Child Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826 (6th Cir. 2024); *Right to Life of Mich. v. Nessel*, No. 1:26-cv-390, 2026 WL 2117175 (W.D. Mich. July 10, 2026), this case does not challenge the Michigan Attorney General's prospective enforcement of a law, so there is no reason to include Nessel as a defendant for the purpose of injunctive relief under § 1983 or the Charitable Choice Act. In short, CCIEC fails to state a claim against Nessel, which is another basis for dismissing the claims against her.

**2. Hertel**

CCIEC's only pertinent allegations about Hertel are that she "directed, supervised, or authorized" both MDHHS's investigation into CCIEC and the decision to discontinue its designation as a WSS and EWS provider. (Verified Compl. ¶ 15.) Like the allegations against Nessel, these allegations lack facts to support their conclusory assertions. Indeed, CCIEC alleges

that Smith-Butterwick is in charge of the MDHHS division "responsible for administering the Substance Use Block Grant funds for [MDHHS]." (*Id.* ¶ 17.) And Smith-Butterwick issued the letter discontinuing the WSS and EWS designations. (*Id.*) That being the case, it is not clear why CCIEC believes Hertel was personally involved in Smith-Butterwick's actions. In effect, CCIEC is attributing respondeat superior liability to Hertel for Smith-Butterwick's conduct, which is not permissible under § 1983. Or perhaps CCIEC is speculating that Hertel was involved, which is not sufficient to state a plausible constitutional claim against her. And the Court discerns no reason to keep Epkey, Hertel's successor, as a defendant in her official capacity for the purpose of injunctive relief under § 1983 or the Charitable Choice Act when Smith-Butterwick, the responsible MDHHS employee, is already a defendant in her official capacity. Thus, the Court will dismiss the claims against Hertel and Epkey for these additional reasons.

## VI. MOTION TO STRIKE

As part of their motion to dismiss, Defendants MDHHS, Hertel, and Nessel ask the Court to strike the allegations in the complaint about Nessel's public statements regarding CCIEC's predecessor and opponents of abortion. "Rule 12(f) allows a court to 'strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.'" *Operating Eng'rs Loc. 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015) (quoting Fed. R. Civ. P. 12(f)). "Motions to strike are viewed with disfavor and are not frequently granted." *Id.*

The Court declines to strike Nessel's statements. They are not so scandalous or impertinent that the Court should strike them. Nessel herself broadcast these statements to the public, and at least one statement was thoroughly discussed by the court in the *Buck* case. Defendants argue that the statements are irrelevant, but that issue is more properly addressed through dismissal of the

claims against Nessel, rather than through a motion to strike. Consequently, the Court will deny this request.

**VII. CONCLUSION**

In summary, CCIEC is not entitled to a preliminary injunction, so the Court will deny its motion for one. The Court will also grant Defendants' motions to dismiss and dismiss the complaint for failure to state a claim. But the Court denies Defendants' motion to the extent it asks to strike allegations in the complaint.

An order and judgment will enter consistent with this Opinion.

Dated: November 12, 2026

/s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE